**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

**RICHARD JORDAN**                                                          **PETITIONER**

**VS.**                                                    **CIVIL ACTION NO.: 1:05CV260KS**

**CHRISTOPHER EPPS, Commissioner,**
**Mississippi Department of Corrections and**
**JIM HOOD**                                                                **RESPONDENTS**

---

## MEMORANDUM OPINION AND ORDER

### Introduction.

Richard Gerald Jordan was convicted of capital murder in the Circuit Court of Harrison County. He has had two trials on guilt and sentence – one in 1976 and one in 1977. He has had two additional sentencing trials – in 1983 and 1998. The 1998 sentence is currently before the court on a habeas petition.

### Facts of the crime.

Jordan was charged with capital murder in the course of a kidnaping. In 1976, after he discovered that she was the wife of a commercial loan officer at Gulf National Bank, he kidnaped Edwina Marter from her home. Jordan gained entry to the home by pretending to be a utility worker and then, at gunpoint, forced Marter to leave her sleeping three-year-old child. He had Marter drive to a secluded area in the woods north of Gulfport, where Jordan shot Marter in the back of the head with a single bullet, killing her. He then threw the gun into the Big Biloxi River.

After killing Edwina Marter, Jordan called her husband, Charles Marter, demanding a ransom. After two aborted attempts to deliver the money, Marter ultimately dropped it off on the side of Interstate 10 the next day after his wife was kidnaped. Officials had been alerted to the

situation, and two officers saw Jordan take the money. They chased Jordan's vehicle until he ran them off the road, after which Jordan abandoned his vehicle, bought new clothes, and attempted to flee the area. He was discovered in a cab at a road block and arrested.

Jordan confessed to the kidnaping shortly after his arrest, and he told officers where they could find Mrs. Marter. It was not until they found Mrs. Marter's body that law enforcement realized she had been killed. She was found face-down on a slight slope in the woods. David Melton, an investigator with the Harrison County Sheriff's Department, was at the scene when the body was found, and he was asked to lead the investigation. Another investigator from the Sheriff's Department, Bob Allbritton, was with Melton at the scene. Jordan also showed officers where they could find the murder weapon, and he led them to his discarded shirt and pants. Finally, Jordan took the officers to the place where he had hidden the ransom money.

Later that afternoon, Jordan was taken before a county judge for an initial appearance, where he asked to be represented by counsel during future proceedings. The FBI declined to prosecute the case, turning it over to state authorities. After Jordan was returned to his cell, Allbritton learned that his office would be taking the lead in the case, so he went to the jail to take Jordan's photograph and fingerprints. Unaware of the earlier proceedings before the county judge, Allbritton asked Jordan if he would talk to him about the crime. After being advised of his rights (apparently for the fifth time that day), Jordan gave a statement, which was later repeated on tape. The taped statement was subsequently transcribed, but Jordan refused to sign it. Jordan was ultimately tried and found guilty of capital murder in the course of a kidnaping and was sentenced to death.

**Procedural history of Jordan's cases.**

Jordan has been tried four times, and the details of those trials are more fully set out below.

**The 1976 trial.**

At his first trial, Jordan was represented by Earl Denham and Rhett Russell, and Albert Necaise and Joe Sam Owen were the prosecutors. The case had been moved from Harrison County to Jackson County, and Judge Darwin Maples presided. Prior to the trial, defense counsel moved for a psychiatric examination, and Jordan was examined by personnel from the Gulf Coast Mental Health Center, including Dr. Clifton B. Davis. On March 3, 1976, Dr. Davis's office mailed his report, as well as the intake report conducted at the facility, to Rhett Russell. The intake report contains the following information that was reported by Jordan:

> Upon graduation from high school in August, 1964, Mr. Jordan enlisted in the U.S. Army. He was charged with check forgery in 1964 and was told that these charges would be dropped if he consented to join the Army, which he did. He was court-martialed in 1970 for falsification of official documents and was sentenced to 9 months in Leavenworth. He received a dishonorable discharge from the Army in August 1971.

Dr. Davis's report also contains other information that Jordan related to him, including Jordan's version of the kidnap and murder, which he reported included an accomplice, who was the man who actually shot Marter. According to Dr. Davis, "He then explained that the FBI was more or less responsible for the woman's death since they blundered the job in following instructions. He comments that he is sorry that she was killed but then shrugged this off by saying "better luck next time." Dr. Davis concluded that Jordan had an antisocial personality, but that he was competent to stand trial.

Prior to the change of venue, Judge Floyd Logan held a competency hearing, in which Dr. Davis testified for the defense. The question of whether Jordan's discharge was honorable or

dishonorable was the subject of much debate in the fourth trial, but it was not discussed at this hearing. The basis of the questioning was his diagnosis of antisocial personality and whether that condition would prevent Jordan from fully understanding the gravity of the charges against him. The underlying information given to Davis was not examined. Rhett Russell, one of Jordan's attorneys, also testified that Jordan seemed unusually detached and unaware of the seriousness of his situation. However, he presented no evidence indicating that the information reported by Davis was inaccurate. The trial court ruled that Jordan was competent to stand trial. Dr. Davis did not testify at the 1976 trial, or any trial thereafter. However, these reports are relevant to this habeas petition because they were relied on by the psychiatric expert who examined Jordan prior to the 1998 trial.

David Melton, who investigated the crime scene where Mrs. Marter's body was found, testified briefly at the first trial. He was not questioned at all about his investigation of the crime scene, but was called solely to establish the chain of custody for evidence that had been taken to the FBI's crime lab in Washington, D.C. The actual photographs of Marter's body as it was found at the crime scene were introduced through Agent Watts of the FBI.

Both Jordan's initial statement to Agent Watts and his later statement to Deputy Allbritton were admitted into evidence. In both statements, Jordan stated that he shot Mrs. Marter accidentally while she was attempting to escape from him. That was the theory of the murder that was recounted in the closing arguments of both sides.

Jordan was tried under then-existing law, where, after he was found guilty of capital murder, he was automatically sentenced to death. He moved for a new trial. During the time that the motion was pending, the Mississippi Supreme Court issued its opinion in *Jackson v. State*, 337 So. 2d 1242

(Miss. 1976), in which it mandated a bifurcated proceeding in capital murder cases. Based on that decision, Judge Maples granted the motion for a new trial.

**The 1977 trial**.

The 1977 trial occurred after the law changed to require the jury to analyze both aggravating and mitigating circumstances before imposing a sentence. Jordan was again represented by Denham and Russell, and Necaise and Owen prosecuted the case. The case was heard before Judge Maples, who adopted the pretrial rulings from the first trial, both those made by Judge Logan and by himself.

Jordan was convicted of capital murder on, essentially, the same evidence as before. During the sentencing phase, the State offered new evidence as to the manner of Marter's killing in order to show that she was shot execution-style, which was used as an aggravating circumstance. Dave Melton did not testify at all during the guilt phase; however, during the sentencing phase of the trial, the state attempted to introduce testimony from Melton regarding blood spatters that he had observed at the murder scene.

Melton wrote a twenty-page investigative report, which was not introduced at any trial, but was given to defense counsel during discovery. With regard to the appearance of the body when it was found, Melton's report relates:

The body was observed as follows: (by investigators MELTON and ALBRITTON)

>    White-female
>    Brown, frosted hair
>    Sandal-type shoes
>    Greenish-yellow, reptile skin-type coat
>    Faded jeans
>    Rings (jewelry) on some fingers
>    Appeared to have a bullet wound to the back of the head

The body was positioned as follows:

> Face straight down
> All limbs completely extended
> Ankles crossed
> Palms up
> Lying in a north-to-south direction with top of head pointed approximately south

> There was a great deal of blood drainage from the head down a very slight incline on the ground (away from the head (southerly)). By the left shoulder there appeared to be keys on a ring lying on the ground. Also on the ground nearby were two "inside" gum wrappers and a green Kleenex-type tissue.

Additionally, after the coroner arrived and turned Marter's body over, Melton made the following notes:

> The body was found to have a large wound to the center of the forehead that appeared to be a gunshot exit wound. The face was covered with blood and the face appeared "distorted" from having been against the ground for a number of hours. Lividity was present. In addition to the clothing previously described, it was now possible to see a white blouse.

Although Melton's report described in detail the scene in which Marter's body was discovered, it completely failed to note any blood spatters at the scene. Nonetheless, Melton was prepared to testify at trial that he observed blood spatters at the scene and that, based on his training and experience, they indicated that Marter was not running away when she was shot, but kneeling in front of Jordan. This evidence was to be offered as an aggravating circumstance. Based on the *Jackson* opinion, the trial court excluded that evidence, finding it improper because it was not offered during the guilt phase. However, Dr. Atchison, the pathologist who conducted Marter's autopsy, testified during the guilt phase as to the cause of death and the path of the bullet, which he described as traveling "upward." Despite this limited testimony as to Marter's position at the time she was killed, both Owen and Necaise were permitted to argue to the jury that she was on her knees when she was shot.

Jordan offered evidence in mitigation, including character testimony from both his family and friends. As stated earlier, Dr. Davis, the psychiatrist who had earlier examined Jordan, did not testify, nor was his report offered into evidence. Some of Jordan's witnesses mentioned his military service, and both of his parents testified that he had been honorably discharged.

After about an hour of deliberation, the jury reported that it was deadlocked, with one juror unable to reach a decision. However, the jury was sent back to continue to deliberate, and, approximately forty-five minutes later, announced its decision that Jordan should receive the death penalty. Jordan's conviction and sentence were upheld by the Mississippi Supreme Court. He filed a habeas petition in this court, which was denied, but the Fifth Circuit granted habeas relief on grounds of an improper instruction. *Jordan v. Watkins*, 681 F.2d 1067 (5th Cir. 1982).

### The 1983 trial.

In 1983, Necaise and Scherry Leshieur from the Harrison County District Attorney's office prosecuted the case, along with Joe Sam Owen, who appeared as a special prosecutor. The order appointing Owen states that it was done at the family's request, as well as the request of the District Attorney, "in order to facilitate the trial." The order also states that "the Defendant has no objections to this appointment." Jordan was represented by Joseph Hudson, Earl Stegall, and James Kilbreth of Washington, D.C.

At this trial, Dave Melton was permitted to testify about the blood spatters that he had observed in his initial investigation. Melton's expertise was based on a week-long blood stain evidence course with Dr. Herbert MacDonnell. According to Melton, the high velocity blood stains that he found behind Marter's body indicated that she was not running when she was shot. On cross-examination, Melton opined that Marter could have been shot while she was on her knees.

Dr. Atchison augmented his earlier testimony with his opinion that the gunshot wound to Marter's head was a "near wound" – that is, that the gun was somewhere between 30 inches and four feet from her head when it was fired. (He apparently used the phrase "near wound" in his original autopsy report, which was not admitted into evidence until the 1998 trial.) Atchison also testified that the trajectory of the bullet suggested that she could have been kneeling, with her head bowed, or that it was possible that she was running away. After that testimony, Judge Maples granted a defense motion to reimburse a pathologist to testify on Jordan's behalf. The defense later presented testimony from Dr. Roland Sampson to the effect that it was impossible to determine from Dr. Atchison's autopsy report the distance from which Marter was shot.

At this trial, Jordan offered substantial mitigation evidence, including his own testimony, in which he stated that he was honorably discharged from the military. Jordan's brother, Robert, also testified, telling the jury that they were both in Vietnam, but that, when they discovered that two brothers did not have to serve in the country at the same time, Jordan re-enlisted so that Robert could return to the States. Jordan also offered testimony from his former attorney, Rhett Russell, to the effect that he had invented a device that converted wind energy into electrical power, in which the Tennessee Valley Authority had shown some interest. The trial court did not permit Russell to testify before the jury, however.

Jordan was again sentenced to death, and the sentence was affirmed by the Mississippi Supreme Court, but reversed and remanded by the United States Supreme Court on grounds that Jordan was impermissibly limited in presenting mitigation evidence, citing *Skipper v. South Carolina*, 476 U.S. 1 (1986). The Mississippi Supreme Court remanded the case to the trial court for another sentencing trial. Despite the reversal of his death penalty, Jordan again attempted to appeal his

underlying conviction, both in state and federal court, on grounds that his statement to Allbritton was wrongfully admitted in contravention of *Michigan v. Jackson*, 475 U.S. 625 (1985). This court denied his habeas petition as successive, as the issue had been presented in his earlier habeas petition and rejected, but the Fifth Circuit granted a certificate of probable cause for an appeal.

Before that appeal could be considered, however, Jordan entered into a plea bargain with the state, in which he agreed to accept a sentence of life without parole in return for his promise not to collaterally attack that sentence. At that time, Jordan was represented by Joseph Hudson, who had represented him in the 1983 trial, along with Rob McDuff. In accepting that plea, Joe Sam Owen, still acting as special prosecutor, signed a document titled "Stipulated Circumstances Mitigating Against the Death Penalty for Richard Gerald Jordan." That stipulation contained ten reasons supporting a life sentence, including Jordan's prison record, his expressions of remorse, and his military service and honorable discharge. During a hearing on the guilty plea, Owen repeated those reasons as justifying his offering Jordan a plea bargain.

In 1994, the Mississippi Supreme Court issued its opinion in *Lanier v. State*, 635 So. 2d 813 (Miss. 1994), invalidating a plea agreement to life without parole for a crime committed before that sentence was an option for a defendant who was not convicted as a habitual offender.[1] Shortly after that decision was issued, Jordan filed a motion to amend or correct his sentence, asking that the court apply *Lanier* to reduce his sentence to life imprisonment by deleting any reference in the plea agreements not to seek parole. The Mississippi Supreme Court, in an unpublished opinion, vacated

---

[1]*Lanier* has been partially overruled by *Twillie v. State*, 892 So. 2d 187 (Miss. 2004), which held that a prisoner who committed a crime prior to the effective date of the new sentencing statute may nonetheless plead to a sentence of life without parole after the effective date, so long as he waives his *ex post facto* rights.

Jordan's sentence, but ruled that the prosecutor could seek the death penalty in a subsequent proceeding. *Jordan v. State*, No. 95-KP-113SCT (Miss. July 17, 1997).

**The 1998 trial.**

Circuit Court Judge Kosta Vlahos presided at Jordan's fourth trial, at which Joe Sam Owen acted as special prosecutor, on an appointment from the Attorney General of Mississippi. Owen's participation in the trial was challenged by Jordan by way of a pretrial motion that was denied by the trial judge. Jordan filed a motion offering to plead guilty in return for a sentence of life without parole, thereby waiving any *ex post facto* challenge to the application of that sentence, and he testified to that effect at a hearing on that motion. The motion was denied, Judge Vlahos concluding that he had no jurisdiction to accept that sentence in the absence of a waiver of the death penalty by the State. (*Twillie*, which would have permitted the plea, had not yet been decided.)

Tom Sumrall and Waide Baine represented Jordan, and their competence is an issue in this habeas petition. In particular, Jordan argues that they were inadequately prepared for trial because they did not review the records of the previous trials. The record shows that Sumrall was appointed on August 28, 1997. In December, he moved the court for additional time to file motions because he had just recently acquired the transcripts of the previous proceedings, but had not had time to review them. During the hearing on that motion, Sumrall stated that he had transcripts of previous trials, but had not been given any work files by the attorneys.

Both before and after trial, it was obvious that the attorneys were confused about the location, or even existence, of the complete record of prior trial proceedings. In particular, the attorneys state at various times during the 1998 proceedings that the 1976 trial record was missing or lost. The procedural history of the case likely caused some of that confusion – because the 1976 trial was not

appealed beyond the trial court, no appellate record was made. Instead, the 1976 transcript was included as an exhibit to the 1977 transcript, and the two trials are contained in one Mississippi Supreme Court record as case number "DP-8." Absent a careful review of that record, an attorney might not be aware that this case actually contained the transcripts of two trials. However, the prosecutor stated that the evidence to be used in 1998 was essentially the same as was used in the 1983 trial, and defense counsel may have relied on that statement to neglect to review prior transcripts.

Prior to trial, Jordan moved for a psychiatric examination, primarily to determine whether he suffered from post-traumatic stress syndrome, due to his military service. Jordan had also filed a motion to be present at all proceedings, and that motion was granted. However, a hearing on the motion for a psychiatric examination was held in chambers, with the prosecutor participating by telephone, and the record states that Jordan's presence at the hearing was waived by his attorney. The State did not object to a psychiatric examination, but argued that it was entitled to a copy of the examiner's report, pursuant to Ms. Cir. Ct. R. 9.04. The trial judge ordered that the report be submitted to the court, with the understanding that it would be disseminated to both sides unless the defense found authority to the contrary. Ultimately, Jordan was examined by Dr. Henry A. Maggio, and his report was furnished to both sides.

Maggio's report contains a long recitation of Jordan's history, as provided by Jordan, including his statement that he served for eight years in the military on active duty, until he was honorably discharged. However, Maggio also reviewed the earlier intake report and Dr. Davis's report (the prosecutor was requested by defense counsel and directed by the court to make those documents available to Maggio), and his assessment of Jordan's story is as follows:

Review of the previous intake interview and psychiatric evaluation reveals a consistency of some of the history; however, there are moments of inconsistency in which Mr. Jordan previously acknowledged that he had a always been a good con man. He has done a number of illegal activities but had not been caught except on one or two occasions; that he had been fired or asked to resign because of embezzlement of $43,000.00 that while he was under financial pressures he wrote bad checks and then was searching for a way for quick money at which time he considered bank robbery with kidnaping and extortion and had worked out the plan himself. He then readily blames the F.B.I. more or less for the woman's death shrugging it off by saying "better luck next time." He apparently displayed little remorse, held the F.B.I. responsible, no overt sadness. The review also shows that he joined the Army in 1964 and had been charged with check forgery and agreed to join the Army so the charges would be dropped. He was also court martialed in 1970 for falsification of official documents and sentenced to 9 months in Leavenworth. He received a Dishonorable Discharge from the Army in 1971. All of this is in contrast and contradiction to what he told me when he denied having any difficulty with authority figures, having an Honorable Discharge from the military and being a good guy prior to this murder and has been a good guy since then while he's in prison.

Maggio diagnosed Jordan as having Antisocial Personality Disorder, but concluded that he was competent to stand trial. Maggio further concluded:

The mitigating evidence that he may want to introduce is 1) Post-Traumatic Stress Disorder of which there is no clinical evidence to substantiate that he did have symptoms of a Post-Traumatic Stress Disorder and 2) the issue of dangerousness. He actually appeared to be a danger to himself and others prior to being in the military, while he was being in the military, and after he got out of the military. He would portray himself as being a really fine, upstanding citizen who has been a good guy and helped people all of his life and would continue to do so if he got out of jail. The evidence seems to be quite the contrary. He is a self-proclaimed con artist, all of his life offers excuses for his behavior and does not take responsibility for his behavior. In addition, he seemed to show no remorse for the crime that he has committed. If, in fact, he is doing all of these good works while he's in jail, then that is a good thing for him to do but one is led to the conclusion that he's only doing it because he is in jail and to paint a good picture of himself.

Jordan filed a motion in limine prior to trial to prevent the use of Maggio's report. During the trial, the court held a hearing on that motion, outside the presence of the jury, and Jordan testified. He told the court that he thought that he was coming to court on the day that Maggio was appointed to examine him, but he was not transported, so he found out through a telephone call from his

attorney that Maggio had been appointed. Jordan went on to state that he was unaware that Maggio's report would be provided to the prosecution.

At that point, the prosecution had not planned to use Maggio's report in its case in chief, but did plan to use the report to cross-examine defense witnesses, and intended to introduce the report, and, possibly, Maggio's testimony on rebuttal. By the time of this trial, many of the earlier witnesses had died, and the defense intended to read their prior testimony, which would have precluded live cross-examination. Therefore, a ruling on the motion in limine was deferred until such time as the State used the report or called Maggio to testify.

Several of Jordan's earlier character witnesses, including his parents, had died by the time of this trial, and their prior testimony was read into the record. Later, the defense called Richard Luther King, a boyhood friend of Jordan's to testify about Jordan's good character, including his military service. When Owen proposed to cross-examine King with material in Dr. Maggio's report, the jury was excused. A lengthy argument followed, during which the court and the attorneys were obviously confused about whether Dr. Davis's testimony or his report were ever offered to the jury at Jordan's first trial. Finally, the trial judge stated:

> "[I]t seems to me that if this were in place and has been in place since 1976, there's plenty of fair opportunity to test the creditworthiness of it. And for the reasons stated in *Buchanan* and *Wilcher*, the Court is of the opinion that the proffer in that area can be developed from this witness in the light that it was presented in cross-examination; and that specific area being his military record and his statement to the jury about his dangerousness.

Owen then cross-examined King before the jury and asked him to read Maggio's report. King was then questioned about his reaction to Jordan's statement, quoted in Dr. Davis's report, that the F.B.I. was to blame for Marter's death, and "better luck next time." Owen asked King if he knew anything about Jordan's discharge from the military, and King said that he did not. He was also questioned

about Jordan's work history, but he knew nothing about that, either. Finally, after a limiting instruction from the judge following a bench conference, Owen asked King whether he thought Jordan was a danger to himself or others before or after his military service, and King answered, "No."

After this testimony, another lengthy discussion occurred between counsel and the court regarding the use of the Maggio report. The defense wanted a definitive ruling from the court on how the report could be used, and whether Maggio could testify, before deciding whether to call other character witnesses or Jordan himself to the stand. Again, there was confusion as to whether Davis had actually testified in front of the jury in the earlier trial, and the judge notes at one point that he would be "more secure" in ruling that the report was admissible if he knew that it had been presented to a jury during the guilt phase. He deferred ruling on the report until he could review it, and, ultimately, ruled that Maggio could not testify at the rebuttal stage unless Jordan took the stand during the defense's presentation.

Following this ruling, Jordan's attorney announced that he was not going to call two of his listed witnesses, due to the potential of their being cross-examined on the basis of Maggio's report. Then, four prison employees testified as to Jordan's good behavior without cross-examination. The fifth employee was cross-examined only as to the privileges that Jordan enjoyed as a trusty. At the end of their case, Jordan's attorneys announced that some potential mitigation evidence, including short stories that Jordan had written, as well as his testimony, would not be presented. While the court was questioning Jordan about that decision, the prosecutor announced that he would not call Dr. Maggio, even if the stories were admitted or Jordan testified; however, Jordan declined to take the stand. Three of the four short stories were offered into evidence, and the defense rested.

On rebuttal, the prosecutor made a proffer of Maggio's expected testimony and moved that his report be admitted into evidence. Another lengthy argument followed, during which the court and counsel again expressed some confusion as to the use of Davis's testimony in the earlier proceedings, and the prosecutor attempted to get part of the record from the Mississippi Supreme Court Clerk's office during trial. When he was unable to do so, he withdrew his motion to offer the report into evidence, although he still intended to include his questioning of King as part of his argument. When the defense argued that any such statements would be inappropriate in light of the lack of evidence to support them, the prosecutor finally stated that he would not make that argument. In fact, the only mention of Owen's cross-examination of the mitigation witnesses was the statement that Jordan had abused and misused his position as a trusty to obtain certain privileges while in prison. Defense counsel argued Jordan's military service in Vietnam as a mitigating factor, and it was also included as a possible mitigating circumstance in an instruction. In rebuttal, Owen stated merely, "Ladies and gentlemen of the jury, this stuff about Richard in Vietnam is all you heard. There is no evidence about what he did there or particularly what he did after he got out." The jury returned a verdict sentencing Jordan to death. The Mississippi Supreme Court affirmed the conviction on direct appeal, *Jordan v. State*, 786 So. 2d 987 (Miss. 2001), and again after post-conviction review. *Jordan v. State*, 912 So. 2d 800 (Miss. 2005). Jordan then filed this petition for habeas relief.

## STANDARD OF REVIEW

The standard of review that a federal court applies to a state court decision under habeas review is contained in 28 U.S.C. § 2254. It provides:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under this provision, where the state court adjudicates the petitioner's claim on the merits, this court reviews questions of fact under § 2254(d)(2), while questions of law or mixed questions of law and fact are reviewed under § 2254(d)(1). Factual findings are presumed to be correct, and the reviewing court defers to the state court's decision regarding factual determinations unless the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000); 28 U.S.C. § 2254(d)(2).[2] The court independently reviews questions of law and mixed questions of law and fact to determine whether the state court's decision thereon was either "contrary to" or an "unreasonable application of" federal law. *Williams v. Taylor*, 529 U.S. 362 (2000); *Williams v. Puckett*, 283 F.3d 272 (5th Cir.2002); *Hill v. Johnson*, 210 F.3d at 485.

For purposes of this analysis, "federal law" is determined by the Supreme Court of the United States, and this Court must determine whether the state court's decision was "contrary to" or "an unreasonable application of" that established federal law. *Williams*, 529 U.S. at 378, 406; § 2254(d)(1). Clearly established federal law is that which exists at the time of the state court

---

[2]The Supreme Court has expressly reserved ruling on whether the provisions of § 2254(e)(1), which accord a presumption of correctness to state court findings that can only be overcome by clear and convincing evidence, applies to all fact findings, or only those extrinsic to the state court record. *Wood v. Allen*, ___ U.S. ___, 130 S. Ct. 841, 849 (2010).

conviction. *Id*. at 412; *Smith v. Spisak*, ___ U.S. ___, 130 S. Ct. 676, 681 (2010). A state court's

adjudication of a claim is *contrary to* clearly established federal law "if the state court applies a rule

different from the governing law set forth in [the Supreme Court's] cases or if it decides a case

differently than [the Supreme Court has] on a set of materially indistinguishable facts." *Bell v. Cone*,

535 U.S. 685, 694 (2002). A state court's application of the correct legal precedent to the particular

facts of a petitioner's case will be an *unreasonable application* of the law if it identifies the correct

federal law but unreasonably applies it to the facts, unreasonably extends the correct legal principle

to a new context where it should not apply, or unreasonably refuses to extend the principle to a new

context where it should apply. 529 U.S. at 406. The term "unreasonable," was distinguished in

*Williams* from "erroneous" or "incorrect"; thus, a state court's "incorrect" application of the law may

be permitted to stand if it is, nonetheless, "reasonable."

## ANALYSIS

**Ground A**: **Petitioner was denied his rights guaranteed by the Eighth and Fourteenth Amendments as a result of prosecutorial vindictiveness and/or the trial court's refusal to sentence Petitioner to life imprisonment without possibility of parole.**

Jordan claims that Owen engaged in prosecutorial misconduct by seeking the death penalty

in the 1998 trial after earlier agreeing to let him plead to life without parole. He argues that Owen

sought the death penalty to "punish" Jordan for appealing the earlier sentence. The Mississippi

Supreme Court addressed this issue in its opinion on Jordan's appeal of the 1998 trial. That court

cited four reasons for denying relief:

> First, Jordan neither filed a motion for rehearing nor collaterally attacked our 1997 ruling that the life imprisonment deal Jordan made with Owen was void and that, upon remand, the State could seek the death penalty. Therefore, the 1997 ruling is unassailed, and Jordan's claim of prosecutorial vindictiveness is barred by res judicata. Second, it was this Court which authorized Owen to seek the death penalty upon resentencing. Therefore, the enhancement of the sentence was attributable to

> our independent assessment of the suitable penalty, not to prosecutorial vindictiveness. [Cite omitted.] Third, the Supreme Court, in *Alabama v. Smith*, 490 U.S. 794, 795, 109 S.Ct. 2201, 2203, 104 L.Ed.2d 865 (1989), [found] . . . that the presumption of prosecutorial vindictiveness does not apply when a sentence imposed after trial is greater than that previously imposed after a guilty plea.

*Jordan*, 786 So. 2d at 1001. Finally, the court held that it was the jury, having been properly instructed on aggravating and mitigating circumstances, as required by law, that actually imposed the death penalty. "The statutory safeguards in place in capital cases assured that the jury operated without the taint of prosecutorial vindictiveness." *Id*. at 1002.

Jordan supports his argument by citing to *North Carolina v. Pearce*, 395 U.S. 711 (1969) and *Blackledge v. Perry*, 417 U.S. 21 (1974). In *Pearce*, the defendant had successfully appealed his conviction, but was retried, found guilty, and sentenced by the court to a longer term than that originally imposed. The Supreme Court held that a defendant should not be punished for exercising his constitutional right to appeal by facing an enhanced punishment if he is successful. The court held that, in the absence of an affirmative statement of the reasons for the enhanced sentence, vindictiveness would be presumed, in violation of the defendant's right to due process. In *Blackledge*, the defendant appealed a misdemeanor conviction, entitling him to a trial *de novo*. The prosecutor then indicted him for a felony offense arising out of the same conduct. The issue there was prosecutorial vindictiveness, not in the imposition of sentence, but in the substitution of a felony charge for a misdemeanor. Rather than establishing a presumption, the Court simply held that the substitution of charges in that situation was not constitutionally permissible.

Since those decisions, their ambit has been significantly narrowed by the Court. In *Chaffin v. Stynchcombe*, 412 U.S. 17 (1973), the Court held that the imposition of a more severe sentence by a subsequent jury, uninformed of the previous sentence, did not violate due process guarantees. In

reaching that decision, the Court found that, unlike a judge re-trying a case after being reversed, a jury "will have no personal stake in the prior conviction and no motivation to engage in self-vindication." *Id*. at 27. Later, in *Bordenkircher v. Hayes*, 434 U.S. 357 (1978), the Court held that a prosecutor may bring additional charges against a defendant who refuses to plead guilty, as long as that possibility was part of the plea bargaining process. The Court recognized that the give and take negotiating process that is part of the plea bargain is substantially different from the State's unilateral imposition of a penalty; therefore, the threat of additional charges, as an inducement to plead guilty, does not violate the Constitution. *Id*. at 362-64.

Finally, in *Alabama v. Smith*, 490 U.S. 794 (1989), the defendant was indicted for three offenses arising out of the same incident, but had agreed to plead guilty in exchange for the prosecution's dropping one count of the indictment. After he succeeded in having his plea vacated, the defendant went to trial on all three charges before the same trial judge, receiving a substantially increased sentence. The Court refused to apply the presumption of vindictiveness, even where the same judge imposed both sentences, holding that the additional information that the judge learned during trial supported the enhanced sentence.

In this case, Jordan had already been sentenced to death three times, once by a judge, then by two different juries. Clearly, the possibility of the death penalty was on the table during the plea negotiations. In order to avoid that penalty, Jordan agreed to plead guilty and accept a life sentence, agreed not to seek parole or pardon, and agreed to refrain from any collateral attack on his sentence or the contemporaneous agreement. Jordan not only failed to perform his end of the bargain, but, by successfully vacating his agreed-upon sentence, he returned to the Circuit Court in the same position that he originally found himself. The prosecutor did not substitute a different charge for the charge

that was originally imposed, nor did he seek a different penalty than that originally sought. Jordan was not sentenced by the judge who heard his guilty plea, but by a jury that was not told that he was originally sentenced to death.

Jordan has failed to show that the state court's opinion was contrary to, or an unreasonable application of, clearly established federal law, based on the facts of his case. For this reason, he is not entitled to habeas relief on this issue.

> **Ground B**: **Petitioner's right to due process as guaranteed by the Fourteenth Amendment was violated by the appointment of a special prosecutor with a conflict of interest, especially since the trial court refused to disqualify the prosecutor, failed to require reasons for the special prosecutor's appointment, and by failing to limit the special prosecutor's authority.**

In his direct appeal, Jordan attacked the appointment of Owen as special prosecutor, arguing that the State had failed to show a need for the appointment. As an initial matter, the court held that the appointment process required approval of the trial judge, which had occurred in Jordan's case. *Jordan v. State*, 786 So. 2d at 1011. Jordan also argued that the District Attorney for Harrison County abdicated control over the prosecution, in violation of his due process rights, by permitting Owen exclusively to make the decision of whether to seek the death penalty in his trial. The court denied relief on direct appeal, stating, "While Jordan presents a compelling argument about the conflicts that can arise in having an attorney who takes a personal interest in the case prosecute a criminal action, there is no limit on an Attorney General's ability to appoint same. Owen therefore acted with proper authority." *Id*. In its review of Jordan's post-conviction petition, where the issue was raised again, the court found that the claim was procedurally barred, but that Jordan had, in any event, failed to offer any evidence to support it. *Jordan*, 912 So.2d at 822.

On habeas review, the federal court's ability to grant relief arises only when a state court has issued an opinion that is contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). The United States Supreme Court has never explicitly delineated the permissible extent of a special prosecutor's powers, although it has held that the injection of personal interests into a prosecution may raise constitutional questions. *Marshall v. Jerrico*, 446 U.S. 238, 249-50 (1980). Later, the Court held that, while a special prosecutor may be appointed to prosecute a criminal contempt case, the appointment of a prosecutor whose client has a financial interest in the underlying litigation is improper. *Young v. U.S. ex rel. Vuitton et Fils, S.A.*, 481 U.S. 787, 790 (1987). The Fifth Circuit has held that, where a special prosecutor is appointed to the case, the district attorney must retain control over the prosecution. *Faulder v. Johnson*, 81 F.3d 515, 517-18 (5th Cir. 1996); *East v. Scott*, 55 F.3d 996, 1001 (5th Cir. 1995). Control is not determined by participation in the day to day conduct of the trial, but by determining who makes key decisions in the prosecution. Those decisions include whether to prosecution, whom to prosecute, the investigative powers to utilize, the penalty to seek, and the plea bargain to offer. *Faulder*, 81 F.3d at 517.

In its opinion on direct appeal, the Mississippi Supreme Court held that Jordan had not proved that the district attorney relinquished control over the prosecution, noting, "either the District Attorney himself or one of his assistants were present with Owen during most of the pre-trial hearings and at trial." 786 So. 2d at 1012. That opinion was repeated on post-conviction review. 912 So. 2d at 822. While these decisions misread *Faulder* in relying on the operational conduct of the trial, rather than decision making, it does not unreasonably apply United States Supreme Court precedent, since there is none. *See Thaler v. Haynes*, ___ U.S. ___, 130 S. Ct. 1171, 1173-74 (2010).

21

Moreover, even focusing on the decision making process of seeking the death penalty, Jordan has not established prosecutorial vindictiveness. As stated earlier, the death penalty was sought in all four proceedings against Jordan, including the third trial, where Owen participated as special prosecutor with Jordan's agreement. It was the Mississippi Supreme Court that authorized the prosecution to seek the death penalty during the fourth trial. Finally, Owen was not a "private prosecutor," in the sense that he was hired and paid by an interested party. Instead, he was appointed by the Mississippi Attorney General, pursuant to statutes that give him unlimited power to do so. Miss. Code Ann. §§ 7-5-5 and -7 (1972). For all of these reasons, Jordan has not established a claim of prosecutorial vindictiveness that is cognizable on habeas review, and he is not entitled to relief on this issue.

**Ground C**: **Petitioner was denied his right to due process of law guaranteed by the Fourteenth Amendment when the prosecution knowingly presented false and unreliable testimony about blood spatters and other details about the shooting.**

This issue relates to the blood spatter evidence offered by David Melton. As discussed earlier, the evidence does not appear in Melton's original report, nor did Melton testify to it during the first trial. The court refused to allow him to testify about it during the second trial, as it was only on sentencing. Melton finally testified about these spatters during the third and fourth trials. In that testimony, he stated that he found blood spatters around Marter's body that indicated that she was stationary when she was shot. The inference was that Marter was shot execution-style, supporting the State's theory of an aggravating circumstance.

After the third trial, Melton's testimony was raised as an issue on appeal, with Jordan arguing that the trial court erred in refusing to allow his counsel to voir dire Melton on his credentials. The Mississippi Supreme Court held that, because the decision to allow expert testimony is discretionary with the trial court, the record did not indicate that permitting Melton to testify was reversible error.

*Jordan v. State*, 464 So. 2d 475, 486 (Miss. 1985). Although noting that the proper procedure is to permit voir dire by opposing counsel, the court found that the extensive cross-examination on Melton's qualifications cured any prejudice.

Melton's qualification as an expert was raised again in the appeal of the fourth trial, and the Mississippi Supreme Court again denied relief. *Jordan*, 786 So. 2d at 1017. In this appeal, Jordan argued that Melton was not properly qualified as an expert, thereby making his opinion testimony inadmissible. The basis for the argument was Melton's testimony as to the position of Marter's body when she was shot and when she was discovered, which Jordan argued crossed the line into forensic evidence, a subject on which he was not qualified to give an expert opinion. The court rejected the argument, stating, "Dr. William D. Atchison, a qualified forensic psychologist, testified as to whether Edwina was kneeling or standing or running or stationary. Therefore, if allowing Melton to testify as to the position of the body was error, it was harmless error." *Id.*

The court reviewed this argument again in its decision on post-conviction relief. *Jordan*, 912 So. 2d at 809. At this point, Jordan had changed his argument to include the claim that he brings here – that the prosecutor knowingly presented false or misleading evidence to the jury. With regard to Jordan's challenge to Melton's credentials, the court held that the issue had been litigated twice, and Jordan was procedurally barred under Mississippi law from raising it again on the theories previously raised, or on any other legal theory. *Id.* On the issue of false testimony, the court characterized Jordan's claim as "attempting to rephrase the issue [of Melton's testimony] as a knowing presentation of false or misleading evidence, but the underlying claim is the same one that has already been addressed and found to have no merit." *Id.*

Despite the procedural bar, the court reached the merits of both issues, finding, first, that Melton's training qualified him to give blood spatter opinion testimony. *Id.* Turning to the issue of false testimony, the court held that the standard to be applied to the claim was whether Jordan "demonstrated a reasonable likelihood that David Melton's testimony on blood spatter evidence resulted in a death sentence . . . ." *Id.* Because Jordan had been sentenced to death on two previous occasions in which this testimony was not presented, the court found no merit to this claim. However, because the court found that the testimony did not prejudice Jordan, it never reached the question of whether it was, indeed, false.

Jordan argues here that the blood spatter testimony was "false" because "it is doubtful that there ever was any blood spatter evidence." Attached to his petition for post-conviction relief is an affidavit from Herbert MacDonnell, who conducted the seminar on blood spatter evidence that Melton attended. MacDonnell reviewed the evidence presented at trial and reached a conclusion different from Melton's, which Jordan argues establishes the falsity of Melton's testimony. Jordan also bases his assertion that Melton's testimony was false on these additional allegations: Melton failed to record any observations about the blood spatters; he did not take photographs of the spatters; he did not test the material that he observed to see if it was actually blood; and he did not conform his analysis to accepted methodology in this field. However, with the extensive size of the exit wound, it would have been practically impossible for there not to be blood spatters.

Had Jordan only argued that Melton should not have been treated as an expert witness, he could not succeed – the admissibility of evidence is an issue of state law, not ordinarily cognizable on habeas review. *Lockett v. Anderson*, 230 F.3d 695, 709 (5th Cir. 2000); *Passman v. Blackburn*, 652 F.2d 559, 568 (5th Cir. 1981). As the Supreme Court has made clear, in the context of habeas

review, "mere errors of state law are not the concern of this court, unless they rise for some other reason to the level of a denial of rights protected by the United States Constitution." *Barclay v. Florida*, 463 U.S. 939, 957-58 (1983). A federal court considering a habeas corpus petition does not sit as a super state supreme court to review error under state law. *Bridge v. Lynaugh*, 838 F.2d 770 (5th Cir. 1988). *See also Derden v. McNeel*, 978 F.2d 1453, 1460 (5th Cir. 1992).

Because Jordan recast his argument to make a federal constitutional claim, and because the state court reached this claim on the merits, this Court must consider it also. To show his entitlement to habeas relief, Jordan cites several Supreme Court cases that he contends were contravened by the Mississippi Supreme Court's post-conviction decision. In the earliest such case, *Mooney v. Holohan*, 294 U.S. 103 (1935), the state did not contest the petitioner's claim that his conviction resulted from perjured testimony, but argued that there was no remedy in state court. 294 U.S. at 111-12. The Supreme Court disagreed, but, noting that the petitioner had not filed a habeas petition in state court, held that the state's argument was unpersuasive and denied the petition without prejudice. In *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959), a witness who had been given a promise of leniency by the district attorney testified at trial that there had been no promise made, an allegation that was not contested by the state on post-conviction review. The Court held that the due process violation caused by the knowing presentation of false testimony is grounds for relief even if the evidence went to the credibility of a witness, rather than the guilt of the defendant. In *Miller v. Pate*, 386 U.S. 1 (1967), the Court granted habeas relief after a pair of men's underwear that had been repeatedly referred to in a trial for sexual assault and murder as "bloody" were determined to actually be stained with paint – a fact that the prosecutor later admitted was known by "everyone" at trial. *Id.* at 6. In *Alcorta v. Texas*, 355 U.S. 28, 30-32 (1957), the prosecutor advised a key witness to avoid admitting

that he was having an affair with the murdered wife of the defendant. Finally, *United States v. Agurs*, 427 U.S. 97 (1976), held that the prosecution must turn over exculpatory material when there has been no request for it, unless the non-disclosure "'did not influence the jury, or had but a very slight effect.'" *Id*. at 112 (quoting *Kotteakos v. United States*, 328 U.S. 750, 764 (1946)).

To establish entitlement to habeas relief on this issue, Jordan must show that: (1) Melton's testimony was false or perjured; (2) Melton's testimony was material to Jordan's conviction or sentence and (3) the prosecution knew that Melton's testimony was false or perjured. *May v. Collins*, 955 F.2d 299, 315 (5th Cir. 1992) (citing *Giglio v. United States*, 405 U.S. 150, 153-54 (1972)). Ideally, once the Mississippi Supreme Court determined it would reach the merits of this claim, it would have applied this test and made all of the appropriate findings. Instead, it reached only the second part of the test, finding no prejudice. As a basis for that finding, the state court noted that Jordan had been twice sentenced to death without the use of blood spatter evidence. 912 So. 2d at 809. Without citing any authority, Jordan asserts that this holding is entitled to no deference, stating, "Those unconstitutional proceedings cannot serve as the benchmark for assessing the prejudice of errors at the 1998 resentencing." He also maintains, "[E]very standard for assessing an error's potential prejudice must be made in reference to the evidence and other circumstances present in the case at hand, not another proceeding." However, none of the cases that he cites in support of that proposition[3] declares that to be the law. In fact, each of these cases involves a petitioner who has been subjected to only one trial. Having reviewed these cases, the Court can only find one reference that remotely supports this assertion. In *Strickland*, when discussing how a reviewing court should assess an attorney's performance, the Court discourages a comparison of one attorney's tactics to

---

[3]*Kyles v. Whitley*, 514 U.S. 419 (1995); *Brecht v. Abrahamson*, 507 U.S. 619 (1993); and *Strickland v. Washington*, 466 U.S. 668 (1984).

those of an attorney in a different matter, saying "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690. This language would not preclude a comparison of two different trials of the same case. Later, in his rebuttal brief, Jordan argues that the burden is on Respondents to show that "there was no likelihood that the error affected the verdict." He cites *Agurs*, 427 U.S. at 103, for that proposition. A review of that case yields no holding that would shift the burden to the state to show lack of prejudice. On the contrary, Jordan has the burden of establishing the three elements necessary to a *Giglio* claim. *Chambers v. Johnson*, 218 F.3d 360, 363-64 (5th Cir. 2000).

Under the law, this Court can grant habeas only if it finds that the state court's opinion is contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254 (d). The Mississippi Supreme Court held that Melton's testimony was not material in the sense that there was no reasonable likelihood that the evidence affected the jury's imposition of the death penalty. This was an accurate assessment of federal law on the issue of materiality in this context. *Giglio*, 405 U.S. at 154 (quoting *Napue*, 360 U.S. at 271). The state court based its holding on a comparison of the trial where Melton did testify to the two previous trials where he did not, all which of resulted in the death penalty. Jordan has not shown that this analysis is contrary to or misapplies clearly established law. This Court may have reached a different result on this issue, but, in the absence of unambiguous precedent from the United States Supreme Court, this Court cannot "overrule a state court for simply holding a view different from its own . . . ." *See also Thaler*, 130 S. Ct. at 1173-74; *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

Because the Mississippi Supreme Court failed to reach the issues of whether Melton's testimony was false and, if so, whether the prosecutor knew that it was false, this Court must conduct a *de novo* review of those issues. *Rompilla v. Beard*, 545 U.S. 374, 390 (2005). Having reviewed the record in this matter and the applicable law, this Court finds that Jordan has failed to make an adequate showing on either issue. In the cases cited by Jordan that were discussed earlier, the falsity of the evidence presented by the prosecution was clearly established, often by the prosecutor's admission. *Agurs*, 427 U.S. at 112; *Miller*, 386 U.S. at 5-6 ; *Napue.* 360 U.S. at 269-70; *Alcorta*, 355 U.S. at 30-32; *Mooney*, 294 U.S. at 111-12. *See also In re Swearingen*, 556 F.3d 344, 348 (5th Cir. 2009) (expert witness who testified at trial executed an affidavit thereafter, stating that her opinion as to the time of death, which was central to the petitioner's alibi, would have been different if she had access to certain evidence withheld by the state.) Here, Respondents vigorously contest the issue of falsity, and this Court cannot conclude that Jordan's arguments establish any reason to believe that Melton's testimony was false.

None of Jordan's claims on this issue is persuasive. To the extent that Jordan's allegations attack Melton's methodology, they go to the issue of credibility. Although Jordan argues that the State should have "fully disclosed the bankruptcy of Melton's methodology," the alleged shortcomings in Melton's testing techniques were not hidden, but were as available to the defense as to the prosecution. Likewise, the fact that Melton's testimony was added to the prosecution's case after the first trial does not establish falsity. The cases cited earlier on the claim of prosecutorial vindictiveness use, as an example of a situation where an increased sentence would be permissible on retrial, a case where the prosecution strengthens its case and adds more evidence. *See, e.g., North Carolina v. Pearce*, 395 U.S. at 723. Finally, the fact that Jordan's expert disagrees with Melton's

conclusions does not establish that Melton's testimony was false. "Inconsistency of testimony among witnesses can as easily be explained as the result of faulty recollections or differences of opinions." *United States v. Washington*, 44 F.3d 1271, 1282 (5th Cir. 1995); *see also Kutzner v. Cockrell*, 303 F.3d 333, 337 (5th Cir. 2002) ("[I]t is not enough that the testimony is challenged by another witness or is inconsistent with prior statements."); *Chambers*, 218 F.3d at 364.

With regard to the prosecutor's knowledge of the alleged falsity of Melton's testimony, Jordan argues, "[T]he prosecution had to have known that the factual basis for Melton's testimony was unreliable and therefore should never have been presented." This allegation falls well short of establishing the prosecutor's knowledge that he was presenting false evidence. "Importantly, due process is not implicated by the prosecution's introduction or allowance of false or perjured testimony *unless the prosecution actually knows or believes the testimony to be false or perjured....*" *Kutzner*, 303 F.3d at 337 (emphasis added). Knowledge of falsity is not imputed to a prosecutor, even where witness committing the alleged perjury is a member of law enforcement. *Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990).

Jordan has not established that the Mississippi Supreme Court's decision that Melton's testimony was not material to the outcome of his case was contrary to, or an unreasonable application of clearly established federal law. Additionally, he has not convinced this Court that further inquiry is needed as to whether Melton's testimony was false or, if so, whether the prosecutor knew it was false. For all of these reasons, the Court is of the opinion that habeas relief is not available to Jordan on this issue.

**Ground D**:  **Petitioner was denied his right to the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments due to trial counsel's mishandling of the bogus "blood spatter" testimony.**

Jordan also argues, however, that his trial counsel in the fourth trial were ineffective in failing to realize that Melton would testify on this issue, and in failing to prepare for that testimony. This issue was considered and rejected by the Mississippi Supreme Court, although it caused some concern, as will be explained below. The record demonstrates a difference in length and tone between the cross-examination during the third trial and that of the fourth, which were defended by different attorneys. During the third trial, counsel asked about Melton's training, about his failure to note the spatters in his record, about the failure to find the bullet, and about the blood that would have been on Jordan's clothing if he had shot Marter from close range. The cross-examination during the fourth trial covered only the failure to find the bullet and the blood that should have been on Jordan's clothing.

In his petition for post-conviction relief, Jordan submitted an affidavit from one of his attorneys in the fourth trial – Tom Sumrall. In the section of the affidavit that describes his trial preparation, Sumrall states as follows:

> I had no factual knowledge of Mr. Jordan's prior trials and when we were in court setting a scheduling outline, I expressed concern about not having enough time to prepare for trial. Part of that concern was due to the voluminous transcripts that had been generated as a result of I believe four prior trials. However, that concern was alleviated by the statement of Joe Sam Owen, the special prosecutor in that case. He stated that he was going to track the 1983 trial with the exception of J. T. Francisco, the medical illustration [sic], and possibly some testimony from the family members concerning victim impact. Other than that, Mr. Owen assured that I could read the transcript and that was what they were going to use. I therefore focus [sic] primarily on the 1983 trial.

> I subsequently learned that some of the transcripts were missing or incomplete but I did receive a box full of transcripts from Joe Hudson, a prior attorney of Mr. Jordan's. I also had generous access to Joe Sam Owen's files and the transcripts that he had available. Mr. Owen made his files available for inspection in a conference room at his office to be used at my convenience. I remember going to his office on several different occasions and on at least one occasion I went there with Wade Baine

who was subsequently appointed as co-counsel and we reviewed the files. Any copies that I wanted, Mr. Owen's office provided for me.

Mr. Jordan had entered into a sentencing agreement at a prior time whereby he agreed not to seek parole in exchange for the prosecutor's agreeing not to seek the death penalty. I believe this was in 1999 and Mr. Jordan was represented by Robert McDuff and Joe Hudson at that time. I never spoke to Mr. McDuff nor did I ever review his files.

. . . .

At the resentencing trial in which I participated, Mr. Owen presented bloodspatter evidence from David Melton. This was a complete surprise to me because I had not been given prior notice that David Melton was being called as an expert witness. I knew David Melton and had known him for quite a few years and had known that he worked for the Sheriff's Department and had been involved in collecting evidence of crime scenes. I thought that Mr. Melton's testimony would pertain to what he learned as an investigator and not give expert testimony. I objected to his testimony at the trial on that basis and I was overruled. If I had known prior to trial that Mr. Melton would testify as a bloodspatter expert, I would have certainly requested funds to retain my own bloodspatter expert. I thought that this was a critical issue at the resentencing hearing because the prosecutor's theory of the case was that Jordan murdered the victim execution-style with her on her knees. It was our theory that the victim was running away when Jordan shot her. I thought that either way it would not make any difference as to the murder happening, but I thought that it was of critical importance because of the inflammatory effect that it might have on the jury if they believed it was execution-style as opposed to the victim running away.

The Mississippi Supreme Court's opinion denying post-conviction relief indicates that the court was "troubled by Jordan's defense counsel's confession that he failed to realize that blood spatter evidence would be presented. Certainly, Sumrall should have realized that such testimony was possible because Melton had testified on the subject in 1983. We find that Sumrall's performance was deficient on this point." *Jordan*, 912 So. 2d at 812. However, the court refused to find in Jordan's favor on the second part of the analysis for ineffectiveness – that he was prejudiced by the failure. *Id*. at 813, (citing *Strickland*, 466 U.S. at 684). The finding of no prejudice is based on the imposition of the death penalty twice before Melton was permitted to testify on this issue, Dr.

Atchison's testimony that the shooting was execution-style, and the defense's presentation in the 1998 trial of the opposing testimony of Dr. Leroy Riddick, also a forensic pathologist. Additionally, although not mentioned by the court, Jordan was sentenced to death in the 1983 trial despite a much more vigorous cross-examination by defense counsel.

Resolution of this issue requires a brief review of the role that Melton, blood spatter evidence, and the "execution" theory have played in the history of Jordan's case. At the 1976 trial, Melton, who investigated the crime scene where Mrs. Marter's body was found, testified briefly, apparently only to establish the chain of custody for evidence taken to the FBI's crime lab. Both of Jordan's statements were introduced, and, in each of them, Jordan stated that he shot Mrs. Marter accidentally while she was attempting to escape – a theory that both sides repeated in their closing arguments.

During the sentencing phase of the second trial, the State attempted to introduce blood spatter testimony from Melton to show that Marter was not running away when she was shot, but kneeling in front of Jordan. Based on the opinion in *Jackson v. State*, 337 So. 2d 1242 (Miss. 1976), in which the Mississippi Supreme Court set out the bifurcated procedure to be used in death penalty cases, the trial court excluded that evidence, finding it improper because it was not offered during the guilt phase. However, Dr. Atchison had testified during the guilt phase as to the cause of death and the path of the bullet, which he described as traveling "upward." Despite this limited testimony as to Marter's position at the time she was killed, both Owen and Necaise were permitted to argue to the jury that she was on her knees when she was shot.

At the third trial, Melton was permitted to testify about the blood spatters, which he said indicated that she was not running when she was shot and could have been shot while she was on her knees. Dr. Atchison added to his earlier testimony his opinion that the gunshot wound to Marter's

head was a "near wound." Atchison also testified that the trajectory of the bullet suggested that she could have been kneeling, with her head bowed, or that it was possible that she was running away. After that testimony, the trial judge granted a defense motion for a pathologist, and Dr. Roland Sampson later testified that it was impossible to determine from Dr. Atchison's autopsy report the distance from which Marter was shot.

The transcript of the fourth trial does not support Sumrall's statement that he was surprised. Prior to the most recent trial, his attorney, Tom Sumrall, made a request, pursuant to the Constitution of the United States, the Mississippi Constitution, and Miss. Unif. R. Cir. and Cty. Ct. Prac. 9.04, for discovery material, including a list of expert witnesses and their proposed testimony. The prosecution responded to the request with a pleading styled "State's Rule 9.04 Disclosures," that was, according to the Certificate of Service, hand delivered to Sumrall in February, 1998. A hearing was held about that same time, and this disclosure document was discussed by counsel and the trial judge. Under the section on expert testimony, the State identified David Melton as a proposed expert witness, with the following summary of his expected testimony:

> At the time of the crime, Mr. Melton was employed as an investigator for the Harrison County Sheriff's Department. Mr. Melton is expected to testify that he was present when the victim's body was located and the greatest amount of blood around or near the victim's body was at the head position. Mr. Melton may also testify that the very small droplets of blood found on the leaves indicated a high velocity blood stain behind the victim's body which would indicate that the victim was standing or kneeling when the shot was fired.

Two new experts were listed in the disclosure document, and Sumrall asked the court for funds to hire experts to examine their proposed testimony, stating "I didn't know this was coming up until today." The information about Melton was repeated in a Supplemental Disclosure hand delivered

to Sumrall a few months later. At about the same time, the State filed and served a Witness List, in which Melton was listed as an expert witness.

At trial, defense counsel made the following comment in his opening statement, "[I]t's the State's theory that it was an execution style murder. That Edwina Marter was on her knees when it happened. We will vigorously dispute that." Later, counsel argued over the admissibility of a photograph of Marter that showed the exit wound. Sumrall argued that it was unnecessary and inflammatory, noting, "And they have just gobs of evidence already as to how the crime was committed. They have exhibits to show the trajectory of the bullet. They have illustrations to illustrate it." Following the court's decision to admit the photograph, Dr. Atchison testified that the wound to Marter's head was inflicted from a distance of approximately two feet to thirty inches away. He also testified, through the use of a photograph, that the shot was fired while Marter was on her knees. Sumrall cross-examined Atchison extensively about his opinion, including the failure to find a bullet and the variance between this testimony and his previous testimony, where he said that it was "a possibility" that she was shot while in a kneeling position.

Just before Melton testified, the trial judge asked the prosecutor about the substance of his testimony. The prosecutor responded:

> He's going to take the stand and testify that he was involved in the investigation, that he was present when the autopsy was performed, and he also went to the scene of the crime on January 13, 1976. He's going to ID the photograph that is already in evidence. He will testify that Edwina Marter's body was found in the position as shown in Exhibit 13. He's going to testify as to where he observed the blood around the body. He's going to testify as to the position of the body. He's going to testify that in his opinion the blood stains were consistent with high velocity blood stains, and that in his opinion she was in a stationary position when she was shot.

The judge then asked defense counsel, "That doesn't catch you by any surprise, does it, Mr. Sumrall?" Sumrall replied, "No, sir. I don't think so." Melton took the stand and testified about his training, his observations at the murder scene, and his characterization of the blood stains as the result of "high velocity" wounds. It was not until he began to testify about the "blow back" reaction, where brain matter exits from the entry room, that defense counsel objected, on grounds that this testimony went beyond his expertise. The prosecutor announced an intention to move away from that testimony, and then he asked Melton to give his opinion on Marter's position when she was shot. Sumrall objected again, saying "I don't think this witness is qualified to testify to that. They have had a pathologist here." After an unrecorded bench conference, the judge overruled the objection, and Melton was permitted to testify that Marter was in a stationary position when she was shot. Sumrall's co-counsel cross-examined Melton and questioned him about his inability to find the bullet, which would be less likely if the bullet had actually been fired downward. He also asked about the failure to find blood stains on Jordan's closing. In his motion for a new trial, Jordan asserted that the court erred "in allowing Police Officer Melton to give an expert opinion for which no proper foundation was laid to show that he had any expertise relative to the matter to which he was testifying about."

Jordan's trial counsel also represented him on direct appeal. In his brief, he raised Melton's testimony as error; however, as in his motion for a new trial, the only basis mentioned to support the argument is the State's failure to properly qualify him as an expert. The Mississippi Supreme Court considered the issue on that basis. After reviewing Melton's qualifications to testify, the court held that Melton could give opinion testimony about the blood stains, but not in other areas of forensic

pathology. 786 So. 2d at 1017. However, since Atchison had the necessary qualifications and testified on that issue, the court held that any error was harmless. *Id*.

Different counsel represented Jordan during the post-conviction process, and those attorneys obtained an affidavit from Sumrall. In that affidavit, executed approximately five years after the trial, Sumrall described his pretrial preparation, stating that he was concerned about having enough time to read all of the material generated from the first three files. Since, at the pretrial hearing discussed above, the prosecutor told him that he "was going to track the 1983 trial," Sumrall used that record as his primary source of information. Because he did not have all of the material generated from the previous trials, Sumrall obtained documents from one of Jordan's prior attorneys, as well as Owen, himself. He did not, however, speak with attorney Rob McDuff, who, during post-convictions proceedings between the third and fourth trials, had obtained an affidavit from Herbert MacDonnell. MacDonnell is a well-known blood stain expert under whom Melton had received training. Sumrall believed he never saw this affidavit, which stated, in pertinent part:

> Based on Mr. Melton's testimony and description of the scene of the crime, I have substantial doubts about the conclusions reached by Mr. Melton. Specifically, Mr. Melton describes three separate areas covered by blood spatters, and testifies that he believes that all three areas were created from a single shot to a stationary victim. No single impact to a stationary victim could have created all the spatters described by Mr. Melton. In addition, Mr. Melton testified that high velocity blood spatters were present five to six feet from the victim, and also in the area near the victim's waist and thigh. High velocity spatters could not be present at both places. Moreover, Mr. Melton makes the questionable assumption in his testimony that spatters five to six feet from the victim's feet are back-spatters; two to three feet is the liberal maximum for back spatters. If Mr. Melton's description of the scene is accurate, given my years of experience and knowledge in the field of blood stain analysis, I would conclude that the victim probably was moving at the time she was shot.

In his affidavit, MacDonnell stated that these were his "initial impressions," based solely on Melton's trial testimony, and he further stated that he would want to review other material before "reaching firm conclusions."

After admitting that he had not seen this affidavit, Sumrall maintained that Melton's testimony was completely unexpected. The Mississippi Supreme Court relied on this affidavit in its findings on the issue of ineffectiveness, remarking that it was "troubled by Jordan's defense counsel's confession that he failed to realize that blood spatter evidence would be presented." Noting that Melton had testified on this subject in 1983, the court found that "Sumrall's performance was deficient on this point."

In this Court's opinion, the record in this case casts serious doubt on this finding, as it appears that Sumrall was aware of the substance of Melton's opinion testimony. As he was advised on two separate occasions by the State's disclosure, "Mr. Melton may also testify that the very small droplets of blood found on the leaves indicated a high velocity blood stain behind the victim's body which would indicate that the victim was standing or kneeling when the shot was fired." During his opening statement, Sumrall evidenced acute awareness of the State's execution theory. Immediately prior to Melton's taking the stand, Sumrall was advised by the prosecutor that Melton would "testify that in his opinion the blood stains were consistent with high velocity blood stains, and that in his opinion she was in a stationary position when she was shot." When specifically asked by the trial judge whether that testimony took him by surprise, Sumrall answered that it did not.

Additionally, the record indicates that Sumrall's only objection at trial was to the extent of Melton's expertise; he **never** indicated that he was surprised by the testimony, either at trial or in documents filed thereafter. His co-counsel conducted an adequate cross-examination of Melton that

did not indicate that the attorneys were surprised at his testimony. There is no evidence whatsoever that Melton's testimony surprised anyone prior to the 2003 affidavit obtained by post-conviction counsel. Given the time that elapsed between the trial and the execution of the affidavit, it is possible that trial counsel simply forgot the details surrounding Melton's testimony.[4]

The Mississippi Supreme Court's finding of deficient performance rests on less than a firm foundation. However, Respondents have not asked this Court to rule on this matter or indicated that the discrepancy between the affidavit and the record is of any concern. That being the case, the Court will defer to this finding that trial counsel's performance was deficient and proceed to the issue of prejudice.

Jordan contests the state court's opinion on prejudice on several grounds. First, he argues that the court's rulings are internally inconsistent, pointing out that, in an earlier decision, the court had used the evidence of an execution style killing to support the charge that the murder was "especially heinous, atrocious or cruel." *Jordan*, 786 So. 2d at 1004. He also argues that it was improper for the state court to compare Jordan's most recent trial with his earlier trials, stating, "Each trial stands on its own merits, and whatever assistance counsel renders at any capital trial must be judged in the context of what transpired in that trial, and that trial alone." He maintains that the state court's finding of no prejudice is "bizarre" when compared to its determination that the blood spatter testimony was "clearly an emotional and highly charged detail of Jordan's trials." Additionally, he challenges the court's finding that "there was enough evidence even without such testimony to convict Jordan twice before," as he is challenging the effectiveness of his counsel as to his sentence, not his conviction. According to Jordan, the court's comparison was a "faulty outcome determinative

---

[4]It appears that both of the attorneys who represented Jordan at trial are deceased.

analysis" in contravention of *Wiggins v. Smith*, 539 U.S. 510, 537-38 (2003) and *Williams v. Taylor*, 529 U.S. 362, 399 (2000). Moreover, Jordan claims, the court used an "enough evidence" standard that is contrary to the reasonable probability standard announced in *Strickland*. Finally, Jordan criticizes the court's finding that he had not provided sufficient detail as to his counsel's ineffectiveness when he argued that the blood spatter testimony was "central" to the prosecution's case.

In the context of ineffectiveness, a finding of prejudice requires more than simply determining that the blood spatter evidence was important to the State's case. The Mississippi Supreme Court had already determined that Melton could testify on this subject. *Jordan*, 464 So. 2d at 486. Thus, the question is not whether Jordan's most recent counsel was ineffective because the evidence was presented to the jury, but whether counsel could or should have ameliorated the evidence to the point where the jury might have viewed it differently. The Mississippi Supreme Court ruled in its post-conviction decision that there was no prejudice:

> In this petition, Jordan merely states that it was prejudicial and points out that the blood spatter testimony was central to the State's case. A meritorious claim of ineffective assistance of counsel requires more than the mere statement that the defendant was prejudiced and requires more than just the petitioner's allegations that this subject matter was central to the State's case. As we have noted, Jordan was convicted and sentenced to death twice before David Melton's blood spatter testimony was ever presented to a jury. While the blood spatter testimony is clearly an emotional and highly charged detail of Jordan's trials after 1983, there was enough evidence even without such testimony twice before.

912 So. 2d at 812-13.

As to Jordan's specific arguments on this issue, this Court finds that the state court's rulings are not internally inconsistent. Although the court had used the evidence of an execution style killing to support the charge that the murder was "especially heinous, atrocious or cruel," that finding could

have been made from Atchison's testimony, even without Melton's. The state court's finding of no prejudice is not "bizarre" when compared to its determination that the blood spatter testimony was "clearly an emotional and highly charged detail of Jordan's trials," since the court also found that "there was enough evidence even without such testimony to convict Jordan twice before." Additionally, Jordan was sentenced to death twice before the Melton bloodspatter evidence was admitted.

According to Jordan, the court's comparison was a "faulty outcome determinative analysis" in contravention of *Wiggins*, 539 U.S. at 537-38 and *Williams v. Taylor*, 529 U.S. 362, 399 (2000). However, *Wiggins* did not set forth a new standard of review, but repeated *Strickland*'s test for prejudice, "[T]o establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Wiggins*, 539 U.S. at 534 (quoting *Strickland*, 466 U.S. at 692. *Williams* used the same test. 529 U.S. at 399. Jordan has apparently focused on paragraph 28 of the state court's opinion, without reference to the next paragraph. This is *precisely* the test quoted by the Mississippi Supreme Court at the end of its discussion on this issue. 912 So. 2d at 813.

The Mississippi Supreme Court ruled in the appeal of the 1983 trial that Melton was qualified to testify as to his blood spatter observations and opinions. 464 So. 2d at 486. In its opinion on the direct appeal of this case, the court repeated that finding. 786 So. 2d at 1017. Therefore, even if counsel was surprised at the testimony, there is not a reasonable probability that further preparation would have kept Melton off the stand. Moreover, as the state court noted, Dr. Atchison had already testified on this issue. *Id.* Finally, this Court's review of the cross-examination that was conducted

evidenced enough preparation to challenge Melton's opinions on the blood spatter evidence. For all of these reasons, this Court is of the opinion that Jordan was not prejudiced within the meaning of *Strickland* by his counsel's performance in preparing for or handling Melton's testimony, and habeas relief is not available on this issue.

> **Ground E:** **Petitioner was denied his rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments by the admission of his statement to Officer Robert Allbritton**

Jordan has raised this issue on several occasions throughout the history of this case. It is based on the fact that Officer Allbritton[5] interviewed Jordan after an attorney had been appointed for him, but outside the presence of that attorney. These events occurred on the day that Jordan was taken into custody. Immediately following his arrest, Jordan was taken to the FBI office in Gulfport, where local police advised him of his *Miranda* rights. Jordan recited those rights from memory at the same time the officer read them. Shortly thereafter, an FBI agent advised him of his rights, after which Jordan executed a written waiver. During that interview, Jordan confessed to the crime, drew a map locating Mrs. Marter's body, and helped police find other evidence. Later that afternoon, Jordan was brought before a county judge and charged with capital murder. The following colloquy occurred:

> BY THE COURT: How old are you?
>
> BY THE DEFENDANT: Twenty-nine, sir.
>
> BY THE COURT: I see. Have you an attorney?
>
> BY THE DEFENDANT: No sir, I do not.
>
> BY THE COURT: Do you desire an attorney before you are arraigned?

---

[5]The investigator has been referred to in various pleadings and opinions alternatively as "Albritton" and "Allbritton." His report containing the statement that Jordan made to him spells his name "Allbritton," and he will be referred to as such in this Opinion.

BY THE DEFENDANT:  Yes, Your Honor.

BY THE COURT:  Have you the means to employ an attorney by yourself?

BY THE DEFENDANT:  No, Your Honor, I do not.

BY THE COURT:  Do you desire this Court to appoint an attorney for you?

BY THE DEFENDANT:  Yes, Your Honor, at this time.

BY THE COURT:  I see.  What do you mean, "at this time?"

BY THE DEFENDANT:  Maybe in the future I will be able to obtain, through relatives or something, one.

BY THE COURT:  I see.  You recognize the fact that you are here today so that you may have an immediate hearing.  Is that correct?

BY THE DEFENDANT:  Yes, Your Honor.

BY THE COURT:  But you desire now that the Court will make an appointment of an attorney for you before you have either the arraignment or a hearing in this case.  Is that correct?

BY THE DEFENDANT:  Yes, Your Honor.

BY THE COURT:  Now, Mr. Jordan, you have told the Court that you would rather not enter a plea to that charge, be arraigned on this particular charge, until you've had an attorney appointed.

BY THE DEFENDANT:  Well, Your Honor, I'll plead at this time.  I already know what my plea is going to be.

BY THE COURT:  Now, that's left with you, if you voluntarily desire to enter a plea, or the Court will appoint an attorney, and you can wait until you've conferred with the attorney before you enter your plea if you desire.

BY THE DEFENDANT:  Yes, I'll wait until I confer with him.

BY THE COURT:  All right, sir.

MR NECAISE:  Let me say, if Your Honor please, that the State of Mississippi is ready and can go forward today, at this time, with a preliminary hearing.

BY THE COURT:  I assume that that is a fact, and that's the reason why I want this defendant to know that he is entitled to that hearing if he desires it at this time, or you do have the right to pass that until you have an attorney, and that's what you desire to do?  Is that correct?

BY THE DEFENDANT:  I prefer to have the attorney here that –

BY THE COURT:  All right.  Does the defendant have anything further he would like to take up with the Court?

BY THE DEFENDANT:  Not at this time, your Honor.

BY THE COURT:  All right.  Your attorney will then confer with Mr. Necaise after this to ascertain when a hearing can be had if you desire one.  Do you understand that?  Is that correct?

BY THE DEFENDANT:  (The defendant nods, "Yes")

BY THE COURT:  All right.  That will be fine.  Under the circumstances this case is closed.

Later that day, the FBI informed local officials that the FBI would be turning over the case to them. Officer Allbritton, who was unaware that the court was appointing counsel for Jordan, found him at the county jail and asked Jordan if he would talk to him.  Jordan agreed to do so, Allbritton advised him of his rights, and Jordan gave the statement in question.

In its opinion on Jordan's first appeal, the Mississippi Supreme Court recognized that the statement given during that interview could be admitted only if the State had established a knowing and intelligent waiver of his right to remain silent.  *Jordan v. State*, 365 So. 2d 1198, 1202 (Miss. 1978).  The court then made the following findings:

In the present case there is no indication of illiteracy on the part of Jordan but, to the contrary, the record shows that he was a very intelligent individual who not only understood but could recite his rights.  There is no indication of any deliberate "shunting" of Jordan from one law officer to another.  Equally important is the fact that the circumstances surrounding Jordan's second confession (the disputed one) are quite different from the circumstances in *Abston*.  Prior to requesting counsel, Jordan had already admitted to FBI Agent Watts everything which he subsequently admitted to Allbritton.  Before the controversial confession to Allbritton and before requesting counsel, Jordan had already voluntarily directed the officers to the place where Mrs.

Marter's body was found, and pointed out other locations where critical items of physical evidence were located. By the time Jordan gave Allbritton the controversial confession attacked by the motion to suppress, he had been advised of his rights at least five times, had acknowledged that he understood them, and had even recited them as they were related to him. Moreover, both the tape recording and the transcript of the second confession show that Jordan did not mention that he had an attorney or wanted one. In this confession he acknowledged that he had neither been promised anything in exchange for his statement, nor threatened or intimidated. The facts here show that in making his statement to Allbritton, Jordan knowingly and intelligently waived both his right to counsel and his privilege against self-incrimination.

It is also clear that the disputed confession made by Jordan to Allbritton was merely cumulative of and not in any significant manner different from that to which he had already confessed to the FBI agent, Watts. By receiving the disputed confession, the jurors did not receive any evidence incriminating Jordan that was not already in evidence. Upon the record, we cannot say the trial court erred in overruling the motion to suppress the disputed confession or in admitting its contents into evidence.

*Id*. at 1203.

Following the denial of certiorari by the United States Supreme Court, Jordan petitioned this Court for habeas relief, apparently making the same argument. The habeas case was stayed pending the resolution of a petition for writ of error coram nobis (the predecessor to the petition for post-conviction relief). That petition was denied. *In re Jordan*, 390 So. 2d 584, 588 (Miss. 1980). After that denial, this Court denied Jordan's petition for writ of habeas corpus. (A citation to the District Court's unpublished decision is unavailable, due to the age of the case.) The denial was appealed to the Fifth Circuit, which affirmed the decision in part, and reversed and remanded it in part. *Jordan v. Watkins*, 681 F.2d 1067 (5th Cir. 1982). With regard to this issue, the Fifth Circuit affirmed this Court's decision. *Id*. at 1072-75. In reviewing the Fifth Amendment aspect of Jordan's claim, the court noted that, in the hearing where counsel was appointed, "Jordan never requested the assistance of counsel with respect to custodial interrogation; he merely told the judge that he would like

appointed counsel to assist him in further judicial proceedings." *Id*. at 1073. Thus, the court found, "Jordan's request for an attorney when he was brought before the court for arraignment was 'unrelated to the Fifth Amendment-based right to confer with or have counsel present before answering any questions.'" *Id*. at 1074 (quoting *Blasingame v. Estelle*, 604 F.2d 893, 896 (5th Cir. 1979)). The court further found that, after considering Jordan's age, intellect, and experience, as well as the fact that he had been advised of his Miranda rights at least four times before he made his statement, Jordan "made a voluntary, knowing and intelligent waiver of his fifth amendment rights." 681 F.2d at 1074.

Jordan also raised a Sixth Amendment claim, contending that his rights were violated by being interrogated outside the presence of his counsel. The court recognized that adversarial proceedings had commenced against Jordan by that time, thereby triggering his right to counsel. However, the court also recognized that, like the right to refrain from self-incrimination, the right to counsel could be waived. To establish such a waiver, the prosecution must prove that the right had been intentionally relinquished. *Id*. at 1075 (citing *Brewer v. Williams*, 430 U.S. 387, 404 (1977)). Based on the same circumstances that supported a finding that Jordan waived his Fifth Amendment rights, the court held that his Sixth Amendment rights had been likewise waived. Jordan did not petition the United States Supreme Court for further review of this decision.

Although it upheld the denial of habeas relief on this ground and affirmed his conviction, the Fifth Circuit reversed the denial of habeas relief on the sentence, on the issue of the sentencing instructions, thereby necessitating another sentencing trial, which was held in 1983. After the death penalty was again imposed, this issue – at least with regard to the Sixth Amendment claim – was considered by the Mississippi Supreme Court in its opinion on Jordan's direct appeal. *Jordan v.*

*State*, 464 So. 2d 475, 480 (Miss. 1985).  Noting that the argument had been raised and decided in the Fifth Circuit's previous opinion, the court stated, "We are of the opinion that the State met its burden [to prove waiver] with respect to Jordan and that question is now *res judicata*." *Id*.

Jordan filed a petition for writ of certiorari to the United States Supreme Court on three other grounds, but not the confession.  That Court vacated the death sentence and remanded the case in light of the holding in *Skipper v. South Carolina*, 476 U.S. 1(1986), with regard to evidence in mitigation.  The Mississippi Supreme Court reviewed the mitigation evidence that had been excluded at trial and held that the principles announced in *Skipper* had been violated, and Jordan was entitled to a new trial.  *Jordan v. State*, 518 So. 2d 1186, 1188-89 (Miss. 1987).  At the same time that this question was under consideration by that court, Jordan submitted a post-conviction petition, in which he claimed that the recently decided case of *Michigan v. Jackson*, 475 U.S. 625 (1986), which prohibited law enforcement from initiating contact with a suspect for whom counsel had been appointed, should be applied to his case.  The Mississippi Supreme Court denied relief, holding,

> We are of the opinion that Jordan's conviction of capital murder became final in 1982 when the Fifth Circuit upheld his conviction of capital murder and he did not petition the United States Supreme Court to review that decision.  We hold that the question is res judicata and is barred from relitigation.

*Jordan*, 518 So. 2d at 1189.

While awaiting his resentencing trial, Jordan submitted another habeas petition, challenging the use of the Allbritton statement on grounds that *Jackson* precluded its admission.  The case was referred to then-Magistrate Judge Singletary for the entry of a Report and Recommendation as to its disposition.  Judge Singletary entered his Report on May 17, 1990, recommending the denial of relief on grounds that Jordan's petition was successive under *United States v. Sanders*, 373 U.S. 1, 15 (1963).  In making that determination, Judge Singletary applied *Sanders* and found that the petition

raised the same issue as the prior petition, the issue in the prior petition had been decided on the merits, and the ends of justice would not be served by reaching the merits in the second petition. *Jordan v. Black*, Civil Action No. S89-0542(G) (S.D. Miss. May 17, 1990).  Although he found that *Jackson* constituted an intervening change in the law, he also recognized that, in such a situation, the petitioner still had to make a "colorable showing of factual innocence."  Finding that Jordan's other statement and actions establishing his guilt precluded that showing, Judge Singletary recommended that the petition be denied as successive.  District Judge Gex, to whom the case was assigned, adopted the Report and Recommendation and dismissed the petition.  *Jordan*, No. S89-0542(G) (S. D. Miss. Sep. 24, 1990).  The Fifth Circuit granted a Certificate of Probable Cause for appeal.  *Jordan v. Jackson*, No. 90-1866 (5th Cir. Mar. 22, 1991).  However, before oral argument could be had on the appeal, Jordan moved to dismiss it, on grounds that he had reached a plea agreement with the Circuit Court.  The appeal was dismissed, with no specification as to whether it was with or without prejudice.  As discussed earlier, the plea agreement was later revoked by Jordan, and this most recent sentencing trial followed.

In his current habeas petition, Jordan argues that *Jackson* should have been applied to his case, and that application of the principles announced in that decision would mandate habeas relief. Respondents argue that this is a successive petition that should be dismissed, without reaching any other issue in their brief.  The Court agrees.  *See McCleskey v. Zant*, 499 U.S. 467, 496 (1991) (discussing the threshold nature of the abuse of the writ inquiry and recognizing that a determination on "abuse of the writ is 'preliminary as well as collateral to a decision as to the sufficiency or merits of the allegation itself.'") (quoting *Price v. Johnson*, 334 U.S. 266, 287 (1948)).  Jordan claims that,

because this petition is related to a separate legal proceeding related only to sentencing, the successive petition limitations should not apply.

The statutory prohibition against successive petitions by state prisoners is now codified at 28 U.S.C. § 2244(b), which prohibits, in different paragraphs, a petitioner from raising the same claim or a new claim in a subsequent petition. With regard to Jordan's situation, the statute reads, "A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed." The statute's failure to define "second or successive" has generated much litigation attempting to establish the parameters for this "gatekeeping mechanism." *Felker v. Turpin*, 518 U.S. 651, 657 (1996).

When this issue arose in the second habeas petition, pre-AEDPA law was applied to determine whether Jordan had "abused the writ" – a more forgiving standard. However, one purpose of AEDPA was to "enforce the preference for the state's interest in finality of judgment over a prisoner's interest in additional review." *Johnson v. Dretke*, 442 F.3d 901, 909 (5th Cir. 2006). Not surprisingly, then, the AEDPA "greatly restricts the power of federal courts to award relief to state prisoners who file second or successive habeas corpus applications." *Tyler v. Cain*, 533 U.S. 656, 661 (2001); *see also Calderon v. Thompson*, 523 U.S. 538, 559 (1998) ("Section 2244(b) of the statute is grounded in respect for the finality of criminal judgments."); *United States v. Barrett*, 178 F.3d 34, 57 (1st Cir. 1999) (noting that AEDPA encourages a "one bite at the post-conviction apple" approach).

That being said, it would logically follow that this Court would repeat the finding of Magistrate Judge Singletary and District Judge Gex that Jordan's petition is successive. However, although the previous authorities suggest that the gatekeeping mechanism is claim-based, the

Supreme Court has conclusively established that the review is actually judgment-based. Before the preclusion of § 2244(b)(1) can apply, it must be determined that the petition is "second or successive." According to the Supreme Court, a subsequent habeas petition that attacks a different judgment is not "second or successive." *Magwood v. Patterson*, ___ U.S. ___, 130 S. Ct. 2788 (2010); *Burton v. Stewart*, 549 U.S. 147 (2007). In the earlier case, *Burton*, the Supreme Court analyzed a prisoner's argument that he was entitled to bring a second habeas petition because it was based on a later judgment that amended his sentence. While the Court ultimately found against him, it did so on the basis of a factual finding that, although different judgments had been entered through the appellate process, the petitioner was in custody on the same judgment at the time he filed both petitions. The problem with Burton's case, according to the Court was that "there was no new judgment intervening between the two habeas petitions." *Id.* at 156. Responding to the petitioner's argument that he would otherwise have lost the right to habeas review of his conviction because the statute of limitations would have run on that claim, the Court said, "'Final judgment in a criminal case means sentence. The sentence is the judgment.'" *Id.* at 156 (quoting *Berman v. United States*, 302 U.S. 211, 212 (1937)). As one court summarized the decision, "*Burton* makes clear that the writ and AEDPA, including its limitations provisions, are specifically focused on the judgment which holds the petitioner in confinement. What this Court has previously called the judgment of conviction and the sentencing judgment together form the judgment that imprisons the petition." *Ferreira v. Secty, Dept. of Corrections*, 494 F.3d 1286, 1293 (11th Cir. 2007).

In *Magwood*, the Court went further in defining the term "second or successive." There, the petitioner, who had been sentenced to death, filed his first habeas petition in 1983, contesting the state court's failure to consider his mental problems as a mitigating circumstance. 2010 WL 2518374

at *4.  Habeas relief was granted, and a new sentencing proceeding was held in 1986, which also resulted in the death penalty's being imposed.  After lengthy appellate proceedings, in which the sentence was affirmed, Magwood filed a second habeas petition in 1997, arguing that, at the time of his offense, he did not have fair warning that his crime (killing a law enforcement officer) made him eligible for the death penalty and that his attorney during the resentencing hearing was ineffective.  *Id*. at *5.  The district court found that the petition was not successive; the court of appeals found that the new claim of ineffectiveness was not successive, but the fair warning claim, which could have been raised in the earlier petition amounted to a successive petition.

The Supreme Court reversed.  Repeating language from an earlier opinion that the phrase "second or successive" is a "'term of art,'" the Court held that the phrase "must be interpreted with respect to the judgment challenged."  *Magwood* at *8 (quoting *Slack v. McDaniel*, 529 U.S. 473, 486 (2000)).  Moreover, because Congress did not use the phrase until it enacted the AEDPA, the Court held that pre-AEDPA cases construing abuse of the writ were inapplicable.  *Magwood* at *11.  Finally, the Court noted that its previous opinion in *Burton* presaged the decision in *Magwood*.  Although the Court rejected the petitioner's claims in that case on grounds that there was no intervening judgment between his petitions, the language of the decision compelled *Magwood's* result.  "There was no such judgment in *Burton*, but there is such an intervening judgment here."  *Id*. at *11.  Thus, Magwood's petition was not successive, even though he raised a claim in it that could have been raised earlier.  As the Court reasoned, "An error made a second time is still a new error.  That is especially clear here, where the state court conducted a full resentencing and reviewed the aggravating evidence afresh."  *Id*. at 12.

In *Magwood*, there were two claims raised in the subsequent petition: one claim solely related to the new judgment and another claim that could have been raised in connection with the first judgment, but was not. Thus, the fact situation did not mirror the circumstances of Jordan's case, where the same issue has been raised with each entry of judgment. Indeed, the dissenting opinion in *Magwood* warned that such a result could be sanctioned by the language of the Court's opinion. In response, the majority explicitly approved such a result. "The dissent's concern that such a petitioner may 'reraise every argument against a sentence that was rejected by the federal courts during the first round of federal habeas review,' *post*, at ----, is similarly hyperbolic. It will not take a court long to dispose of such claims where the court has already analyzed the legal issues." *Id*. at *12 n.15.

In Jordan's case, a new judgment has been entered at the conclusion of every trial, and the 1998 judgment imposing the death penalty has not previously been challenged by way of a habeas petition. Therefore, under *Magwood*, Jordan's claim relative to the Allbritton statement is not successive, and this Court must review it on the merits. Respondents offer no assistance in this analysis, as they did not brief this issue beyond the point of terming it successive. However, it is the result reached in state court that is the focus of habeas review, not the State's brief, nor even the state court's analysis. *Early v. Packer*, 537 U.S. 3, 8 (2002); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002). The result reached by the state court may be upheld even if the controlling cases are not cited, or even if the state court is unaware of those cases, so the fact that Respondents did not brief this issue is not dispositive. *Id.*

To analyze that result, it is necessary to briefly outline the procedural history of this issue. Admission of the Allbritton statement was raised in Jordan's first direct appeal, and the Mississippi

Supreme Court ruled that Jordan "knowingly and intelligently waived both his right to counsel and his privilege against self-incrimination." 365 So. 2d at 1203. The argument was made again in Jordan's first habeas petition, which was denied by this Court. That decision was appealed to the Fifth Circuit, which affirmed on this issue, although reversing on other grounds. According to the Fifth Circuit, Jordan's request for counsel at his arraignment was for the purpose of representation at future proceedings and was unrelated to interrogation. 681 F.2d at 1074. The court also found that Jordan's waiver of his Fifth and Sixth Amendment rights was voluntary, knowing and intelligent. *Id*. This opinion was not appealed further.

After Jordan's case was remanded and he again received the death penalty, Jordan raised this claim in state court on appeal. The Mississippi Supreme Court found that the State had sufficiently proved that Jordan had waived his rights "and that question is now *res judicata*." Jordan subsequently petitioned the United States Supreme Court for certiorari on other issues, but not this one. During the pendency of that petition, the Supreme Court decided *Jackson*, and Jordan submitted a post-conviction petition to the Mississippi Supreme Court asking for reconsideration of his case under that precedent. That court held that Jordan's conviction became final in 1982, after the Fifth Circuit upheld it and he failed to petition the Supreme Court for certiorari. Additionally, the court held, "We hold that the question is res judicata and is barred from relitigation." 518 So. 2d at 1189. Jordan then submitted his second habeas petition, arguing that *Jackson* applied to his case, but that petition was rejected as successive. Jordan voluntarily dismissed his appeal of that decision to the Fifth Circuit, so that he could pursue his plea bargain.

Jordan was sentenced to death again in 1998. He argued on direct appeal that *Jackson* should be applied retroactively to his case to invalidate the Allbritton confession because it was decided before his case was final. The court rejected that argument, stating:

> Despite his allegations that his case is not yet final, Jordan has received four appellate reviews of this issue, and we have now twice decided that the issue is procedurally barred. most importantly, the issue is harmless error at best. Our initial decision on this issue showed the admission of that statement to Officer Allbritton was harmless since it was merely cumulative of the properly obtained statement that Jordan gave to FBI Agent Watts. *Jordan*, 365 So. 2d at 1203. Therefore, this issue is without merit.

786 So. 2d at 1020. In its decision on Jordan's application for post-conviction relief, the Mississippi Supreme repeated this reasoning and denied relief. 912 So. 2d at 822-23.

The Mississippi Supreme Court rejected Jordan's latter arguments as barred by the doctrine of *res judicata*. Prior to the enactment of § 2244 (a form of which became law prior to the passage of the AEDPA), it was generally recognized the principle of res judicata did not apply to habeas cases. *Sanders*, 373 U.S. at 8 (holding that, because conventional notions of finality of litigation have no place where life or liberty is at stake and infringement of constitutional rights is alleged, the inapplicability of res judicata to habeas is "inherent in the very role and function of the writ.) The enactment of § 2244, however, constitutes "a qualified application of the doctrine of res judicata to habeas corpus . . . ." *Potts v. Zant*, 638 F.2d 727, 739 (5th Cir. 1981); *see McCleskey v. Zant*, 499 U.S. 467, (1991) ("[W]hile we [have] rejected res judicata in a strict sense as a basis for dismissing a later habeas action, we made clear that the prior adjudication bore vital relevance to the exercise of the court's discretion in determining whether to consider the petition.") However, Jordan's petition is not successive, and the concept of *res judicata* is not otherwise applicable to a habeas

action.  For these reasons, Jordan is entitled to a review on the merits, but he is not entitled to habeas relief.

The law of the case doctrine does apply here.  In this circuit, the law of the case principle "generally precludes reexamination of issues of law or fact decided on appeal, either by the district court on remand or by the appellate court itself on a subsequent appeal." *Todd Shipyards Corp. v. Auto Transp., S.A.*, 763 F.2d 745, 750 (5th Cir. 1985).  While neither a jurisdictional prerequisite nor "an inexorable command," it is "a rule of practice, usually followed but limited in scope." *Id.* (citing *Arizona v. California*, 460 U.S. 605, 618 (1983); *United States v. Horton*, 622 F.2d 144, 148 (5th Cir. 1980)).  However, the law of the case doctrine does not apply where "(1) a subsequent trial produces substantially different evidence, (2) controlling authority has made a contrary decision of the law applicable to the issues, or (3) the prior decision was clearly erroneous and would work an injustice." *Todd Shipyards*, 763 F.2d at 752 n.14; *see also Shexnider v. McDermott Int'l, Inc.*, 868 F.2d 717, 718-19 (5th Cir. 1989).

Here, the Supreme Court made a contrary decision of the law when it decided *Jackson*, which would have made Jordan's confession to Allbritton presumptively invalid.  Jordan argues that *Jackson* should apply retroactively to his case. *Jackson* was decided in 1986, and it should properly be applied to all cases where the conviction did not become final until after the decision was announced. *Teague v. Lane*, 489 U.S. 288, 304 (1989) (citing *Griffith v. Kentucky*, 479 U.S. 314 (1987)).  A conviction and sentence become final for retroactivity analysis when the direct appeal to the state court is concluded and the time for petitioning for certiorari has expired or a timely petition for certiorari has been denied. *Caspari v. Bohlen*, 510 U.S. 383, 390 (1994).  In the context of retroactivity, both the conviction and the sentence must become final before a defendant is

precluded from relying on a change in the law. *Teague*, 489 U.S. at 314 n.2 (rejecting Justice Steven's suggestion that finality concerns are limited to convictions and not applicable to sentencing, "As we have often stated, a criminal judgment necessarily includes the sentence imposed upon the defendant.").

It could be held that the claims related to the Allbritton confession became final on October 1, 1979, the date on which the United States Supreme Court denied certiorari on Jordan's first appeal. To the extent that the confession was used to convict Jordan of capital murder, that was the date upon which the conviction, which has never since been reversed, became final. However, in light of the language of *Teague* and the recent holding in *Magwood*, this Court is convinced that the correct holding is that Jordan's most recent conviction *and* sentence were not final until January 7, 2002, the date on which certiorari was denied on the most recent sentencing proceedings. For that reason, *Jackson*, which was decided in 1986, was the law at the time that Jordan's conviction and sentence became final and should be applied to Jordan's case.

*Jackson,* however, was recently overruled, and there is no longer a presumption that a confession given after the appointment of counsel is invalid. *Montejo v. Louisiana*, ___ U.S. ___, 129 S. Ct. 2079, 2091 (2009). Instead, the Court held, the crucial issue is "what happens when the defendant is approached for interrogation, and (if he consents) what happens during the interrogation – not what happened at any preliminary hearing. *Id*. at 2091. Thus, if the defendant makes "a clear assertion of the right to counsel" when he is approached by officers, no interrogation can occur unless it is initiated by him. *Id*. That assertion should be "unequivocal." *Id*. Otherwise, the defendant can waive his right to have counsel present, so long as the waiver is knowing and voluntary. *Id*. at 2092; *see also Bell v. Norris*, 586 F.3d 624, 631 (8th Cir. 2009) (quoting *Montejo*, 129 S. Ct. at 2085,

"When a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick.");*Clarke v. Spencer*, 582 F.3d 135, 140 (1st Cir. 2009). *Montejo* returns the law on this issue closer to its position when Jordan committed his crime.

Every court that has considered this question has found that Jordan knowingly and intelligently waived his right to avoid incriminating himself and his right to counsel during interrogation, both under the Fifth and Sixth Amendments. In fact, in reviewing Jordan's first habeas petition, the Fifth Circuit specifically found that Jordan's request for counsel during arraignment was solely for the purpose of representing him during future proceedings and not for the purpose of assisting him during interrogation. 681 F.2d at 1074. That court's conclusion that Jordan's waiver of his rights was voluntary, knowing and intelligent should not be disturbed under the doctrine of law of the case. Additionally, when that finding is analyzed under the Supreme Court's decision in *Montejo*, the conclusion must be that Jordan's confession to Allbritton was not improperly admitted. Thus, the Mississippi Supreme Court's opinion reaching the same result is neither contrary to, nor an unreasonable application of, clearly established federal law. Jordan is not entitled to relief on this issue.

**Ground F**:  **Petitioner was denied his rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments due to prosecutorial misconduct.**

**Ground G**:  **In the alternative to the preceding ground for relief, Petitioner was denied his right to the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments due to trial counsel's failure to object to some of the prosecutorial misconduct.**

Because these issues are so related, they may be discussed together. Jordan argues that certain statements made by the lead prosecutor, Joe Sam Owen, improperly asked the jury to assess

certain mitigation evidence as supporting the death penalty, interjected his personal feelings about the comparative worth of the Marter family as compared to Jordan, and informed the jury that he was working without pay, thereby suggesting to the jury that Jordan's case was unusually heinous. Many of the statements about which Jordan complains were made without objection by his trial counsel. When this argument was made to the Mississippi Supreme Court on direct appeal, the court first noted that those arguments were procedurally barred. However, the court went on to consider the merits of the arguments, and one of the issues to be resolved is whether that was an alternative holding or whether the court intended to ignore the bar. In his post-conviction petition, Jordan made the argument as an ineffectiveness claim, arguing that his counsel's conduct was substandard due to the failure to object. He has raised both issues in this petition.

During trial, Jordan offered evidence to show that his behavior in prison had been good – so good, in fact, that, after he received the sentence of life without parole, he had been made a trusty. As a trusty, he had some freedom of movement within the facility. Jordan had also invented a device to produce electricity from wind, in which the TVA had expressed an interest, and he hired a lawyer to protect his rights to it. During his closing argument Owen characterized Jordan's prison life as unjust, stating (over an objection that was overruled):

> Richard Jordan has tested, abused, and misused the penal system in this state. He's turned it into a mockery. Trusteeship and the things that you have at Parchman have a purpose, but he's abused it and misused it in my opinion, in the State of Mississippi's opinion, when a prisoner charged with this terrible crime can do the things that he's doing at Parchman and can engage in the outside activities that he's engaging in, and ladies and gentlemen of the jury you cannot say that justice is being served.

Other statements about which Jordan complains, to which there was no objection, follow:

And his absolute freedom as a trusty buttresses and supports the argument that the State of Mississippi makes to you today, ladies and gentlemen of the jury, that justice delayed in justice denied.

What is Richard Gerald Jordan's punishment right now? He's been in the state penitentiary doing what? Nothing. There has been reverse punishment. Kevin and Chuck and Eric have suffered more than the man that took their mother and wife's life. Something is wrong when that takes place. They suffer more than he does. He has a law library, he has a telephone, he rides around on a tractor, he writes short stories, he calls this lady in Hattiesburg, he and his lawyer they negotiate contracts . . . And we put him there. "We're not going to punish you, Richard, because what you did that's not that bad. . . ."

Society hasn't benefitted one inch from Richard Gerald Jordan walking around Parchman. They haven't benefitted one inch from anything Richard Gerald Jordan has done. He's done it for himself. How does that help me and you? How does that help society? How does that help the State of Mississippi for people, for our young ones, to know that you can enter into the house, about the only sanctified place that we have left, and to take an unarmed, defenseless woman into a remote area, kill her, and then get the benefit of a full trusty position in Parchman and to be able to write short stories and to be able to use the phone?

Is justice served by allowing Richard Gerald Jordan to stroll about Parchman with his invention in one hand and his short stories in the other hand, using the telephone, doing the things that he's always wanted to do as a young man, and having the same privileges and being pretty much in the same area as a person charged with burglary or grand larceny? Is that just recompense for what this has done to the Marter family, and the senseless and pitiless killing of Edwina Marter?

Can you imagine 10 years from now the grandchild of Eric and Kevin Marter, for some reason they made a visit to Parchman, and were to glance over to the side and see Richard Gerald Jordan with his feet propped up on a desk typing a short story, on a telephone maybe, and one of them proclaimed, "Do you know that's the man that took my grandmother from the sanctity of her house and shot her in the back of the head with a .38 caliber pistol, and because he was shrewd in 76 and he was shrewd in 98 and he knew just what he was supposed to do to convince the jury to let him continue to live the life in Parchman.

If you feel I'm harsh on Richard Gerald Jordan then I apologize. But I've been in this case a long time. The state of Mississippi is convinced that this man is a scam artist. He knows the art of deception, he knows the art of persuasion, he knows the right thing to do. He knew how to throw those short stories before you. . . .

It would be a death nail for our criminal justice system to continue to allow this charade to continue.

Chuck said, "I hope you rot." Well, he's not. He's enjoying the good life. Unfortunately, the Marters have to rot in their memories. Here they are in this courtroom 22 years later putting up with this.

It is time for closure. Edwina Marter is entitled to it, the Marter family is entitled to it.

He's killing society today. And that's the problem that we have in our criminal justice sentencing.

He's going to walk right out of this courtroom, go back to Parchman, and I can hear him now, "I beat the rap. I go back to a full trusty." And what happens? Chuck and Kevin walk out the door 22 years later having gone through this misery knowing that the man that executed . . . .

I stand before you today as a special prosecutor. This is not my profession. I gain nothing from it. I profit nothing from it. I am a private practitioner. I'm not salaried by the District Attorney's office. I'm not salaried by the Attorney General. I don't get one penny. I don't want one penny. I want justice, the State of Mississippi wants justice.

In addition, Jordan generally complains that the prosecutor, on several occasions, referred to him as a "con man" or a "scam artist,"falsely stated that he received a financial benefit from his invention, and contended that Jordan intended to shoot Mrs. Marter again if she had not been killed by the first bullet.

Jordan argues that the prosecutor's statements about "abusing the system" and other aspects of his life in prison attacked him for exercising his right to a jury trial, the right to argue the mitigating circumstance of good jail behavior, and the right to avoid cruel and unusual punishment with a life sentence. He claims that Owen's comparisons of him and the Marter family constituted an improper use of victim impact evidence. Additionally, Jordan asserts that calling him a scam artist, stating that he was going to shoot Marter again, and implying that he was receiving money for

his invention all relied on facts that were not in the record. Finally, Jordan believes that Owen's telling the jury that he was prosecuting the case for no salary was an improper interjection of his personal view of the case.

Jordan relied in the state court, as he does here, on *Zant v. Stephens*, 462 U.S. 862 (1983) to argue that Owen "turned around" his mitigation evidence and used it as an aggravating circumstance. *Zant* denied habeas relief to a prisoner contesting Georgia's scheme for narrowing the class of persons eligible for the death penalty, which permitted the jury to take into account the statutory aggravating circumstances. *Id*. at 877-78. Although it found that Georgia's procedure adequately protected the rights of defendants charged with death-eligible offenses, the Court also stated, "What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Id*. at 879.

Jordan argues that *Zant* held that the state "cannot treat mitigation evidence as a basis for imposing the death penalty." Thus, he maintains, application of *Zant* to his case mandates habeas relief. He also relies on *Dawson v. Delaware*, 503 U.S. 159 (1992), *Darden v. Wainwright*, 477 U.S. 168 (1986), *Griffin v. California*, 380 U.S. 609, 615 (1965), and *Burns* v. Gammon,, 260 F.3d 892, 896 (8th Cir. 2001). Jordan argues that the state court's analysis was constitutionally flawed because it failed to "make the required 14th Amendment due process analysis on this issue or apply other constitutional protections against prosecutorial misconduct." Citing *Campbell v. United States*, 266 F. Supp. 2d 587, 589 (E.D. Mich. 2003), he claims that the court should have analyzed the prosecutor's comments to determine whether they were isolated or made in response to the defense's evidence. He also asserts that the court was required to determine whether the remarks would mislead the jury or prejudice Jordan, as well as whether they were made deliberately, citing *United*

*States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994); *Washington v. Hofbauer*, 228 F.3d 689, 708 (6th Cir. 2000). Jordan concludes:

> Had the court conducted these analyses, it would have reached the readily apparent conclusion that the prosecutor's improper commentary was deliberate, extensive, and misled and prejudiced the jury. Having failed to make the required analysis, and having ignored the factual realities in the record, the state supreme court's judgment was an unreasonable application of established federal law.

Respondents' primary argument in response to these allegations is that they were defaulted in state court for failure to contemporaneously object to the prosecutor's arguments (with the exception of the two objections noted earlier). They contend that the Mississippi Supreme Court relied on this independent and adequate state ground to deny the claim, and that beginning the discussion of the merits with the phrase "Out of an abundance of caution" did not convert an alternative holding to one that relied on an analysis of the merits of the claim. Finally, Respondents maintain that the claim fails on the merits since, under applicable Supreme Court precedent, the prosecutor's statements were not improper.

In its opinion on Jordan's direct appeal, the Mississippi Supreme Court first noted that Jordan had only objected to Owen's statements twice. The first objection was to the remark, "It's time for Richard Gerald Jordan and the likes of Richard Gerald Jordan to be stung ad infinitum." Defense counsel objected on grounds that it was an improper comment on "what other people ought to get." The objection was sustained. *Jordan v. State*, 786 So. 2d 987, 1012 (Miss. 2001). The second objection was to Owen's statement that Jordan "tested this system." That objection, and the simultaneous motion for a mistrial, were both overruled.

On these remarks, the Mississippi Supreme Court reviewed *Zant* and decided that its holding did not mandate reversal in Jordan's case. It considered the following summary of the record as the basis for its consideration:

> Jordan introduced character evidence that he was a good prisoner and had caused no trouble in his 22 years at Parchman. He attained trusty status while under a sentence of life imprisonment without parole, indicating that he was not a threat to himself or others and that he was not an escape risk.
>
> The State used this character evidence to argue that the imposition of the death penalty was appropriate because Jordan had used and misused the system; because a person who had committed a terrible crime such as that one committed by Jordan should not be eligible for the benefits that Jordan received at Parchman; and because Jordan could use the phone, watch television, write his short stories, go to the law library, ride around on a tractor, etc., implying that Jordan was not being punished severely for his crime.

786 So. 2d at 1013. The court then distinguished *Zant*, noting that there, "[T]he invalid aggravating circumstance was included in an instruction to the jury. Owen's characterization of Jordan's mitigation evidence was made in his closing remarks and was not incorporated into a jury instruction." *Id.* at 1014. The court went on, however, to say that, while Owen's remarks "may have been improper," any error was harmless in light of other evidence presented. *Id.*

Where a statement made by the prosecutor during argument is challenged by way of collateral review, the appropriate standard of review is not whether the comment was improper or worthy of condemnation, but whether it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). In that review, the court must consider that the remark "is but one of several components of the trial which may result in the judgment of conviction." *Id*. at 645. In *Darden*, 477 U.S. 168, the Court was presented with several statements made by the prosecutor during closing argument that allegedly mandated reversal:

As far as I am concerned, there should be another Defendant in the courtroom, one more, and that is the division of corrections, the prisons . . . . Can't we expect him to stay in a prison when they go there?

I will ask you to advise the Court to give him death. That's the only way that I know that he is not going to get out on the public. It's the only way I know. It's the only way I can be sure of it. It's the only way that anybody can be sure of it now, because the people that turned him loose.

As far as I am concerned, and as Mr. Maloney said as he identified this man this person, as an animal, this animal was on the public for one reason.

He shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of that leash. . . . I wish [one of the victims] had had a shotgun in his hand when he walked in the back door and blown his [the defendant's] head off. I wish that I could see him sitting here with no face, blown away by a shotgun. . . . I wish someone had walked in the back door and blown his head off at that point. . . . He fired in the boy's back, number five, saving one. Didn't get a chance to use it. I wish he had used it on himself. I wish he had been killed in the [subsequent auto] accident, but he wasn't. Again, we are unlucky that time.

Only after the last comment did defense counsel object to the argument. 477 U.S. at 181 nn. 9, 10, 11 and 12. The Court affirmed the conviction in that case, noting that the trial court instructed the jurors that the comments of counsel were not evidence. Additionally, two victims of the crime survived and gave eyewitness testimony identifying the defendant as the assailant, another witness described his car, and, after the car was later involved in an accident, a gun with a misfired shell in the chamber was found near the scene, later described as the same type of gun that killed the third victim. This "overwhelming evidence," in the Court's opinion, made it unlikely that the jury's verdict was influenced by this argument, however ill-advised. *Id*. at 182. *See also Ward v. Whitley*, 21 F.3d 1355, 1365 (5th Cir. 1994) ('The argument that Ward was a bad person deserving of death . . . pales beside the other evidence of his bad character . . . .").

Respondents argue that the prosecutor's comments regarding the privileges that Jordan enjoyed while he was a trusty pale in comparison to the remarks made in *Darden* and *Donnelly*.

Jordan distinguishes these cases, however, on grounds that the prosecutor at his trial was commenting on his exercise of a constitutional right to rehabilitation. This Court disagrees with that premise. The case he cites in support of his argument, *Darden v. Wainwright*, simply does not hold that a prisoner has the right to avoid cruel and unusual punishment through a life sentence, trusty status, or rehabilitation. 477 U.S. 168. In fact, the United States Constitution does not recognize a protectible liberty or property interest in the custodial classifications of prison inmates, unless they impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.". *Sandin v. Conner*, 515 U.S. 472, 484 (1995)*; see also Wilkinson v. Austin*, 545 U.S. 209, 223-24 (2005) (applying *Sandin* but finding indefinite confinement in a "Supermax" facility with almost no human contact and concomitant loss in parole eligibility was an "atypical and significant hardship.") Likewise, prisoners have no constitutional right to rehabilitative programs. *Moody v. Dagggett*, 429 U.S. 78, 88 n.9 (1976); *Stewart v. Winter*, 669 F.2d 328, 336 n.19 (5th Cir. 1982). Thus, Jordan's argument that the prosecutor improperly commented on his constitutionally protected right to engage in rehabilitative conduct while in prison is unpersuasive.

The Court also rejects Jordan's argument that the comments were an attack upon his availing himself of his constitutional right to a trial. The thrust of the argument was to refute Jordan's claim that his life should be spared because he had exhibited good behavior in prison. There was nothing about the argument that was critical of Jordan's right to stand trial. Similarly, the Court does not find that the remarks prevented Jordan from presenting evidence in mitigation, in contravention of *Skipper v. South Carolina*, 476 U.S. 1 (1986). Jordan was permitted to present his mitigation evidence; that does not mean that the prosecutor must let it go unchallenged.

Jordan also contends that the prosecutor "took Mr. Jordan's most important mitigating circumstance, his rehabilitation, and used that as aggravating circumstances and fodder for inflaming the jury." By so doing, Jordan argues, the prosecutor violated *Zant*. Jordan has provided neither a pinpoint citation nor a quote from that case, and the Court's review of *Zant* reveals no language that would support the argument that the prosecutor may not negatively comment on, or otherwise impeach, a defendant's mitigation evidence. The opposite is likely true. *Cf. Buchanan v. Angelone*, 522 U.S. 269, 276 (1998) ("[T]he state may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence.").

With respect to the comments about which an objection was made, the Court has found no Supreme Court precedent that would suggest that they should be the subject of habeas relief. The Mississippi Supreme Court denied relief on two grounds – that *Zant* does not apply because it was factually distinct and that the remarks, while inappropriate, were harmless. Jordan has not convinced this Court that this decision was contrary to, or an unreasonable application of, clearly established law. For this reason, habeas relief is unavailable on these comments.

The next question that must be answered is whether this Court can review the remainder of this claim on the merits, or whether they are barred from review as having been defaulted in state court. Here, the Mississippi Supreme Court clearly stated at the beginning of two different discussions of prosecutorial misconduct its opinion that this issue was procedurally barred as not having been raised earlier. 786 So. 2d at1013, 1014. Jordan argues, however, that the state court reached the merits by beginning its discussion with, "Nevertheless, in an abundance of caution, we will address the merits." Respondents argue that this was merely an alternative ruling that does not

diminish the State's right to rely on the lack of a contemporaneous objection to preclude habeas review.

A procedural bar will not prevent habeas review of an issue unless the last state court that ruled on the claim "clearly expressed its reliance on an adequate an independent state law ground . . . ." *Harris v. Reed*, 489 U.S. 255, 263 (1989). Where a state court has clearly expressed its reliance on a procedural bar, however, the fact that it alternatively rules on the merits will not vitiate the bar's validity. *Hughes v. Dretke*, 412 F.3d 582, 592 (5th Cir. 2005); *Thacker v. Dretke*, 396 F.3d 607, 614 n. 8 (5th Cir. 2005). Other courts have used similar language to introduce a discussion of the merits that is clearly an alternative ruling to the finding of a procedural bar. *Scott v. Mitchell*, 209 F.3d 854, 873 (6th Cir. 2000) ("Nevertheless, out of an abundance of caution and in order to clarify our precedents governing sentencing-phase instructions on jury unanimity, we will consider in the alternative the merits of Scott's challenge."); *Muhleisen v. Ieyoub*, 168 F.3d 840, 843 (5th Cir. 1999) ("For the sake of caution, however, we proceed in the alternative to the substance of Muhleisen's claim."); *Reyes v. Ercole*, No. 08-CV-4749, 2010 WL 2243360 at *5 (E.D.N.Y. June 1, 2010). Admittedly, the language in these opinions uses the word *alternative* to describe the discussion on the merits. Jordan asks this Court to reach a different result because that word was not used.

However, the Fifth Circuit has found that state courts have clearly and expressly relied on state law grounds when the transition to a discussion on the merits was much less defined. In *Amos v. Scott*, 61 F.3d 333, 340 (5th Cir. 1995), the petitioner attempted to argue that Texas had not strictly or regularly applied the contemporaneous objection rule. The Fifth Circuit disagreed, relying on *Sochor v. Florida*, 504 U.S. 527, 534 (1992). There, the state court found that a claim regarding jury instructions had been waived by failure to object at trial, but went on to say, "In any event, Sochor's

claims here have no merit." *Id.* (quoting *Sochor v. State*, 580 So. 2d 595, 602-03 (Fla. 1991)). This language, the Supreme Court held "indicates with requisite clarity that the rejection of Sochor's claim was based on the alternative state ground that the claim was 'not preserved for appeal. . . .'" 504 U.S. at 534.

Given the decision in *Sochor*, the Fifth Circuit held that similar language used by the Texas courts "must be viewed as signaling an alternative holding independent of federal law, not as an indication that the state court is excusing the procedural default." *Amos*, 61 F.3d at 341. A contrary result, the court noted, would amount to telling the states in that circuit "[U]nless you use the magic word 'alternative' when following a procedural default holding with a merits holding, we will deem your application of your rule not to be strict or regular, and thus not independent and adequate." *Id.* at n.24. Recognizing "an infinite variety of particularized transitional phrases to signal alternative holdings," the court quoted from *Coleman v. Thompson*, 501 U.S. 722 (1991): "[W]e have no power to tell state courts how they must write their opinions. We encourage state courts to express plainly . . . the grounds upon which their judgments rests, but we will not impose on state courts the responsibility for using particular language in every case in which a state prisoner presents a federal claim . . . ." *Amos*, 61 F.3d at 341(quoting *Coleman*, 501 U.S. at 739). *See also Williams v. Puckett*, 283 F.3d 272, 280 (5th Cir. 2002) (finding that the Mississippi Supreme Court relied on the contemporaneous objection rule to deny relief and the discussion on the merits was merely an alternative ruling, even in the absence of an express statement to that effect). Based on this authority, this Court finds that the Mississippi Supreme Court intended to rely on the procedural ground of lack of a contemporaneous objection in its review of Jordan's case, and the language thereafter described an alternate finding.

The doctrine of procedural default in a habeas case also presumes that a state procedural ground is adequate and independent – the rule must, for instance, be regularly followed – and ordinarily, the burden is on the habeas petitioner to demonstrate otherwise. *Coleman v.Thompson*, 501 U. S. 722, 750 (1991); *Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999). The United States Supreme Court has found that the Mississippi Supreme Court has inconsistently applied a procedural bar where a defendant did not challenge on direct appeal a conviction that formed the basis for an enhanced sentence or aggravating circumstance. *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988). However, it appears that the Mississippi Supreme Court routinely applies a procedural bar where a defendant did not made a contemporaneous objection to the prosecutor's statements that he challenges on appeal. *See, e.g., Hood v. State*, 17 So. 3d 548, 557 (Miss. 2009); *Scott v. State*, 8 So.3d 855, 864 (Miss. 2008); *Underwood v. State*, 919 So. 2d 931,939 (Miss. 2005) (a death penalty case); *Byrom v. State*, 863 So. 2d 836, 872 (Miss. 2003) ( a death penalty case); *Williams v. State*, 684 So. 2d 1179, 1203 (Miss. 1996) ( a death penalty case). In *Walker v. State*, 913 So. 2d 198, 237-38 (Miss. 2005), another death penalty case, the court refused to consider an argument regarding the prosecutor's comments at the sentencing phase, on grounds that there was no objection at trial. Walker argued that the rule had been relaxed in previous cases, and the court agreed, citing three cases in which the plain error rule was used to excuse the bar and reach the merits. *Id.* at 238 (citing *Faraga v. State*, 514 So. 2d 295, 303 (Miss. 1987); *Hansen v. State*, 592 So. 2d 114, 143 (Miss. 1991); and *Grubb v. State*, 584 So. 2d 786, 789 (Miss. 1991) (holding that improper imposition of life sentence by a judge rather than a jury was a plain error that could be considered despite the failure to raise it in the first post-conviction petition). However, the court went on to cite numerous cases in which the contemporaneous objection rule did bar consideration of prosecutorial argument,

concluding, "This Court on numerous occasions has refused to consider the issue of prosecutorial misconduct where the defendant did not raise it at trial, and we so refuse to do so today. 913 So. 2d at 238. In *Hansen*, the court noted the heightened scrutiny it gives to death penalty cases, "Translated, what becomes harmless error in a case with less at stake may become reversible error when the penalty is death [cite omitted], as procedural niceties give way to the search for substantial justice, all because death undeniably is different." 592 So. 2d at 142. The court went on to state:

> What is important for today is that we understand none of this means the rules themselves change as the penalty of death is sought. Neither the contemporaneous objection rule nor any other rule of procedure or substance becomes metamorphosed into something more favorable to the capital defendant. Any contrary thought may be safely branded error.

*Id*. Mississippi has unquestionably relaxed the contemporaneous objection rule in cases where it found plain error. However, the Fifth Circuit has held that this practice has not "detracted from the consistency of Mississippi's application of the rule. *Wiley v. Puckett*, 969 F.2d 86, 103 (5th Cir. 1992) (citing *Hill v. Black*, 887 F.2d 513, 416 (5th Cir. 1989)). Therefore, this Court finds that the contemporaneous objection rule, as applied to claims of prosecutor comments, has been routinely and regularly applied by the Mississippi Supreme Court. The state court was entitled to and did rely on this rule to hold that claims involving the comments of the prosecutor in Jordan's case were barred from review in that court, and they are likewise barred from review here.

However, Jordan has also made the claim that his counsel was ineffective for failing to object to the remarks. The Court begins this review with the familiar standard of *Strickland*, which requires a defendant to show that his counsel's representation fell below an objective standard of reasonableness, and that there is "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" 466 U.S. at 694. The Mississippi

Supreme Court considered this claim and found it to be without merit, agreeing with the State's contention that, "because this Court held the underlying substantive claims to be without merit, Jordan cannot now sustain a claim of ineffective assistance of counsel because he cannot show deficient performance and actual prejudice." 912 So. 2d at 815. Specifically, the court noted:

> In the 2001 opinion [on direct appeal], the Court found, first, that Jordan's counsel did make two contemporaneous objections which were overruled. Secondly, the Court found that Jordan himself had already introduced some of the same facts regarding his activities and conduct at Parchman into evidence and that the remarks did not unduly prejudice the jury against Jordan.

*Id.*

The statements about which Jordan complains can be categorized as follows: (1) Jordan has had an easy life in prison that cannot be reconciled with his crime; (2) societal interests would be served by awarding the death penalty to Jordan, rather than to permit him to continue his life; (3) imposing the death penalty would serve retributive interests both for society and for the Marter family; (4) Jordan is a scam artist; (5) the death penalty will represent closure for the Marter family; (6) the prosecutor was a private lawyer who believed in this case so strongly that he was working on it without pay. The Court will take each of these categories in turn, reviewing them under the appropriate AEDPA standard. In other words, the Court will review clearly established federal law on the issue of prosecutorial argument to determine whether the Mississippi Supreme Court clearly ran afoul of that law when it held that these remarks did not prejudice Jordan. If the remarks did prejudice Jordan, then the Court must determine whether his counsel's failure to object to them fell below an objective standard of reasonableness in the context of a death penalty case.

The applicable law for determining whether a prosecutor's statements or argument amounted to constitutional error was provided in *Donelly v. DeChristoforo*: whether the comments "so

infected the trial with unfairness as to make the resulting conviction a denial of due process." 416 U.S. at 643. The prejudice prong of the *Strickland* test is worded differently; however, the analysis must be similar; otherwise, a petitioner whose attorney did not object during trial would be more advantaged than a petitioner whose attorney did. In reviewing prosecutorial argument in the context of a death penalty sentencing hearing, a court should "consider the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – and reweigh it against the evidence in aggravation." *Sears v. Upton*, No. 09-8854, 2010 WL 2571856 at *5 (U.S. June 29, 2010) (*per curiam*); *Porter v. Collum*, 558 U.S. __, 130 S. Ct. 447, 449 (2009) (*per curiam*).

Prosecutors are permitted to be "zealous, enthusiastic and determined." *Brooks v. Francis*, 716 F.2d 780, 790 (11th Circ. 1983).Thus, they may argue a case "using simple, blunt or colorful speech." *Id*. at 789. They may "discuss facts which are in evidence and even in 'vivid detail.'" *Id*. (quoting *Hance v. Zant*, 696 F.2d 940, 951 (11th Cir. 1983). His comments may be "dramatic." *Ries v. Quarterman*, 522 F.3d 517, 530 n.7 (5th Cir. 2008). Finally, they may "remind the jury of its solemn obligation, of its awesome responsibility, or of the importance of the task at hand." *Id*. A prosecutor may comment on society's general interest in the deterrence of crime, so long as he also emphasizes the jury's responsibility in making an individually focused sentencing decision. *Welcome v. Blackburn*, 793 F.2d 672, 679 (5th Cir. 1986). Otherwise, so long as the prosecutor has not infringed upon another specific constitutional right of the accused (e.g., commenting on his failure to testify, misrepresented the jury's role as a decision maker), a prosecutor's comments are judged under the general standard of whether they rendered the trial fundamentally unfair. *Rogers v. Lynaugh*, 848 F.2d 606, 608 (5th Cir. 1988) (citing (*Donnelly v. DeChristoforo*, 416 U.S. 637)). *See*

*also Woodfox v.Cain*, ___F. 3d ___, 2010 WL 2505580 at *23 (5th Cir. June 21, 2010) ("Improper prosecutorial remarks are constitutionally unfair only if they are persistent and pronounced, or if the evidence is so weak that no conviction would have occurred but for the remark.")

In this case, the jury heard that Jordan crafted a plan to kidnap a member of a bank employee's family in order to obtain ransom money. He took great pains to identify the Marter family, stake out their house, and gain entry by pretext. Once inside, he kidnaped Mrs. Marter at gunpoint, forcing her to leave her small child alone. Jordan took Marter to the woods, shot her in the back of the head, and spent the next two days soliciting ransom money from her husband, on the pretense that she was still alive. These facts are uncontroverted. The only real factual dispute was whether the shooting was accidental, and the jury heard evidence that she was shot while kneeling – "execution style." This evidence amply supported the aggravating circumstances that the jury found. The mitigating circumstances were his family relationships, his service in the military, his creative works, and his good behavior while in prison.

Jordan argues that the prosecution improperly turned his mitigation evidence against him. It is true that the Eighth Amendment requirement of individualized sentencing in death penalty cases prohibits a prosecutor from suggesting to the jury that a mitigating factor may not be considered. *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). However, Jordan has cited no case, and this Court is not aware of one, that holds that the prosecution must sit idly by and let mitigation evidence go unchallenged. Clearly, "[T]he state may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269 (1998). Thus, the prosecution is permitted to discredit mitigation evidence in the same manner that any evidence may

be contested. *See Slagle v. Bagley*, 457 F.3d 501, 522 (6th Cir. 2006); *Sims v. Brown*, 425 F.3d 560, 578-80 (9th Cir. 2005); *Fox v. Ward*, 200 F.3d 1286, 1299-1300 (10th Cir. 2000). He may also comment on defense witnesses and strategy. *Byrd v.* Collins, 209 F.3d 486, 535 (6th Cir. 2000); *O'Bryan v. Estelle*, 714 F.2d 365, 386-87 (5th Cir. 1983).

This Court has reviewed the prosecutor's entire closing argument in Jordan's case, and it cannot find that the prosecutor's argument was so unfairly prejudicial as to deny Jordan of a fair trial. The remarks complained of were based upon evidence presented to the jury during the sentencing trial or were reasonable inferences therefrom. The jury had already heard about Jordan's life in prison from witnesses he presented. The jury was well aware that Mrs. Marter's murder occurred in 1976, and the trial took place in 1998; therefore, they most likely suspected that some legal wrangling had occurred in the interim that benefitted Jordan. The allegation that he "abused the system" was simply the prosecutor's characterization of the legal proceedings that had taken place during those twenty-two years. A prosecutor may make "an appeal to the jury to act as the conscience of the community . . . ." *United States v. Phillips*, 664 F.2d 971, 1030 (5th Cir. 1993). Much of the prosecution's argument was made to counteract the mitigating evidence put on by the defense, which the prosecutor is entitled to do, even by discussing the impact of the victim's loss on her family. *Payne v. Tennessee*, 501 U.S. 808, 825 (1991).

The only comment that gives the Court pause is the prosecutor's announcement that he took this case on for no fee. "[I]t is improper for a district attorney, in argument to the jury, to use his position or function as a basis for convicting or more severely sentencing a defendant." *Holland v. Anderson*, 439 F. Supp. 2d 644, (S.D. Miss. 2006) (citing *United States v. Garza*, 608 F.2d 659, 663 (5th Cir. 1979). The fact that this Court finds the comment improper is not the end of the analysis;

it still must have made Jordan's trial fundamentally unfair. Given the strength of the evidence produced at this trial and the nature of the crime, the Court finds that this isolated comment did not so infect the trial with unfairness that the sentence was a denial of due process. *Darden*, 477 U.S. at 181. For all of these reasons, the Court finds that the prosecutor's argument in Jordan's case did not deprive him of a fundamentally fair trial. Because the Mississippi Supreme Court held that the comments were not objectionable under state law, Jordan's trial counsel performed in a constitutionally acceptable manner. The Court likewise finds that his counsel's failure to object was not prejudicial to him and did not implicate *Strickland*. *Ries v. Quarterman*, 522 F.3d 517, 531 (5th Cir. 2008). Habeas relief is unavailable on this issue.

### Ground H: Petitioner was denied his right guaranteed by the Sixth and Fourteenth Amendments to adequately cross-examine a state witness.

This claim stems from the trial testimony of William Atchison, the pathologist who conducted Mrs. Marter's autopsy and who testified for the State at Jordan's trial. Atchison testified that Marter died from a gunshot wound to head, administered from a distance of no more than thirty inches away. He also testified that it was his opinion that Marter was on her knees when she was shot. On cross-examination, defense counsel attempted to ask the following hypothetical question:

> Let me just give you a hypothetical case. Let's assume that a person is standing on the side of the hill, and for the moment just forget about whether it's a near wound or a far wound or anything, and another person is running away from them and they are in a crouched position going say up the hill, would you rule out the possibility that a trajectory could have made the same path in the skull as we have in this case?

The prosecutor objected, on grounds that those were not the facts that was in evidence and "all of this is couched in terms of possibility." The trial judge sustained the objection, noting that the hypothetical should be couched in medical probabilities and should conform to the proof that had

been – or would be – in the record.  Defense counsel responded, "Okay" and asked the following question:

> Dr. Atchison, I'll ask you in your opinion in terms of reasonable medical probabilities, are you saying that it is improbable that there could have been any other circumstances, for example, Mrs. Marter being at some distance from Richard Gerald Jordan at the time that the pistol was shot, perhaps running away or in a crouched position, that the projectile could not have followed that same path through her skull?

Atchison began responding, "Anything in the world may be possible, but this I did in 19– . . ." The judge interjected, "You have to answer the question in terms of medical probabilities, not possibilities."  Atchison then answered, "Well I would say it's very – it would be a rare degree of probability, not a very high degree of probability."  Defense counsel went on to cross-examine Atchison further about his opinion on the trajectory, the failure to find the bullet, the omission of this opinion from the autopsy report and his earlier testimony, as well as the lack of testing on the powdery residue found on Marter's body.  Later, in re-direct, Atchison testified that it was possible that Marter was kneeling or that she was running away.

Jordan argues that the trial judge so limited his attorney's ability to cross-examine Atchison as to have violated the Confrontation Clause of the Sixth Amendment, in derogation of *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986).  He argues that the hypothetical question was substantially in agreement with the facts that had been placed in evidence and that expert witnesses may be asked about possibilities.  Because this testimony was crucial to the prosecution's argument that Jordan "executed" Marter, and because this argument was critical to the imposition of the death penalty, Jordan maintains that this limitation could not have been harmless error.

On direct appeal, the Mississippi Supreme Court found no error in Atchison's cross-examination.  Specifically, it found:

There was no proof in the record that would support that Jordan was in a "crouched position." Therefore, the trial judge's ruling on this issue is not erroneous. Jordan could have rectified the situation by asking the same hypothetical without references to crouching or by requesting that the State specify what parts of the hypothetical did not conform to the record.

786 So. 2d at 1017. Additionally, the court found that any possible error was harmless, "since the State's pathologist admitted on cross-examination that Jordan's theory was within 'a rare degree of probability." *Id*. at 1017-18. The issue was not raised in Jordan's petition for post-conviction relief.

Jordan contends that the Mississippi Supreme Court's opinion was an unreasonable application of the law established by *Van Arsdall*. There, the defense was completely prohibited from asking a primary witness for the state about the dismissal of a criminal charge against him in exchange for his testimony. 475 U.S. at 676. *Van Arsdall* is distinguishable from Jordan's case. It involved a probe into the witness's bias, and the trial court "prohibited *all* inquiry into the possibility that [the witness] would be biased as a result of the State's dismissal of his pending public drunkenness charge." 475 U.S. at 679; *see also Olden v. Kentucky*, 488 U.S. 227, 231-32 (1988) (complete exclusion of evidence showing that a defense witness was cohabiting with the victim violated Confrontation Clause). Of further note, although the Court found a violation of the Confrontation Clause, it also held that the error was subject to harmless error analysis. *Id*. at 680-84; *United States v. Jimenez*, 464 F.3d 555, 562 (5th Cir. 2006); *Callins v. Collins*, 998 F.2d 269, 274 (5th Cir. 1993).

While the Confrontation Clause guarantees a criminal defendant the right to confront witnesses against him, and although that right includes cross-examination, the right "is subject to the wide latitude of trial judges to impose reasonable limits." *Bigby v. Dretke*, 402 F.3d 551, 573 (5th Cir. 2005). An expert is permitted to testify in response to a hypothetical question "containing facts

that have evidentiary support in the record." *United States v. Garcia Abrego*, 141 F.3d 142, 173 (5th Cir. 1998). Under Mississippi law, a hypothetical that goes beyond the evidence in the record is improper. *Williams v. State,* 544 So. 2d 782, 787 (Miss. 1987). When an improper hypothetical question has been propounded to an expert, the trial court has the discretion to exclude the response. *Id.*

Based on Mississippi law, the trial judge was authorized to sustain the prosecution's objection to the hypothetical question asked of Dr. Atchison. The problem with the question is unclear. In sustaining the objection, the trial judge gave counsel some leeway to correct it, stating "the hypothetical should conform to the proof that's either in the record or that which you anticipate will be placed in the record." Defense counsel sought no further explanation of the ruling, insofar as what evidence was missing, and appeared to acquiesce in it by rephrasing his question. Immediately following, he asked virtually the same question, with the only limitation placed on it by the trial court was that the answer had to be couched in terms of medical probabilities. As the Supreme Court has stated, "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (*per curiam).* Under these circumstances, this Court cannot say that Jordan's right to an effective cross-examination was impaired.

Even if a Confrontation Clause violation had occurred, this Court would have to determine whether it was harmless. In so doing, a court should "look primarily at the specific testimony omitted, rather than the weight of the evidence notwithstanding the omitted testimony." *Jimenez*, 464 F.3d at 563 (citing *Fahy v. Connecticut*, 375 U.S. 85, 86 (1963)). Other factors to be considered are:

(1) "the importance of the witness' testimony in the prosecution's case"; (2) "whether the testimony was cumulative"; (3) "the presence or absence of evidence corroborating or

contradicting the testimony of the witness on material points"; (4) "the extent of cross-examination otherwise permitted"; and (5) "the overall strength of the prosecution's case."

*Jimenez*, 464 F.3d at 564 (quoting *Van Arsdall*, 475 U.S. at 684). The Mississippi Supreme Court found that any error in restricting Atchison's cross-examination was harmless, as he ultimately testified that it was within "a rare degree of probability" that Marter was running away when she was shot. This Court agrees. Thus, the testimony that was excluded was virtually the same as the testimony that was ultimately presented. The testimony was essentially cumulative of other testimony given by the same witness. Therefore, the Mississippi Supreme Court did not come to a conclusion that was contrary to, or an unreasonable application of, federal law. This issue cannot be the basis for habeas relief.

**Ground I:** **Petitioner was denied his right to the effective assistance of counsel, his right to present mitigating evidence, his right to confront witnesses, his right against self-incrimination, and his due process and equal protection rights to a qualified mental health examination when the special prosecutor sabotaged the mental health examination by knowingly providing the court-appointed examiner with false information and used the results of that flawed evaluation to secure Petitioner's death sentence.**

This argument involves the report of Dr. Henry Maggio, who was appointed by the trial judge to examine Jordan prior to trial. At Jordan's request, the prosecutor supplied Dr. Maggio with the report of the mental health examination that was conducted by Dr. Clifton Davis prior to the 1976 trial, as well as the intake records from that examination. Those records contained extensive information about Jordan's military service, including the statement that he was dishonorably discharged. Maggio relied on this information in drafting his report. Jordan now claims that the prosecutor knowingly supplied false information to Dr. Maggio. He further claims that this information tainted Maggio's report to such a degree as to make his opinion unreliable. Jordan also contends that the information affected his presentation of a defense.

In particular, Dr. Davis's report contains the following information received from Jordan during his intake examination:

> Upon graduation from high school in August, 1964, Mr. Jordan enlisted in the U.S. Army. He was charged with check forgery in 1964 and was told that these charges would be dropped if he consent[ed] to join the Army, which he did. He was court-martialled in 1970 for falsification of official documents and was sentenced to 9 months in Leavenworth. He received a dishonorable discharge from the Army in August 1971.

This report was furnished to Dr. Maggio, whose interview with Jordan provided the following information:

> Richard Jordan went on to add that he was in Vietnam from April of 1966 through February of 1969 with some periods of relief in between. Most of the time he was with the First Air Cavalry, especially during the Tet Offensive of 1968. He states he was given a Purple Heart because he received a bullet in his left arm and he also had an injury with a tendon repair to his right ankle which was hurt in a trench. In civilian life prior to going into the military, he was a licensed pilot and when he joined the Army he ended up being a door gunner in a helicopter for 9 months and later worked as [sic] in flight operations.

> . . . .

> He stayed in the military for 8 years on active duty from August 1964 through September of 1972 stating he had an Honorable Discharge at the level of E-6. He denies having any difficulties with authority figures in the military. He had gone in for 3 short discharges and returned to active duty. He states they were going to send him back to Germany but he was now married and his wife was pregnant and decided not to do this. He elaborated that he had been in the military and at one time he had come back home and was stationed in Georgia, Kentucky and Alabama and was offered a job with proficiency pay and teaching at a school. Then they wanted to send him back to Germany and was told he was on a levy for Germany. The records from 1965-66 showed that he had gone to Vietnam and it was thought to be an incomplete tour. He basically had 6 months left and they wanted him to reenlist. His wife was pregnant; they talked it over and decided not to do so and he did not reenlist.

> . . . .

The review also shows that he joined the Army in 1964 and had been charged with check forgery and agreed to join the Army so the charges would be dropped. He was also court martialed in 1970 for falsification of official documents and sentenced to

9 months in Leavenworth. He received a Dishonorable Discharge from the Army in 1971. All of this is in contrast and contradiction to what he told me when he denied having any difficulty with authority figures, having an Honorable Discharge from the military and being a good guy prior to this murder and has been a good guy since then while he's in prison.

Jordan did not raise this particular issue on direct appeal, arguing, instead, that it was error for the trial court to order Dr. Maggio's report be furnished to the prosecution. He did raise this claim in his petition for post-conviction relief, and the Mississippi Supreme Court denied relief on this issue. 912 So. 2d 800, 816. The court found no explanation in the record for the notation in Dr. Davis's report that he was dishonorably discharged, although the court notes, "Jordan also admits that the information could have been entered incorrectly in the record." *Id.* The court cited *United States v. Agurs*, 427 U.S. 97 (1976), as setting forth the applicable law that "the State has a responsibility not to present false or misleading evidence." *Id.* Relying on *Agurs*, the court stated, "The proper standard of materiality of undisclosed evidence, and the standard applied by the trial judge in this case, is that if the omitted evidence creates a reasonable doubt of guilt that did not otherwise exist, constitutional error has been committed." *Id.* The court found that the information characterizing Jordan's discharge was not material. Reaching a related issue – whether trial counsel was ineffective for failing to note the error – the court found:

> Dr. Maggio's report does in fact note that Jordan himself explained he had been *honorably* discharged from the Army. Dr. Maggio was made aware of the discrepancy during his own examination of Jordan. Jordan suffered no prejudice from the discrepancy between the two mental health reports and he has not demonstrated that trial counsel was ineffective for failing to object to Dr. Maggio's report.

912 So. 2d at 816.

Jordan argues that the Mississippi Supreme Court's opinion was an unreasonable application of *Townsend v. Burke*, 334 U.S. 736, 741 (1948), and *Berger v. United States*, 295 U.S. 78 (1935).

In *Townsend*, a defendant pleaded guilty to charges of burglary and robbery. At the sentencing hearing, the trial judge questioned the defendant about several previous charges. The defendant had been acquitted of some of them. *Id*. at 740. The Supreme Court granted habeas relief, finding that the defendant "was sentenced on the basis of assumptions concerning his criminal record which were materially untrue. Such a result, whether caused by carelessness or design, is inconsistent with due process of law, and such a conviction cannot stand." *Id*. at 741. In *Berger*, the prosecutor made material misstatements regarding the evidence during his examinations of witnesses. *Id*. at 85. Additionally, his argument "was undignified and intemperate, containing improper insinuations and assertions calculated to mislead the jury." *Id*. The Court was highly critical of the United States attorney who tried the case, stating, "It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Id*. at 88. Given the prosecution's tactics, combined with the weak case against the defendant, the Court found that prejudice was probable. "If the case against Berger had been strong, or, as some courts have said, the evidence of his guilt 'overwhelming,' a different conclusion might be reached." *Id*. at 89.

Jordan also compares his case to *Kyles v. Whitley*, 514 U.S. 419 (1995), where the prosecution failed to disclose several variant pretrial statements given by eyewitnesses to the crime, as well as an associate of the defendant's who manifested an unusual interest in helping the police in their investigation of the accused. *Id*. at 443-46. The Supreme Court reversed, holding that the question to be resolved when *Brady* evidence is withheld is not whether the outcome would have been different with the withheld evidence, but whether, in its absence, he received a fair trial. *Id*. at 434. Or, as summarized in the Court's concluding language, ""[T]he question is not whether the State

would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same." *Id*. at 453.

None of the cases relied upon by Jordan addresses the facts of this case, where a mistake of fact, not involving obviously exculpatory evidence, was provided before trial by the prosecution to a witness. Given the facts of this case, this Court concludes that the Mississippi Supreme Court correctly relied on *Agurs* as the appropriate authority. There, the Court considered a case where there was only a general request was made for *Brady* material. As a preliminary matter, the Court rejected a rule requiring complete disclosure of prosecutors' files and held that constitutional error did not depend on whether the exclusion of evidence was in good faith. "If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." *Id*. at 110. Additionally, such an omission "must be evaluated in the context of the entire record." *Id.* at 112. In so evaluating the omission, the reviewing judge must set aside the judgment "unless his 'conviction is sure that the error did not influence the jury, or had but very slight effect.'" *Id*. (quoting *Kotteakos v. United States*, 328 U.S. 750, 764 (1946)). In *Agurs*, the Court ultimately denied relief, noting that the withheld evidence "did not contradict any evidence offered by the prosecutor, and was largely cumulative of [other] evidence . . . ." *Id*. at 113. This materiality test continues to be used by the Court. *Cone v. Bell*, ___ U.S. ___, 129 S. Ct. 1769, 1783 (2009); *Banks v. Dretke*, 540 U.S. 668, 698-99 (2004); *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987); *United States v. Bagley*, 473 U.S. 667, 678 (1985) ("[A] constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial.")

As stated earlier, Dr. Maggio diagnosed Jordan as having Antisocial Personality Disorder. That diagnosis was based, in part, on the inconsistency between Jordan's oral history and Dr. Davis's report on the manner of his discharge. However, there were numerous other inconsistencies in his history, as well as other self-confessed wrongdoing.

One of Jordan's primary complaints about Maggio's report is the recitation from Dr. Davis that Jordan was dishonorably discharged from the Army. However, Jordan has never denied that he was court-martialed, and his DD-214, which he provided as an exhibit to his post-conviction petition, supports his earlier report that he was discharged for misconduct. After nearly eight years of active duty, Jordan was discharged with the rank of PV1 and pay grade E-1. (Jordan has insisted in his pleadings, and testified at his post-conviction hearing in the trial court, that he was "reduced to E-5 once" but was discharged as an E-6.) There is no indication that Jordan was awarded a Purple Heart medal, as he had informed Dr. Maggio. Finally, the form shows several periods of non-pay status, including a nine-month period in 1971-72, which would be consistent with the confinement at Leavenworth that Jordan reported to Davis. During the argument on admission of the Maggio report, Jordan's attorney recognized, "Well he might have been court-martialed, but he wasn't – he didn't get a dishonorable discharge. There were some proceedings and he appealed it and he did not receive a dishonorable discharge. But be that as it may, he still served in Vietnam."

The point on which Dr. Maggio made his diagnosis was not the nature of Jordan's discharge, but the facility with which he lied to the examiners. Regardless of whether he was discharged dishonorably or not, the fact is that he told two completely different stories about his military service. In the original story, Jordan confessed that he joined the Army only to avoid a criminal charge, and, while on active duty, he was court martialed for falsifying official documents and served nine months

in Leavenworth. Clearly, his military career involved some serious misconduct. By the time that Maggio interviewed Jordan, he was a Purple Heart recipient who was discharged due to disability at a pay grade of E-6, who had never had difficulties with authority figures in the military. Maggio properly considered the inconsistencies in the stories in making his diagnosis. Had the DD-214 been available at the time, he would have been aware that Jordan's discharge was honorable, but that much of his remaining story was untrue.

In any event, Dr. Maggio never testified, his report was never introduced into evidence, and the jury was never told that Jordan had been dishonorably discharged. The only use of the report was during the cross-examination of one of Jordan's witnesses, who was asked simply whether he knew anything about Jordan's discharge. Owen ultimately told the court and counsel that he would not use that testimony in his closing argument. There is little chance that Maggio's opinion of Jordan would have changed if the conditions of Jordan's discharge had been reported correctly to Dr. Davis, and, for this reason, this Court cannot conclude that the error in the information sent to Dr. Maggio was material. The Mississippi Supreme Court's standard of review and its ultimate opinion on this issue was in accord with clearly established federal law, and habeas relief on this issue would be inappropriate.

> **Ground J**: Petitioner was denied his right to a reliable and adequate mental health evaluation in violation of his rights guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

Jordan argues that he received a constitutionally deficient mental health evaluation from Dr. Maggio. As grounds for this claim, he reiterates his argument from the previous section, regarding the information sent from the prosecutor. The Court has already ruled that this information was not material – either to the outcome of Jordan's trial, or, very likely, to Dr. Maggio's opinion. Aside

from that issue, he argues that Maggio "spent little time with Mr. Jordan and made no effort to obtain records or other information from other sources." He argues that the diagnosis of antisocial personality disorder was improper, as there was no evidence that Jordan had a conduct disorder prior to age 15. Finally, relying on an affidavit from another attorney, Jordan argues that Dr. Maggio generally performs inadequate evaluations.

Respondents argue that the issue is procedurally barred, as was recognized by the Mississippi Supreme Court. Additionally, they argue that Jordan has not presented sufficient evidence to support his claim that the examination was inadequate. Maggio was, apparently, not the only expert that the court suggested, but defense counsel expressed no problem with using him. Finally, Respondents claim that the case that Jordan primarily relies upon, *Ake v. Oklahoma*, 470 U.S. 68 (1985), does not guarantee him a mental health expert where he has not raised his sanity at trial, nor is it applicable where future dangerousness is not an issue.

The Mississippi Supreme Court addressed this issue in its opinion on Jordan's petition for post-conviction relief and found, "[T]his claim is procedurally barred for failure to object at trial or raise this issue on direct appeal." 912 So. 2d at 818. The court went on, "Notwithstanding the procedural bar, this Court has long recognized Dr. Maggio's qualifications and acceptance as an expert in the field of psychiatry. A defendant is not entitled to a favorable mental health evaluation, but is instead entitled to a competent psychiatrist and an appropriate examination." *Id*. In an earlier discussion on procedural bars and alternative rulings, this Court set out the appropriate standards for determining whether a state court's opinion, after recognizing a procedural bar, amounts to a decision on the merits. In the interest of brevity, at least as much as can be sustained in this Opinion, that language need not be repeated here. It is enough to say that the Court's opinion on this issue is the

same.  Jordan forfeited his right to argue this issue because he failed to make an objection to Maggio's work at trial or on direct appeal.  The state court recognized the procedural bar and relied on it, and the additional language in its opinion was an alternative ruling, and not one on the merits.

Jordan argues that, if there is a bar, his attorneys' ineffectiveness is cause that should excuse his default.  For counsel's ineffectiveness to constitute cause to excuse default, it "must have been so ineffective as to violate the Federal Constitution."  *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).  Such ineffectiveness is itself a claim.  A review of Jordan's petition for post-conviction relief does not reveal that he asserted it in state court.  He argued that "counsel had an obligation to ensure that the court-appointed psychiatrist conduct an evaluation at least minimally consistent with accepted practice."  However, he did not argue that counsel was ineffective for failing to raise that issue earlier.  Thus, he cannot use this claim of ineffectiveness as cause for excusing default on this issue.  Because it will be necessary for this Court to look more closely in the next section of this Opinion at whether his counsel was ineffective for failing to ensure a competent mental examination, no more must be said here except that habeas relief is not available on this issue.

**<u>Ground K</u>:  Petitioner was denied the effective assistance guaranteed by the Sixth Eighth, and Fourteenth Amendments to the federal Constitution by trial counsel's failure to ensure that Petitioner receive a reliable mental health evaluation.**

Jordan argues that his trial counsel were ineffective in two ways – first, they failed to insure that Dr. Maggio received accurate information regarding him, and, second, they failed to ensure that he received a competent and effective mental health evaluation.  With regard to the first issue, the Mississippi Supreme Court held:

> As the State points out Dr. Maggio's report does in fact note that Jordan himself explained he had been *honorably* discharged from the Army.  Dr. Maggio was

made aware of the discrepancy during his own examination of Jordan. Jordan suffered no prejudice from the discrepancy between the two mental health reports and he has not demonstrated that trial counsel was ineffective for failing to object to Dr. Maggio's report. *Strickland, supra*. Therefore, this issue has no merit.

912 So. 2d at 816.

As stated earlier, the standard for determining the effectiveness of counsel during trial is the two-prong test set forth by the Supreme Court in *Strickland*, 466 U.S. 668. A defendant must show that counsel's representation fell below an objective standard of reasonableness, and that there is "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 694. To meet the prejudice prong, the defendant must affirmatively prove, and not merely allege, prejudice. *Skinner v. Quarterman*, 576 F.3d 214, 217 (5th Cir. 2009).

According to Jordan, if counsel had thoroughly inspected the prosecutor's files or if he had contacted Robert McDuff, Jordan's former counsel, they would have known that Jordan had been honorably discharged. The Court agrees that, since Jordan's military service had been discussed in prior trials, counsel should have made themselves aware of its nature.[6] The transcript of the discussion of Dr. Maggios' testimony demonstrates that counsel's performance was deficient in not adequately reviewing the earlier trial records. That being said, the Court cannot conclude that Jordan was prejudiced by this failure. Dr. Davis's report would not have been altered, and, even if Dr. Maggio knew that it was incorrect as to the issue of Jordan's discharge, he still would have had to reconcile the inconsistent story. Moreover, the nature of the discharge was not crucial to Maggio's

---

[6]In *Strickland*, the Supreme Court recommended reaching the prejudice prong of the ineffectiveness test before assessing counsel's performance, in order to "ensure that ineffectiveness claims do not become so burdensome to defense counsel that the entire criminal justice system suffers as a result." 466 U.S. at 697. However, in a more recent decision, the Court has suggested that an inquiry into the adequacy of counsel's performance is the preliminary question. *Sears v. Upton*, No. 09-8854, 2010 WL 2571856 at * (U.S. June 29, 2010).

opinion of Jordan, which was, instead, based on his penchant for lying. As the DD-214 demonstrates, additional evidence of Jordan's military career might have created more problems than it solved. Finally, as stated earlier, Maggio did not testify, nor was his report ever introduced into evidence. The jury never heard that Jordan had been dishonorably discharged. Maggio's report was only used to cross-examine of one of Jordan's witnesses, who was asked simply whether he knew anything about Jordan's discharge. The prosecutor did not use that testimony in his closing argument. For all of these reasons, this Court finds that the state court's opinion on this issue was neither contrary to, nor an unreasonable application of, clearly established federal law.

On the second issue – that counsel were ineffective for failing to procure their own mental health expert – the Mississippi Supreme Court also denied relief under state law, holding, "[A] defendant is not entitled to a psychiatrist or psychologist of his choice, but only has the right to a competent one." 912 So. 2d at 817. Additionally, the court cited federal law holding that ineffectiveness cannot be established "from mere undeveloped assertions that another expert would have been beneficial." *Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985). Examining Jordan's argument, the court found that he had not provided evidence of how he was prejudiced by the failure to pursue another mental health expert; therefore, he did not meet the *Strickland* standard.

Before Jordan's attorneys could be deemed ineffective on this account, Jordan would have to show that he was entitled to the appointment of such an expert. *White v. Johnson*, 153 F.3d 197, 207-08 (5th Cir. 1998). Absent a showing of a particularized need for a mental health expert, the failure to request one cannot be the basis of a claim of ineffectiveness. Jordan argues that he has presented sufficient evidence of a mental disorder – post traumatic stress syndrome – to show that he was prejudiced by counsel's failure to seek an expert qualified to examine him for that disorder.

Jordan described his military career in his testimony at the 1983 trial. According to him, he went into the Army in 1964, receiving basic training at Fork Polk, Louisiana, and working in personnel management, and then as an air traffic controller, at Ludwigsburg, Germany, for about fifteen months. In 1966, he volunteered to go to Vietnam, where he was stationed with the First Air Cavalry Division in the central highlands. Once there, he volunteered to fly as a door guard on a CH-47 helicopter, which he did, off and on, for two years. His responsibility was "maintaining the machine guns that the aircraft was armed with and to provide fire power if necessary to protect the aircraft against hostile attacks." Ultimately, Jordan was injured in a helicopter crash and subsequently went on ground duty in flight operations. He was in Vietnam for approximately thirty-four months, partly due to extending his tour to permit his only brother to leave the country. That brother, Robert, testified at the 1983 trial that Jordan had not been the same since leaving the military: that he seemed more nervous. That was the only testimony remotely suggesting that Jordan suffered from a psychological impairment related to his military service.

When Jordan spoke with Dr. Maggio in 1998, he told him about his time in Vietnam and his service as a door gunner, although he said it was for only nine months. (In the affidavit Jordan gave in connection with his post-conviction petition, he stated that he served as a door gunner "on a daily basis for almost one year of that time.") According to Dr. Maggio's report, Jordan told him about his injury to an ankle and that "[H]e was given a Purple Heart because he received a bullet in his left arm . . . ." At this point, Jordan was raising the possibility that he suffered from post-traumatic stress syndrome. Maggio asked him how being in Vietnam figured into this disorder:

> He replied, he sees guys in uniforms picketing and marching, etc., and he basically said "get a life." Then again at other times, he sees the news and remembers the time when he was a gunner when he had to pull injured males out of the helicopters; one

time they went into a village and they took a hit and lit up the village. He also had times when he went into restricted areas and he wondered if the children could read.

Jordan rests his legal argument on *Ake v. Oklahoma*, 470 U.S. 68, 80 (1985). There, the Supreme Court recognized, "[W]hen the State has made the defendant's mental condition relevant to his criminal culpability and to the punishment he might suffer, the assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense." *Id*. Thus, expert testimony from a mental health professional is appropriate where the state relies on future dangerousness as an aggravating factor, in order to rebut the psychiatric or psychological testimony to that effect. *Id*. at 83-87. Jordan's argument is that, in his case, the prosecution's strategy was built around Dr. Maggio's report. Therefore, even though neither the report nor Maggio's testimony was offered into evidence. Jordan's counsel should have retained experts to rebut it with evidence of PTSD.

As the Mississippi Supreme Court recognized, the right to expert assistance in developing a defense cannot be based on "little more than undeveloped assertions that the requested assistance would be beneficial . . . ." *Caldwell,* 472 U.S. at 323 n.1. Jordan supports his claim with affidavits from Dr. John Wilson, a psychologist, and Dr. Sheldon Zigelbaum, a psychiatrist. Each of these men appears to be highly qualified in the area of diagnosing and treating post-traumatic stress syndrome. Each of them theorizes that Jordan suffers from that disorder. However, each of them relies solely on Jordan's service as a door gunner in Vietnam as the basis for his theory. Dr. Wilson states:

> I have been informed that Mr. Jordan served almost three tours of duty in Vietnam. In my experience, a soldier who has served that length of time in combat – and it is extremely rare to have served in Vietnam that long – stands a greater than 85% chance to exhibit symptoms of the disease. Moreover, it is my understanding that Mr. Jordan served as a door gunner in a helicopter during at least some of his time in Vietnam. It is the conclusion of my research that this role, in comparison to others, is significantly positively correlated with virtually every symptom of PTSD.

Dr. Zigelbaum's report was similar:

> I have been informed that Mr. Jordan served almost three tours of duty in Vietnam, and that during at least part of that time, he acted as a door gunner. Based on my experience and research, I believe that it is entirely possible that Mr. Jordan may have had at the time of the crime at least some manifestations of PTSD, and that further examination and testing of him is warranted.

These opinions would be more persuasive if they were based upon more than an assumption that, because Jordan served as a door gunner in Vietnam, he likely has PTSD. They have not examined Jordan, and there is no mention in the report that either expert considered any particular aspect of Jordan's behavior as influential in his opinion.

Jordan, furthermore, has not demonstrated that his behavior is symptomatic of PTSD. According to Dr. Zigelbaum, PTSD symptoms may vary among individuals, "but common manifestations of PTSD include uncontrollable and emotionally distressing intrusive images, dissociative states, and unconscious re-enactments of the traumatic situation." According to Dr. Wilson:

> The disease can manifest itself in various ways in different individuals, but is often characterized by uncontrollable and emotionally distressing intrusive images, dissociative states of consciousness and unconscious behavioral reenactments of the traumatic situation. In addition, it may also be manifested as psychic numbing, loss of normal affect, depression, anger, rage, guilt and various approach-avoidance syndromes. The disease can thus cause extreme mental or emotional disturbances

This Court does not discount Jordan's service to his country; however, he has not produced any evidence of the sort of behavioral issues commonly associated with PTSD. His statements to Maggio – that he is impatient with anti-war demonstrators, he thinks about pulling wounded soldiers off helicopters, remembers his helicopter getting hit over a village, and he wonders if the children in the villages he observed could read – do not seem singularly distinct from the memories any soldier would carry from his wartime experience. Contrast Jordan's case with the Korean veteran in *Porter v. McCollum*, ___ U.S. ___, 130 S. Ct. 447, 450-51 (2009), who served with a unit that once engaged

in hand-to-hand fighting with the Chinese and, in one battle, had over 50% casualties. Porter individually received two Purple Hearts and the Combat Infantryman Badge. While in Korea, Porter went AWOL twice; he went AWOL again after his return to the United States. Although serving six months' imprisonment for that infraction, he received an honorable discharge. His post-Army behavior was described as follows:

> After his discharge, he suffered dreadful nightmares and would attempt to climb his bedroom walls with knives at night. Porter's family eventually removed all of the knives from the house. According to Porter's brother, Porter developed a serious drinking problem and began drinking so heavily that he would get into fights and not remember them at all.

*Id.*

In contrast, Jordan returned from Vietnam and went to work, including a stint as a plant manager at Swift Chemical Company. Although his brother described him as "more nervous," Jordan reported no particular behavior immediately after leaving the service that would indicate that he suffered from post-traumatic stress, nor did he report any, up until the time of the crime for which he was convicted. Since the crime, he has apparently been a model prisoner, with such a clean prison record that he served for several years as a trusty. He has written short stories and invented a machine to convert electricity from wind. Nothing in this behavior supports the theory that Jordan suffers from PTSD.

The only aberrant behavior exhibited by Jordan since his military service is the kidnaping and killing of Mrs. Marter. Dr. Wilson posits:

> If Mr. Jordan did have PTSD at the time of the crime, it is likely that the offense was committed while Mr. Jordan was under the influence of extreme mental or emotional disturbance, and that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

Dr. Zigelbaum states that he believes it is "entirely possible" that Jordan had "at least some manifestations of PTSD" at the time of the crime. However, other than Jordan's service in Vietnam, there is no indication that these experts reviewed the circumstances of Jordan's offense or his behavior before and after the murder in suggesting this diagnosis. Jordan himself admitted in an exchange with the trial court outside the presence of the jury that he never thought he suffered from PTSD. Absent more evidence of a connection between Jordan's actual behavior and the possibility that he has PTSD, this Court is not persuaded by these experts' affidavits that hiring additional mental health experts would have made a difference in Jordan's case. *Goodwin v. Johnson*, 132 F.3d 162, 189 (5th Cir. 1997).

Jordan also argues that other mental health experts would have exposed the deficiency in Dr. Maggio's evaluation of him as having antisocial personal disorder. Although this issue was raised in Jordan's post-conviction petition, the Mississippi Supreme Court did not address it in the context of ineffectiveness. In support of his argument here, Jordan argues that the diagnosis of antisocial personality disorder was inaccurate because it was based on "little or no evidentiary support," since Maggio spent little time with Jordan and sought no other information. Additionally, Jordan argues:

> Dr. Maggio ultimately concluded that Mr. Jordan had antisocial personality disorder. However, according to the Diagnostic and Statistical Manual ("DSM-IV-TR), there must be some evidence of a conduct disorder prior to age 15, but in this case there was no such evidence. There is also little, if any, support for most of the other criteria for the antisocial personality disorder diagnosis. The relevant diagnostic criteria from the DSM were attached as Exhibit 40 to the state court petition,

The referenced exhibit is a single page that does contain the diagnostic criteria Jordan describes – evidence of Conduct Disorder with onset before age 15 years. However, there is no authentication of this page as having come from the DSM-IV. There is no validation of this diagnostic criteria as being effective at the time that Jordan was interviewed. No expert in mental health has opined that

Maggio's diagnosis was fatally flawed in the absence of this finding. This Court is unwilling to find that counsel was ineffective in failing to obtain expert advice to refute this finding on the basis of an untitled page. Jordan has not provided evidence to demonstrate that he was prejudiced in this regard, and the failure of the Mississippi Supreme Court to vacate his death sentence on this issue is neither contrary to, nor an unreasonable application of, clearly established federal law.

**Ground L:  The trial court denied petitioner's rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments by ordering the disclosure of mental health evaluation even though Petitioner did not intend to call the court-appointed evaluator as a witness.**

Prior to trial, Jordan moved the court for a psychiatric examination and evaluation "to determine if there are possible mitigating factors that could be used as evidence on defendant's behalf at his sentencing hearing. There were difficulties in scheduling the motion for a hearing, and the transcript indicates that a hearing occurred with little notice to the parties to discuss whether the State was entitled to a copy of the examiner's report. For that reason, and in order to prevent delay, Jordan's counsel waived his presence at the hearing, on the court's assurance that the issue could be reconsidered at a time when Jordan was present.

Counsel reiterated at the hearing that the examination would be for the purpose of exploring possible mitigation factors. Jordan's attorney argued that, if his client could afford to hire an expert, he would not be required to provide a copy of his report to the State until he decided to use the expert at trial. He contended that it was a violation of due process to prejudice his client because he was indigent. The prosecutor argued that Rule 9.04 of Mississippi's Rules of Circuit and County Court Practice required disclosure of the report. Thus, although he had no objection to the examination, he argued that the State was entitled to the report. The judge ruled for the State, "unless there's a motion for rehearing with some authority otherwise . . . ."

Dr. Maggio was chosen as the expert, with no objection from Jordan's counsel.  As discussed earlier, Maggio's report included information from Dr. Davis indicating that Jordan had been dishonorably discharged from the Army.  Maggio concluded that Jordan had antisocial personality disorder.  Maggio concluded:

> [Jordan] actually appeared to be a danger to himself and others prior to being in the military, while he was being in the military, and after he got out of the military.  He would portray himself as being a really fine, upstanding citizen who has been a good guy and helped people all of his life and would continue to do so if he got out of jail.  The evidence seems to be quite the contrary.  He is a self-proclaimed con artist, all of his life offers excuses for his behavior and does not take responsibility for his behavior.  In addition, he seemed to show no remorse for the crime that he has committed.  If, in fact, he is doing all of these good works while he's in jail, then that is a good thing for him to do but one is led to the conclusion that he's only doing it because he is in jail and to paint a good picture of himself.

This report was never offered into evidence.  However, Richard King, a childhood friend of Jordan's, testified that Jordan was not a danger to society and that he would welcome Jordan into his home.  During cross-examination, the prosecutor asked whether he was aware of several of the facts related in the report, including his military record, embezzling, the fact that Marter was killed because the FBI did not follow his instructions, and his comment to Dr. Davis, "Better luck next time."

Following King's testimony and that of another witness, Jordan's attorneys announced that they had intended to call two other witnesses, Dola Jones and Joseph Fairchild, but would not do so "in light of the Court's ruling as far as allowing them to be examined on the basis of the psychiatric reports . . . .We're not calling them for that reason only."  Ultimately, the trial judge ruled that Maggio could not testify in rebuttal, unless Jordan testified to some matter that Maggio could rebut.  After that ruling, Jordan's attorneys asked for a mistrial, based on the decision not to call Jones and Fairchild "for fear, actually being intimidated, that something might inadvertently come out of the witness' mouth to open the door to the use of this report . . . ."  The motion was denied.  Jordan

declined to testify because of the potential that it would open the door to Maggio's testimony, after which the prosecutor stated that he would not call Maggio under any circumstances. Jordan conferred with his attorneys about that development, but still declined to testify.

Jordan argues now that the judge's interpretation of Rule 9.04 violated the Fifth, Sixth, Eighth and Fourteenth Amendments. He contends that, by ordering Maggio's report to be simultaneously published to both sides, the trial court violated his right to due process. He also claims that he was disadvantaged because of his indigency, in violation of his right to equal protection. Jordan equated the compulsion to provide the State with Maggio's report to being required to share an expert, rather than being permitted an independent expert, in violation of *Ake v. Oklahoma*, 470 U.S. at 77. Citing *Brooks v. Tennessee*, 406 U.S. 605, 612 (1972), Jordan argues that the trial court's ruling violated the Fifth and Sixth Amendments by requiring him to provide assistance to the prosecution.

The Mississippi Supreme Court recognized that there are limitations on the use of psychiatric testimony where it has been ordered by the court. *Jordan*, 786 So. 2d at 1007-08; *Estelle v. Smith*, 451 U.S. 454, 462 (1981). However, it distinguished Jordan's case from the authorities that he cited, on grounds that he requested the examination and voluntarily subjected himself to it. *Jordan*, 786 So. 2d at 1008. According to that court, where the defendant requests such an evaluation or presents psychological evidence, the prosecution is entitled to rebut it. *Id*. (citing *Buchanan v. Kentucky*, 483 U.S. 402, 422-23 (1987)). The prosecution may resort to the reports of the defendant's expert to do so. *Id*. The court concluded:

> We find that the State's cross-examination of King did not violate Jordan's privilege against self-incrimination. King testified that he had known Jordan most of his life; therefore it was reasonable for the State to ask King about Jordan's employment and his military career. King testified that he did not consider Jordan to be dangerous and that he had exhibited good behavior during his tenure at Parchman;

therefore it was reasonable for the State to ask King about statements made by Jordan about the killing.

786 So. 2d at 1010. Additionally, the court noted that the substance of Maggio's report was never divulged to the jury.

Jordan argues that the Mississippi Supreme Court never reached any issue beyond his Fifth Amendment claim; therefore, his remaining claims may be reviewed *de novo*. He claims that the court's reliance on *Estelle*, and *Buchanan* was in error, as he did not present mental health or mental status testimony. Additionally, according to Jordan, the state court's opinion relied on a mistake of fact. In its opinion, the court states, "The basis of the State's questions was Dr. Davis' psychiatric report which was introduced into evidence when Dr. Davis testified during the guilt phase. *See Jordan v. State*, 365 So. 2d 1198, 1203 (Miss. 1978)." 786 So. 2d at 1010. As Jordan correctly avers, Davis did not testify during any trial. He was retained to examine Jordan to determine whether he was competent, and his only testimony occurred at a pretrial hearing. His report was never introduced into evidence. Thus, to the extent that the state court opinion permitted use of Davis's report on the assumption that a jury heard it during the guilt phase, that assumption was in error.

With regard to the first issue, this Court agrees with Respondents that the Mississippi Supreme Court's decision was not limited to his Fifth Amendment claim. The opinion states:

> Even though Jordan claims his right to due process was violated, the issue, at its basis implicates the Fifth Amendment to the United States Constitution, the guarantee against self-incrimination. Jordan did not want the State to have copies of the psychiatric reports because they included statements made by Jordan and opinions based thereon which may have been damaging to his defense. Therefore, if it is determined that Jordan's Fifth Amendment rights were not violated, he has no due process claim.

786 So. 2d at 1007. As to the third issue, this Court agrees that the Mississippi Supreme Court made a factual error – Dr. Davis never testified before a jury in Jordan's case. However, the error does not

mandate habeas relief, since the court's opinion is not reliant solely on the assumption that reference to Davis's report was proper because it had been introduced to the jury in the only trial on Jordan's guilt. Instead, the opinion went on to reason that reference to the report was proper to impeach King, particularly since its contents were never revealed to the jury. 786 So. 2d at 1010.

It is the second issue, whether requiring Dr. Maggio to provide his report to both the prosecution and the defense violated Jordan's constitutional rights, that is the primary issue here. The state court ruled that it did not, and this Court agrees. In *Granviel v. Lynaugh*, 881 F.2d 185 (5th Cir. 1989), the petitioner raised an insanity defense. In response. the State introduced testimony from two psychiatrists who had examined him earlier. Granviel argued that the admission of that testimony violated his Fifth and Sixth Amendment rights, both of which claims were rejected. *Id*. at 190. Additionally, Granviel attacked, on constitutional grounds, the state statute that permitted the appointment of a disinterested expert, but required that a copy of his report be provided to the court and opposing counsel. *Id*. at 191. Based on that statute, the trial court required that the report of one of the psychiatrists be disclosed to the State.

The court disposed of Granviel's Sixth Amendment claim on grounds that it was waived when his attorney requested that an expert be appointed. *Id*. Granviel had also alleged that he was denied the right to meaningfully defend himself by asserting an insanity defense, in contravention of *Ake*. The court denied that claim, stating, "Granviel's ability to uncover the truth concerning his sanity is not prejudiced by a court-appointed, neutral expert. . . . The state is not required to permit defendants to shop around for a favorable expert." 881 F.2d at 192. Thus, Granviel had been provided "the raw materials integral to the building of an effective defense." *Ake*, 470 U.S. at 77.

In a later case, *White v. Johnson*, 153 F.3d 197 (5th Cir. 1998), the petitioner, who had been convicted of capital murder and sentenced to death, had asked for the appointment of a psychiatrist to assist him in defending the State's claim of future dangerousness. The trial court gave him two options – a simultaneous, joint examination by psychiatrists for both sides or an examination by a court-appointed psychiatrist whose report would be made available to the court and counsel for each side. *Id*. at 200. Because White would not agree to either option, the court denied his motion. White contended that the trial court had violated his due process and equal protection rights, as well as his Fifth Amendment right against self-incrimination.

The court first distinguished White's case from Granviel's, noting that Granviel had put his mental state at issue by pleading an insanity defense, while White sought expert assistance to counter a claim made by the State. *Id*. at 201 n.2. Without deciding that the State erred in setting conditions for the appointment of a psychiatrist, the court determined that any error was harmless. To establish the standard of review, the court decided that failure to provide the services of a psychiatrist in this context was trial error, rather than structural error, and therefore, subject to harmless error analysis. In making that determination, the court noted that White's right to psychiatric assistance was contingent upon the State's introduction of evidence of future dangerousness. Absent the introduction of such evidence, White had no right to psychiatric assistance under *Ake*. Thus, the court reasoned, "if the state's admission of psychiatric testimony is subject to harmless-error analysis, then the purported *Ake* error is likewise subject to harmless-error analysis." *Id*. at 203. The court noted that the Supreme Court had held that the erroneous admission of psychiatric testimony is subject to harmless error analysis. *Id*. (citing *Satterwhite v. Texas*, 486 U.S. 249, 257-58 (1988)). That being so, the denial of psychiatric assistance to White was also subject to harmless error analysis.

White argued that it was error not to provide him with his own psychiatrist to counter the testimony of the state's expert, who testified that he considered White to be at the end of the spectrum in terms of danger to society, and that he considered him to be a high risk for future dangerousness. However, there was ample lay testimony to the same effect; e.g., officers testified that he bragged about the crime and showed no remorse; his ex-wife reported that he beat her, as well as other ex-wives; and family members who testified about his propensity for violence. Given this testimony, the court concluded that the psychiatrist's testimony likely did not affect the jury's finding the issue of future violence, particularly considering the effectiveness of the defense's cross-examination. The court further rejected White's claim that psychiatric testimony would have helped him in other areas of his case, since he did not include those areas in his request for expert assistance. For these reasons, it found that, if error was committed, it was harmless. *Id.* at 205-07.

*Granviel* continues to apply to cases in which the request for psychiatric expert assistance is made to support an issue raised by a criminal defendant. *Long v. Johnson*, No. 98-10994, 189 F.3d 469 (5th Cir. July 15, 1999). There, the petitioner argued that the state was obligated to appoint an independent psychiatrist, not merely a neutral one, to assess his claim of insanity. The court noted that other circuits had held that appointment of an expert who was neutral, but not independent, violated *Ake*. However, without ruling on that issue, the court noted, "[T]he trial court in this case would not have felt bound to apply these cases in the face of *Granviel's* binding precedent." *Id.* at n.6. More recently, the Fifth Circuit again recognized the contrary opinions from other circuits, but held, in the absence of a clear precedent from the Supreme Court, a state court does not err in assuming that *Graviel* remains good law. *Woodward v. Epps*, 580 F.3d 318, 332 (5th Cir. 2009).

When Jordan raised this issue on direct appeal, it was couched as an attack on the trial court's interpretation of Rule 9.04, which Jordan contended was unconstitutional. His argument was that the Rule should be interpreted to compel production of an expert's report to the state only when a defendant intends to use the expert's opinion at trial. 786 So. 2d at 1007. The court analyzed the argument as a Fifth Amendment claim. "Jordan did not want the State to have copies of the psychiatric reports because they included statements made by Jordan and opinions based thereon which may have been damaging to his defense." *Id*. The court recognized that, where a defendant is ordered to participate in a mental health evaluation, a Fifth Amendment claim arises from the use of his statements at that evaluation. *Id*. at 1007-08 (citing *Estelle v. Smith*, 451 U.S. 454, 462 (1981)). The court also recognized, however, that the analysis changes when it is the defendant who seeks a psychiatric examination. *Id*. at 1008 (citing *Buchanan v. Kentucky*, 483 U.S. 402, 422-23)). Even in that situation, however, use of expert testimony by the state is only appropriate where the defendant has "introduce[d] mental-status evidence that may be fairly be characterized as expert . . . ." *Id*. (citing *Schneider v. Lynaugh*, 835 F.2d 570, 576 (5th Cir. 1988)). Lay opinions on sanity were not "mental status evidence" for that purpose. *Id*. (citing *Brown v. Butler*, 876 F.2d 427 (5th Cir. 1989)). However, even if Maggio's report could not have been introduced to counter Jordan's witnesses' testimony, a lay witness may be confronted with a report from a mental health expert on cross-examination. *Id*. at 1009-10. Finding that Jordan's witness, Richard King, had made specific comments about Jordan's character, there was no error in having him silently read Maggio's report. *Id*. at 1010.

Based on the law announced by the Supreme Court in *Ake* and interpreted by the Fifth Circuit in *Granviel* and *Woodward*, the Mississippi Supreme Court's opinion was not contrary to, or an

unreasonable application of, clearly established federal law. Jordan requested the appointment of a psychiatrist to explore the possibility that he suffered from Post Traumatic Stress Disorder. Given the vagueness of his assertion, Jordan's right to the appointment of a psychiatrist is dubious. Some threshold showing or reason for same is necessary. *Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985); *Goodwin v. Johnson*, 132 F.3d 162, 189-90 (5th Cir. 1997). In any event, under the law in this Circuit, Jordan did not have a right, under *Ake* to an independent psychiatrist, and the trial court's appointment of Maggio under the condition that his report be shared by both sides did not violate Jordan's constitutional rights. For this reason, he is not entitled to habeas relief on this issue.

> **Ground M:** Petitioner was denied his rights guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution due to the lack of a knowing and intelligent waiver prior to cooperating with the court-appointed examiner.

> **Ground N:** Petitioner was denied the effective assistance guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and Mississippi law by trial counsel's failure to ensure that he had the opportunity to make a knowing and intelligent waiver prior to cooperating with the court-appointed evaluation.

> **Ground O:** Petitioner did not knowingly, intelligently, or voluntarily waive his right to be present on numerous occasions, including at a hearing on his motion for appointment of a mitigation expert.

These issues are so interrelated that they may be discussed together. Prior to the trial, Jordan filed a pleading titled, "Assertion of right to be Present." The document asserted his right to be present at "all aspects of the case . . . ." Jordan specifically named the following events:

a.  all pre-trial hearings, conferences or any other matters (save only telephone scheduling of proposed hearings or meetings between the attorneys);

b.  all other pre-trial matters, including but not limited to the drawing of the jury pool;

c.  all aspects of the trial, including but not limited to all voir dire, all bench conferences, and all charge conferences;

d.  all other hearings and judicial proceedings of any kind which may influence whether he lives or dies.

Despite Jordan's assertion, he was not present at the pretrial conference where the trial judge ruled that Dr. Maggio's opinion would be shared by counsel for both sides. That hearing was held in the judge's chambers, with the prosecutor participating by telephone. At the beginning of the hearing, defense counsel waived Jordan's presence, noting:

> I initially tried to get the motion set for the 25th or the 26th, and due to the Court's schedule I was unable to do so. Joe Sam advised us that he had a conflict this afternoon, and so I think that because of the nature of this motion for a psychiatric evaluation, and in order to not cause a possible delay or grounds for delay in the trial, I wanted to go forward with this because sometimes these things take a lot of time and I wanted to move quickly on it. For that reason I've waived Jordan's presence at this hearing.

Jordan argues that, because he was not present at the hearing, he was unaware that the judge had ordered the report of his psychiatric evaluation to be sent to the prosecution. He further contends that his attorneys did not advise him of that fact. According to Jordan, he declined to cooperate with an examination during earlier proceedings because this condition was imposed. Thus, he maintains, had he known that the report would be given to the prosecution, he would not have participated in it, and the prosecution would not have had the benefit of the unfavorable evidence it used against him.

This issue was raised on direct appeal, with reference to the hearing on Maggio's report, as well as other pretrial proceedings and bench conferences. While recognizing the general right of a criminal defendant to be present at "critical stages" of his trial, the court held that the conferences did not qualify, since the matters discussed therein were "purely legal, and the criminal defendant can do little to aid his defense." 786 So 2d at 1021-22. With regard to the hearing on Maggio's report, the court held that its ruling on the prosecution's entitlement to Maggio's report disposed of the matter. *Id*. at 1022.

The court addressed the issue again in its opinion on Jordan's post-conviction petition. There, it held, "This Court has already addressed similar issues related to Dr. Maggio's evaluation in its most recent opinion. [cite omitted] This claim is procedurally barred pursuant to Miss. Code Ann. § 99-39-21." 912 So. 2d at 816. The court went on, however, to "examine the merits of Jordan's claim." While not addressing the waiver issue as it related to Jordan's presence at the hearing, the court did address his argument that he did not knowingly and intelligently give a waiver "with respect to the use of those statements at the sentencing proceedings." *Id*. Distinguishing the cases cited by Jordan to show that he should have been fully apprised of the potential use of the examination at trial, the court stated that those cases involved court-ordered examinations, rather than examinations requested by the defendant. "Because Jordan's counsel requested the psychiatric examination, he was well aware, and even intended, that statements he gave be used at the resentencing trial." *Id*. at 817. Moreover, since Maggio was not "a state actor," the warnings were unnecessary. *Id*. Finally, the court held that, since the only use made of Maggio's report was in cross-examination of a witness, any error was harmless. *Id*.

Jordan's claim is three-fold, and the relationship between these issues has not been specifically addressed by the state court. He claims: (1) he did not waive his right to be present at the hearing where the ruling on Maggio's report was made; (2) he did not waive his right to refuse to cooperate in providing incriminating information to the prosecution because he was unaware that Maggio's report would be provided to the prosecutors; and (3) his attorneys were ineffective in failing to communicate the court's ruling to him. As to the first issue, it is clear that Jordan wanted to be present at all pretrial hearings, and this hearing was included in his request. (Although he

excluded some telephonic hearings from his request, those were hearings related purely to scheduling issues.)  It is equally clear from the record that his attorney waived his right to be present.

A criminal defendant has a due process right "to be present in his own person whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge." *Snyder v. Massachusetts*, 291 U.S. 97, 105, 106 (1934).  In *Snyder*, the Court suggested that a different standard governed the analysis where the defendant was not present at a pretrial proceeding:

> Many motions before trial are heard in the defendant's absence, and many motions after trial or in the prosecution of appeals. [cite omitted]  Confusion of thought will result if we fail to mark the distinction between requirements in respect of presence that have their source in the common law, and requirements that have their source, either expressly or by implication, in the Federal Constitution.

*Id*. at 107.   As more recently restated by the Supreme Court, the right extends to "any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987).  Thus, the right to be present at trial extends to certain pretrial proceedings, particularly where testimony would be taken at the proceedings, and the defendant's right to confront witnesses is involved.  *Id*.

It appears that the state court distinguished the Maggio hearing from the other proceedings that Jordan did not attend.  By reaching the issue of waiver, the court implicitly ruled that Jordan had a due process right to attend the Maggio hearing.  That ruling is entitled to deferential treatment under the AEDPA. *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001).  *See also Packer v. Early*, 537 U.S. 3, 8 (2003).  There being no case from the United States Supreme Court that gives a clear answer on this issue, the state court cannot have unreasonably applied clearly established federal law.

*Wright v. Van Patten*, 552 U.S. 120, 126 (2008). Thus, this Court must defer to the state court's judgment that Jordan had a due process right to attend the Maggio conference.

The Mississippi Supreme Court also found that Jordan's counsel had waived his right to attend the motion hearing. Many rights may be waived by counsel on a client's behalf in a criminal case. *Taylor v. Illinois*, 484 U.S. 400, 417-18 (1988). Other rights, however, cannot be waived "without the fully informed and publicly acknowledged consent of the client." *Id.* Those include the right to be present at trial. *Id.* at n.24. *See also Winters v. Cook*, 489 F.2d 174, 179 (5th Cir. 1973) (fundamental rights that cannot be waived by an attorney include the right to plead guilty, the right to waive trial by jury, the right to waive appellate review, and the right to testify personally). The question of whether an attorney can waive his client's right to attend a pretrial motion hearing at which no testimony or evidence was received by the court has not been addressed by the Supreme Court. Again, there being no clearly established federal law to the contrary, this Court must accept the state court's decision that the right was waived.

Jordan argues that, because he did not know that Maggio's report would be sent to the prosecutor, he could not knowingly waive his right to refuse to cooperate with Maggio's evaluation. The Mississippi Supreme Court addressed this issue in its post-conviction opinion. Jordan argued that existing precedent required a pre-examination warning, based on the Fifth and Sixth Amendments. *Estelle v. Smith*, 451 U.S. 454 (1981); *Gardner v. Johnson*, 247 F.3d 551 (5th Cir, 2001). The court held those cases inapposite to Jordan's, noting that in neither of those cases had the examination been requested by the defendant. The court went on to discount Jordan 's claim that he did not realize that Dr. Maggio's report would be shared with the prosecution, stating that he "was well aware, and even intended, that statements he gave be used at the resentencing trial." 912 So.

2d at 817. Finally, the court held that no warning was necessary because Maggio was not a "state actor." *Id.*

As noted in the earlier discussion, this Court cannot conclude that the Mississippi Supreme Court's decision that Jordan had no constitutional right to prevent disclosure of the information in Maggio's report runs afoul of clearly established federal law. That being so, the Court must likewise defer to the state court's finding that Jordan had no constitutional right to waive; therefore, his knowledge of the trial court's ruling prior to the examination has no constitutional implications. Clearly, Jordan had the right to refuse to talk to Maggio, but that right is not derived from the Constitution of the United States.

This Court must likewise defer to the state court's finding that Jordan was aware that Maggio's report would be used at trial, as it is not unreasonable determination of the facts in light of the evidence. Jordan addressed the trial court during an argument on Maggio's report and asserted that he was unaware, at the time of the examination, that Maggio's report would be provided to the State. His attorneys, however, never confirmed that they failed to inform Jordan of the trial court's ruling, either during argument at trial or in the affidavit given in support of his post-conviction petition. Additionally, the content of the report indicates that Jordan's intent was to provide a wealth of information to be used as mitigation evidence. Only a small portion of the examination was dedicated to a discussion of possible post-traumatic stress. In contrast, the majority of the report contains self-aggrandizing statements made by Jordan to demonstrate his good behavior. The only bad information in the report came from Davis's report and the comparison of the statements made therein with the statements made to Maggio. Finally, Jordan's prior counsel stated that the same conditions would have been imposed on Maggio's report if Jordan had been examined by him in

earlier proceedings. Based on that requirement, his former counsel stated, "We determined that it would be advisable for Mr. Jordan not to cooperate with an evaluation if the results of that evaluation were to be disclosed to the prosecution." Jordan, then, was likely aware of the possibility that Maggio's report would be shared with the State. A defendant's experience with the criminal justice system is a factor in determining whether that defendant knowingly and intelligently waived constitutional rights. *Parke v. Raley*, 506 U.S. 20, 37 (1992); *Marshall v. Lonberger*, 459 U.S. 422, 437 (1983). For all of these reasons, this Court is of the opinion that the Mississippi Supreme Court's determination that Jordan's conversation with Maggio was conducted with full awareness of its ramifications was not unreasonable in light of the evidence. Thus, the waiver issue has no merit.

Jordan also argues that his trial counsel was ineffective for failing to inform him of the trial court's ruling with regard to Maggio's report; however, Respondents contend that this issue was defaulted in state court and therefore never discussed by the Mississippi Supreme Court. Jordan disagrees and directs this Court's attention to his post-conviction petition. The entirety of his argument on this issue is as follows:

> XXII PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE GUARANTEED BY THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE FEDERAL CONSTITUTION AND MISSISSIPPI LAW BY TRIAL COUNSEL'S FAILURE TO ENSURE THAT HE HAD THE OPPORTUNITY TO MAKE A KNOWING AND INTELLIGENT WAIVER PRIOR TO COOPERATING WITH THE COURT-APPOINTED EVALUATION.

> 257. Petitioner incorporates all facts alleged in Grounds XVIII - XXI.

> 258. Trial counsel filed a motion requesting that Petitioner be allowed to be present at all hearings. Although the trial court granted that motion, counsel waived Mr. Jordan's presence at a conference with respect to the appointment of a mental health evaluator. Although the Mississippi Supreme Court addressed whether Mr. Jordan had a due process right to be present at the hearing, *Jordan v. State*, 786 So. 2d 987, 1022 (Miss. 2001), it did not have reason to

address the distinct question as to whether trial counsel adequately informed Mr. Jordan about the purpose of the evaluation and whether anything that he said to Dr. Maggio could be used against him. Exhibit 36.

259.    By not ensuring that their client was aware of the ramifications of cooperating with the evaluation, Mr. Jordan could not make a knowing and intelligent waiver of his rights prior to meeting with Dr. Maggio. *See Estelle, supra.* Therefore, Petitioner is entitled to post-conviction relief.

All applicants seeking federal habeas relief under § 2254 are required to exhaust all claims in state court prior to requesting federal collateral relief. *See Edwards v. Carpenter*, 529 U.S. 446 (2000); *Coleman v. Thompson*, 501 U.S. 722, 729-55 (1991); *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998). The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court in a manner that adequately developed the factual basis for the claim. *Williams v. Taylor*, 529 U.S. 420, 429-30 (2000). That presentation must also alert the state court as to the legal basis for the claim. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

In his post-conviction brief to the Mississippi Supreme Court, Jordan informed the state court that he was bringing an ineffectiveness claim under the Sixth, Eighth and Fourteenth Amendments to the federal Constitution. However, the sum total of his discussion on that claim was the bare reference in the heading; in no part of the discussion on the issue does he address *Strickland* or the requirements for an ineffectiveness claim. Not surprisingly, the Mississippi Supreme Court failed to address this issue in its opinion.

The Respondents argue that Jordan completely defaulted this claim; it appears that the more appropriate question is whether he failed to "fairly present" it. The law requires Jordan to present to the state court the "controlling legal principles" that he believes apply to the facts of his case. *Picard v. Connor*, 404 U.S. 270, 277 (1971). In the habeas context, most cases involving exhaustion deal with state court pleadings that described the relevant claim in terms of state law, with no mention

of federal law. Thus, in *Picard*, the petitioner's Fourteenth Amendment equal protection claim was defaulted because his state court claims were based on state law, with only a passing reference to the Fifth Amendment. Later, in *Anderson v. Harless*, the Court dismissed a habeas claim on the constitutionality of a malice instruction given at trial. 459 U.S. 4, 7 (1982). Because the petitioner had only argued his claim under state law in state court, he could not make a due process claim under federal law in his habeas pleadings. *But see Howell v. Mississippi*, 543 U.S. 440, 444 (2005) (refusing to excuse default because a litigant could raise a federal issue by simply labeling the claim "federal"); *Baldwin v. Reese*, 541 U.S. 27, 32 (2004)).

In other cases, the petitioner has raised a federal claim in state court, but seeks to add a different federal claim for habeas review. In such a case, the Fifth Circuit has barred a habeas claim of ineffective assistance of counsel where the petitioner argued ineffectiveness at the mitigation stage of his trial to the state courts, but added a claim of ineffectiveness during voir dire and closing to his habeas petition. *Ries v. Quarterman*, 522 F.3d 517, 524-26 (5th Cir. 2008). *See also Wilder v. Cockrell*, 274 F.3d 255, 261-62 (5th Cir. 2001) (holding that a brief reference to *Chambers v. Mississippi*, 410 U.S. 284 (1973), in a discussion on ineffectiveness did not exhaust *Chambers* claim).

Jordan's situation is a little different. He has mentioned the appropriate constitutional provisions under which his claim arose; however, he did so only in a heading in his brief, with no further discussion or citation to relevant cases. "The general rule is that *arguments* not raised before the district court are waived on appeal." *Balentine v. Thaler*, No. 09-70026, ____ F.3d ____, 2010 WL 2433243 at *4 (5th Cir. June 18, 2010) (holding, in a case with the opposite situation, that the errant heading of a section of the argument was not dispositive of the issue raised, where the argument sufficiently set out the grounds for relief). The Supreme Court addressed a similar issue

110

in *Dye v. Hofbauer*, 546 U.S. 1, 4 (2005) (per curiam). There, the state court pleading contained the following heading to the relevant argument: "The Prosecutor Denied Defendant Due Process of Law and Fair Trial by Numerous Instances of Misconduct." After outlining the specific instances of misconduct complained of, the petitioner included in the text citations to the Fifth and Fourteenth Amendments to the Constitution of the United States. He further cited several federal cases concerning alleged violations of federal due process rights in the context of prosecutorial misconduct. The Court found that the state court brief "was clear that the prosecutorial misconduct claim was based, at least in part, on a federal right."

The issue is close. Certainly, Jordan did not do nearly as much as the petitioners in the cases in the preceding paragraph to notify the state court of his claim. Still, he did something, and the language of *Howell* suggests that he need not do much. Based on this authority, this Court concludes that Jordan adequately raised his federal claim of ineffective assistance of counsel, and the issue has not been defaulted.

As has been already recognized in this Opinion, the standard for determining the effectiveness of counsel during trial is the two-prong test set forth by the Supreme Court in *Strickland*, 466 U.S. 668. A defendant must show that counsel's representation fell below an objective standard of reasonableness, and that there is "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 694. Although the state court did not rule on the issue of ineffectiveness, it did hold that the use of Maggio's report, if error, was harmless. 912 So. 2d 800, 817.

In a habeas case, a state court's determination that an error was harmless must be reviewed under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) ("whether the error

'had a substantial and injurious effect or influence in determining the jury's verdict.'") (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)) . Thus, even if the state court found an error harmless, this Court's review does not rely on § 2254 to determine whether that finding was unreasonable, but analyzes the alleged error under *Brecht. Fry v. Pliler*, 551 U.S. 112, 121 (2007); *Westbrook v. Thaler*, 585 F.3d 245, 255 (5th Cir. 2009). The harmless error analysis under *Brecht* relies on a higher standard than that recognized under *Strickland*; in other words, if an error has been found not to violate the *Brecht* standard for harmlessness, it cannot meet the standard for prejudice under *Strickland. Kyles v. Whitley*, 514 U.S. 419, 435-36 (1995); *White v. Johnson*, 153 F.3d 197, 208 (5th Cir. 1998).

Here, Jordan argues that Maggio's report caused him harm in two ways – diminishing the credibility and effect of Richard King's testimony and preventing two other witnesses from testifying. With regard to Mr. King, who testified as a mitigation witness, the report was used as follows:

> Q. Mr. King, I'm to resume with my questioning. I believe you told this jury that, in effect, that Richard Gerald Jordan was not a dangerous person and you would welcome him into your house?
>
> A. Yes, sir, I did.
>
> Q. I want to hand you a document and ask you to read to yourself, please, this paragraph right here.
>
> BY MR. OWEN: May it please the court, on behalf of the record I'm handing him the 2-23-76 evaluation. [Done by Dr. Davis, not Dr. Maggio]
>
> A. This one right here?
>
> Q. Right here what I had already read to you? [During an earlier proffer]
>
> A. Yes, sir. I have read it.
>
> Q. Did you know that Richard Gerald Jordan blamed the FBI?

A.  Not until you showed me that piece of paper, sir.  That's what you're saying.

Q.  Well, that's what is contained in this report, is it not?

A.  Yes, sir.

Q.  Did you know that?

A.  No, sir.

Q.  Did you know that Richard Gerald Jordan also said, as reflected by this report, that he's sorry that she was killed, but then he shrugged his shoulders and said, "better luck next time."

A.  No, sir.  Not until I saw that.

Q.  What does better luck next time mean?

A.  Just what it says, better luck next time is the way I understand it.

Q.  Maybe next time he will have better luck and won't get caught?

A.  That wouldn't be my interpretation.  No, sir.

Q.  I'm sorry.

A.  That would not be my interpretation.

Q.  Well, I'm not going to spend a great deal of time arguing with you, but to make sure we're together here.  He blamed the FBI for the death of Edwina Marter because the FBI blundered the job in not following instructions.  He comments that he's sorry that she was killed, but then he shrugged this off by saying, "better luck next time."  You see that, don't you?

. . . .

Q.  Did he tell you anything about his discharge from the military?

A.  No, sir.

Q.  Do you know if he received a discharge from the military?

A.  No, sir.  I have never seen a piece of paper.

. . . .

Q.     Did he tell you anything about why he left that fertilizer company?

A.     No, sir.

Q.     Let me hand you this report of 2-23-76 [Dr. Davis's report].  I'm going to ask you only to read this to yourself okay.  If I may stand by the witness.

       BY THE COURT:     All right.

Q.     Starting with the word when, ending with the word company.  Starting there, please.  Stop right there.  Did you read that?

A.     Just a minute.  Okay.

Q.     Now don't say anything about it, but were you aware of that event?

A.     No, sir.

. . . .

Q.     I'm going to hand you this document.  For the record this is the Maggio report, Judge, and – if I might stand by the witness.  I'll invite your attention to where it starts with two, the issue of dangerousness, and ask you to read that sentence?

A.     Okay.

Q.     Do you agree with that?

(Objection overruled.)

Q.     Mr. King, was Richard Jordan a danger to himself when he was in the military?

A.     Repeat that question.  A danger to himself when he was in the military?

Q.     Right.

. . . .

A.     I was not in the military with him.  He was in the Army and I was in the Marine Corps.

Q.    If you don't know all you have to say is that you don't know?

A.    I don't know.

Q.    Was he a danger to others prior to going into the military?

A.    No, sir.

Q.    In your opinion he was not?

A.    In my opinion, no, sir.

Q.    And after he got out of the military he was not a danger to anyone, was he?

A.    I didn't see him except at the class reunion.  In my opinion, no, sir.

Q.    Well we know he was a danger to one person anyway, don't we?

A.    Yes, sir.

Q.    Edwina Marter?

As can be seen from this excerpt of trial testimony, the majority of the questioning about which Jordan complains was predicated upon the 1976 report of Dr. Davis, not Dr. Maggio's report.  Dr. Davis's report was already in the prosecution's possession, and its genesis is not at issue in this matter.  This Court is of the opinion that this limited use of Dr. Maggio's report did not have a substantial and injurious effect or influence in determining the jury's verdict.

In addition to the cross-examination of Mr. King, Jordan complains that he was compelled to exclude two other mitigation witnesses from testifying.  The harm or prejudice that the exclusion of this testimony caused to Jordan's case is unclear, since he did not proffer the witnesses' testimony to the court.  In the absence of such evidence, this Court must conclude that the exclusion of these witnesses was harmless.  *Allen v. Hardy*, 478 U.S. 255, 261 n.4 (1986); *Brown v. Butler*, 876 F.2d 427, 431(5th Cir. 1989) (citing *Buchanan v. Kentucky*, 483 U.S. 402, 425 (1987)); *see also Barkat*

*v. Gonzales*, 207 F. App'x 451, 452 (5th Cir. 2006); *Martin v. Maggio*, 739 F.2d 184, 187 (5th Cir. 1984). *Cf. Luce v. United States*, 469 U.S. 38, 42-43 (1984) (holding, in the context of a motion in limine at a federal criminal trial to exclude evidence of the defendant's prior conviction, harmless error analysis requires that the defendant testify to preserve the error). Thus, the exclusion of these witnesses does not change the conclusion reached above as to the use of Maggio's report.

The effect of the limited use of Maggio's report being, at most, harmless error, it cannot be prejudicial within the meaning of *Strickland*. That being the case, Jordan cannot establish that its use resulted from ineffectiveness on the part of his trial counsel. Additionally, as shown above, the Mississippi Supreme Court's determination that Jordan had no constitutional rights to assert with regard to the use of Maggio's report is neither contrary to, nor an unreasonable application of, clearly established federal law. Thus, Jordan cannot establish a claim to habeas relief based on the use of Dr. Maggio's report at trial.

### <u>Ground P</u>: The trial court's ruling precluding petitioner from presenting certain mitigating evidence violated Petitioner's Sixth, Eighth, and Fourteenth Amendment rights.

Jordan argues that he was prevented from presenting certain mitigation evidence because the trial court sustained the prosecution's objections to the testimony of some of his witnesses. This issue was raised in Jordan's direct appeal and considered by the Mississippi Supreme Court. The particulars of Jordan's complaint and the state court rulings on each claim are set out below:

<u>Issue No. 1</u>:

> [T]he trial court sustained the special prosecutor's objections to testimony by Parchman official Estelle Denley that while he never had any problems with Mr. Jordan he did have problems with other inmates.

116

The Mississippi Supreme Court considered this issue and ruled, "Evidence of the behavior of other inmates was irrelevant, and the State's objection thereto was properly sustained." *Jordan v. State*, 786 So. 2d at 1020.

Issue No. 2:

> [I]n the transcript of the testimony of Homer Jordan, Mr. Jordan's father, the trial court sustained the prosecutor's objection to defendant's question whether his father ever saw Mr. Jordan's children.

On this issue, the state court made the following ruling:

> Evidence of a criminal defendant's death and the effect it would have on the life of his family is not relevant and is properly excluded since such evidence does not impact on the defendant's character, the record, or the circumstances of the crime. *Wilcher v. State*, 697 So. 2d 1123, 1133-34 (Miss. 1997).

*Id*.

Issue No. 3:

> During the testimony via transcript of Ms. Shirley Thames, Mr. Jordan's cousin, the trial court sustained the prosecutor's objections to testimony about the problems that Mr. Jordan's offense has created for his family; about Mr. Jordan's relationship to his wife; about Mr. Jordan's religious background; about Mr. Jordan's reputation for peace or violence prior to 1976; and about the circumstances under which Mr. Jordan and his wife separated.

With regard to Ms. Thames's testimony, the court made the following decision:

> Similarly the testimony of Jordan's cousin, Shirley Thames, was properly excluded for the same reason. Thames proposed to testify about the problems that Jordan's crime created for his family and for his relationship with his wife. Such testimony is not allowed under *Wilcher*. Also, Thames wanted to testify to Jordan's reputation in the community prior to 1976. This testimony was properly excluded since she did not live in the same community at that time.
>
> After Thames testified that Jordan was "brought up in the church by his parents," the State objected on the basis of hearsay, and the court sustained the objection. Thames could not so testify from personal knowledge, so the testimony was properly excluded. *See* M.R.E. 602.

*Id*. The court went on to note that Jordan was not prejudiced by the exclusion of this testimony because his brother testified at length about Jordan's affiliation with the church, both during their childhood and as an adult. *Id*.

Jordan argues that the state court's decision abrogated the decisions by the United States Supreme Court as to the wide range of evidence that may be offered in mitigation, citing *Tennard v. Dretke*, 542 U.S. 274 (2004); *Hitchcock v. Duggar*, 481 U.S. 393, 394 (1987); *Skipper v. South Carolina*, 476 U.S. 1 (1986); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); and *Jurek v. Texas*, 428 U.S. 262, 271 (1976). He also cites to the Mississippi Supreme Court's earlier decision remanding Jordan's case for a new sentencing hearing on grounds that proper mitigation evidence was excluded. *Jordan v. State*, 518 So. 2d 1186, 1188-89 (Miss. 1988). He claims that the evidence excluded was similar to the evidence that constituted reversible error in his earlier case. He also contends that the trial court improperly excluded evidence of "good character and redeeming qualities," citing *Williams v. Taylor*, 529 U.S. 362, 416 (2000). With respect to the determination that the testimony involved hearsay, Jordan argues that the hearsay rule is relaxed in mitigation hearings. *Green v. Georgia*, 442 U.S. 95, 96 (1979). Finally, he maintains that the error was not harmless, stating that at least one juror might have reconsidered the death sentence if he had heard that "Jordan had been a religious person in the past, and had resumed his religion in prison, that he had a good record in jail, and that he had enjoyed a reputation for peace and non-violence prior to the murder . . . ."

With regard to the first issue, the testimony of Mr. Denley, Respondents argue that the complete transcript of his testimony shows that he was able to describe Jordan as an inmate, saying "It is hard to describe it. You just don't really remember that. you remember the people that caused you trouble, and I never had any trouble out of Mr. Jordan." Defense counsel followed up by asking

"So he never caused you any trouble?" Denley answered, "Never did." The objection came to the following question, "Did other prisoners cause trouble?" Before the objection was made and sustained, Denley actually answered "Yes. Some." That answer was not stricken.

The Mississippi Supreme Court found that the objectionable question sought information that was not relevant. Jordan argues, "[T]he trial court sustained the special prosecutor's objections to testimony by Parchman official Estelle Denley that while he never had any problems with Mr. Jordan he did have problems with other inmates." This argument is somewhat disingenuous. Denley *was* able to testify that he never had any problems with Mr. Jordan. He was simply not permitted to testify that he had problems with other inmates.

Under certain conditions, the exclusion of evidence during a sentencing trial, even though proper under state evidentiary rules, may constitute a violation of the Due Process Clause. *Green v. Georgia*, 442 U.S. 95, 97 (1979) (*per curiam*); *Eddings v. Oklahoma*, 455 U.S. 104, 111 (1982); *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). However, in this Circuit, *Green* is "limited to its facts, and certainly did not federalize the law of evidence." *Barefoot v. Estelle*, 697 F.2d 593, 597 (5th Cir. 1983); *see also McGinnis v. Johnson*, 181 F.3d 686, 693 (5th Cir. 1999); *Edwards v. Scroggy*, 849 F.2d 204, 212 (5th Cir. 1988). Instead, *Green* has been interpreted to recognize that "certain egregious evidentiary errors may be redressed by the due process clause." *Barefoot*, 697 F.2d at 597. However, the evidence at issue must be "highly relevant to a critical issue in the punishment phase of the trial, and substantial reasons existed to assume its reliability." *Green*, 442 U.S. at 97. In other words, the restriction on testimony must not be "unnecessarily limiting," nor can it render the trial "fundamentally unfair." *Edwards*, 849 F.2d at 212. Denley's excluded testimony about the behavior of other inmates was not "highly relevant to a critical issue in the punishment

phase" – it was not even marginally relevant. The Mississippi Supreme Court's opinion that the exclusion of this testimony as irrelevant was proper did not offend clearly established federal law, and habeas relief is not appropriate with regard to this issue.

Jordan also complains about the exclusion of testimony from his father, Homer Jordan, about whether he ever saw Jordan's children. The Mississippi Supreme Court found that the testimony was offered to show the effect that Jordan's execution would have on his family and held that the exclusion was proper. Respondents argue that the testimony sought was irrelevant, and, in light of Homer Jordan's extensive testimony about Jordan's life and character, the exclusion was harmless.

This testimony was actually given during the 1983 trial. The transcript of that trial reflects the following exchange on direct examination:

Q.     Now he [Jordan] had three children?

A.     Three children; that's correct.

Q.     Do you ever see those three children?

BY MR. NECAISE:  We object to that, if it please the Court, as being immaterial.

BY THE COURT:  Sustained.

Q.     Since your son has been in jail, have you had a chance to see him?

Defense counsel did not present argument on the objection; neither did he proffer Homer Jordan's answer to that question. This issue was not raised in the appeal of the 1983 trial. No claim of procedural bar has been raised with respect to this issue, and the Mississippi Supreme Court reviewed it on the merits. In any event, the Mississippi Supreme Court's decision is not contrary to, or an unreasonable application of, clearly established federal law.

As the cases that Jordan cites establish, a defendant facing the death penalty is entitled to present "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v Ohio*, 438 U.S. 586, 604 (1978). However, the Supreme Court has never included "execution impact" testimony as a category of mitigating evidence that must be admitted. *Jackson v. Dretke*, 450 F.3d 614, 618 (5th Cir. 2006). Thus, the state court's decision was not contrary to the law on mitigation evidence, as established by Supreme Court precedent. *Id*. at 617. Likewise, since that type of evidence does not reflect on Jordan's background, character, or the circumstances of his crime, the Mississippi Supreme Court's was not unreasonable in failing to extend the precedent to this situation. Habeas relief is unavailable on this issue.

Similarly, Ms. Thames's testimony from the 1983 trial was read to the jury in the 1998 proceeding. Jordan contends that he was impermissibly restricted in presenting mitigation testimony regarding "the problems that Mr. Jordan's offense has created for his family; about Mr. Jordan's relationship to his wife; about Mr. Jordan's religious background; about Mr. Jordan's reputation for peace or violence prior to 1976; and about the circumstances under which Mr. Jordan and his wife separated." As to the first and second issues – the problems that Jordan's offense has created for his family and his relationship with his wife – the Mississippi Supreme Court ruled that this testimony was improper for the same reason that Jordan's father's testimony was excluded. Based on the discussion of that issue above, this Court is of the opinion that it cannot grant habeas relief on this issue.

With regard to Ms. Thames's testimony on Jordan's religious background, the transcript of the 1983 trial contains the following colloquy:

Q.	Do you know anything about his [Jordan's] religious background?

A.	Yes, I do.

Q.	What is that?

A.	Gerald was brought up in church by his parents.  I can't recall being in service with Gerald at any time.

> BY MR. NECAISE:  Then, if the court please, we are going to object to it as being hearsay.

> BY THE COURT:  Sustained.

> BY MR. HUDSON:  Judge, I think the religious background can be a lot broader.

> BY THE COURT:  Well, I think you ought to go ahead and ask another question.

The Mississippi Supreme Court held that the objection to this testimony was proper, because it was not based on Ms. Thames's personal knowledge.  786 So. 2d at 1020.  As stated above, the testimony was properly excluded as hearsay, so long as it was not "highly relevant to a critical issue" and its exclusion did not make the sentencing proceedings fundamentally unfair.  *Green*, 442 U.S. at 97; *Edwards*, 849 F.2d at 212. The testimony was relevant to the issue of Jordan's character; however, in light of other testimony given, the exclusion was not unfair.  As noted by the Mississippi Supreme Court, Jordan's brother offered extensive testimony about Jordan's church involvement.  *Id*. Additionally, both his father and his mother testified that Jordan regularly attended church, both as a child and as an adult.  It was proper to exclude this testimony.

Jordan also complains that Thames's testimony was improperly limited when she was not permitted to testify as to his reputation for peace or violence prior to 1976.  The Mississippi Supreme Court held that the testimony "was properly excluded, since she did not live in the same community

at that time." *Id*. Again, the exclusion was proper, so long as the sentencing trial was not made fundamentally unfair without this evidence. Moreover, in addition to the requirement that excluded evidence be "highly relevant to a critical issue," *Green* requires that substantial reasons exist to assume that the excluded evidence is reliable. 442 U.S. at 97. Thames's opinion of Jordan's reputation in the community for peace or violence could not have been reliable if she did not live in that community. Furthermore, at the end of her direct testimony, defense counsel asked her about Jordan's "acts of kindness." She responded:

> He was very friendly and he was considerate. He was lovable. When I was around him, he acted like he was proud to see us. And he was proud to be a part of the family. And he was a family man. He loved his children. You know, he was proud to show off his children to the family when he would come to visit us and bring the children. He was just kind to everybody. He just wanted to be nice to everybody.

The jury did hear, therefore, indirect evidence of Jordan's character from Thames, and the exclusion of her unreliable, hearsay opinion did not make Jordan's trial fundamentally unfair. This Court is of the opinion that the Mississippi Supreme Court's decision was not an unreasonable application of, or contrary to, clearly established federal law on this issue. Jordan was not improperly restricted in his ability to present a mitigation case by these rulings, under clearly established federal law. Therefore, he is not entitled to habeas relief on these issues.

**Ground Q:** **The State's repeated failures to provide Petitioner with a constitutionally sound capital sentencing trial ultimately prevented him from developing all relevant mitigating evidence, thereby violating his Eighth and Fourteenth Amendment rights guaranteed by the federal Constitution and Mississippi law; in the alternative, counsel were ineffective for not objecting to their inability to present all relevant mitigating evidence due to the State's repeated inability to provide Petitioner with a legally sound sentencing proceeding.**

Jordan's argument on this issue is based on the nature of the testimony he was compelled to present in the 1998 trial, which occurred fifteen years after the previous trial and twenty two years

after the crime.[7]  During that time, many of the witnesses for both sides had died, including Jordan's parents.  As a result, he was forced to present them to the jury through reading their testimony in the previous trial.  Jordan argues that this presentation could not "convey the emotion or evoke the jury's sympathy in a way that a parent could."  Jordan argues that the delay was the result of the State's failure, on three previous occasions, to afford him a proper trial.  He further argues that his attorneys were ineffective for failing to object to the trial court on this basis.

Of primary concern to Jordan is the inability to present convincing testimony that he suffered from post traumatic stress disorder, resulting from his service in Vietnam.  He argues that his father's earlier testimony on that issue could not have been persuasive because so little was known about the disease at that time.  Thus, he argues, he was prevented from effectively presenting important mitigating evidence, in contravention of *Lockett*, 438 U.S. 586, and *Jurek*, 428 U.S. 262.  In actuality, it was his brother, Robert, and not his father, Homer, who testified on the issue of Jordan's change in behavior after returning from Vietnam, and Jordan's attorney has admitted the misidentification.  Robert's 1983 testimony was also read to the jury at the 1998 trial.  According to Respondents, Robert was still alive at that time, but could not attend the trial due to illness.

This issue was presented to the Mississippi Supreme Court in Jordan's petition for post-conviction relief.  That court ruled:

> Jordan has had the benefit of all of the mitigating evidence that was available the first time he was convicted and sentenced to death.  Although the form of some of the evidence is not the same as it was in the original presentation, it is still available and has been utilized to the best extent possible by defense counsel.  Likewise, Jordan

---

[7]Part of the delay between the third and fourth trials can be attributed to Jordan's stopping the appeal process of his habeas petition and pleading to a sentence of life without parole in 1991.  He revoked the agreement in 1994 in an attempt to be re-sentenced to life with parole, thereby necessitating legal proceedings that culminated in the Mississippi Supreme Court's vacating his sentence and remanding his case in 1997.

> was convicted and sentenced to death in his very first trial in 1976 when, ostensibly, all of his mitigation witnesses were alive and well. Therefore, we find that Jordan fails to demonstrate any actual prejudice from the unavailability of his parents' live testimony. This claim has no merit.

912 So. 2d at 822. This Court views Jordan's claim as two-fold: (1) he argues that the mitigation testimony from his parents lost its emotional effect when read to the jury; and (2) he argues that he was prevented from effectively presenting evidence of PTSD because no witness who could testify to that issue testified live at his last trial.

Jordan does not cite any case requiring that mitigation evidence be put before the jury in the particular manner that is most likely to engender sympathy, and this Court is not aware of any. The cases that he does cite hold that he should be able to present for consideration all relevant mitigating evidence. *Eddings*, 455 U.S. at 113-15; *Lockett*, 438 U.S. at 604. These cases say nothing, however, about the *form* that this evidence should take. Jordan essentially insists that the Mississippi Supreme Court should have extended that law to his situation to hold that the Eighth Amendment requires that the substance of his mitigation evidence be presented in the form most likely to appeal to the jury's emotions. The Mississippi Supreme Court declined his invitation, and this Court does, as well.

In *Saffle v. Parks*, 494 U.S. 484, 492 (1990), the Court rejected an argument condemning the anti-sympathy instruction given during the sentencing proceedings in a death penalty case. In so doing, the Court recognized that the state may "insist that 'the individualized assessment of the appropriateness of the death penalty [be] a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence.'" *Id.* (quoting *Gregg v. Georgia*, 428 U.S. 153, 189-95 (1976)). Since "capital sentencing must be reliable, accurate, and nonarbitrary," the jury should be required to consider mitigating evidence in the form of a "'reasoned moral response,'" rather than an emotional one. *Saffle*, 494 U.S. at 493 (quoting *California v. Brown*, 479 U.S. 538,

544 (1987). Given this clearly established federal precedent, this Court believes that the law requiring that defendants be permitted to present their mitigation evidence should not be extended to requiring that they be able to present it in the most emotionally appealing manner. Thus, the Mississippi Supreme Court's opinion was neither contrary to, nor an unreasonable application of, clearly established federal law.

As the Court has discussed earlier, Jordan has simply not presented credible evidence to convince this Court that he has been unconstitutionally denied the right to present mitigating evidence to the jury regarding PTSD. The affidavits he has presented from experts in the field are not based on an actual examination of Jordan, but merely suggest the possibility that he suffers from this disorder because he served in Vietnam. His behavior in prison does not reflect any of the symptoms described by those experts. Finally, during trial, Jordan addressed the court (outside the presence of the jurors) about his interview with Maggio and stated, "If I had been aware that this could be used against me then I would have restricted myself specifically to whether I was [sic] post-traumatic disorder, which frankly I didn't think I was, but, you know, that was something that we had to look into."

The Mississippi Supreme Court found that Jordan was not prejudiced by the presentation of his parents' testimony by reading the transcripts. This Court agrees. Jordan has not established that the state court's decision abrogates clearly established federal precedent on this issue; therefore, he is not entitled to habeas relief. Accordingly, his claim that his counsel was ineffective is likewise unavailing. *Paredes v. Quarterman*, 574 F.3d 281, 291 n.13 (5th Cir. 2009) (citing *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1993) ("An attorney's failure to raise a meritless argument . . .

cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue.").

**Ground R**:  **Petitioner's rights guaranteed by the Eighth and Fourteenth Amendments were violated by the constitutionally impermissible instructions regarding the "especially heinous, atrocious or cruel" aggravating circumstance.**

Jordan complains about the first two of the seven instructions that were given to the jury at the conclusion of his trial.  The first instruction sets out the findings that must be made and considered in determining whether the death penalty was the appropriate punishment.  The second instruction defined the term "heinous, atrocious or cruel."  In Part B of the first instruction, the court set out the aggravating and mitigation circumstances, as follows:

> Next to return the death penalty, you must find that the mitigating circumstances, those which tend to warrant the less severe penalty of life imprisonment, do not outweigh the aggravating circumstances, those which tend to warrant the death penalty.

> Consider the following elements of aggravation in determining whether the death penalty should be imposed:

> 1.  Whether Richard Jordan committed the capital murder while engaged in the crime of kidnaping Edwina Marter;

> 2.  Whether Richard Jordan committed the capital murder for pecuniary gain, that is, whether Richard Jordan demanded $25, 000.00 and did in fact obtain $25,000.00 from Charles Marter; and

> 3.  Whether Richard Jordan committed a capital offense which was especially heinous, atrocious and cruel and whether the murder was conscienceless and pitiless.  In support of this circumstance the State claims that Edwina Marter was murdered in execution style and that she was subjected to extreme mental torture caused by her abduction from the home wherein she was forced to abandon her unattended three year old child and removed to a wooded area at which time she was shot in the back of the head by Jordan.

> . . . .

If one or more of the above aggravating circumstances is found to exist beyond a reasonable doubt, then each of you must consider whether there are mitigating circumstances which outweigh the aggravating circumstance(s). You are not required to find mitigating circumstances beyond a reasonable doubt. Consider the following elements of mitigation in determining whether the death penalty should not be imposed:

1)     Participated in church and school activities and sports while growing up;

2)     Military service including Vietnam;

3)     He confessed to crime and cooperated with police;

4)     Since being in custody he has established a good prison record by working and not causing problems;

5)     Has attempted to make positive contributions by writing short stories and invention of wind tunnel:

6)     Attempted to maintain contact with family and friends and to assist them.

If you find from the evidence that one or more of the preceding elements of mitigation exists, then you must consider whether it (or they) outweigh(s) or overcome(s) the aggravating circumstance(s) you previously found. In the event that you find that the mitigating circumstance(s) do not outweigh or overcome the aggravating circumstance(s), you may impose the death sentence. Should you find that the mitigating circumstance(s) outweigh or overcome the aggravating circumstance(s), you shall not impose the death sentence.

Instruction No. 2 read:

In considering whether the capital offense was especially heinous, atrocious or cruel, you are instructed that heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others.

An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of capital murders – the conscienceless or pitiless crime which is unnecessarily torturous to the victim. If you find from the evidence beyond a reasonable doubt that Richard Jordan utilized a method of killing that inflicted physical or mental pain upon Edwina Marter before

her death, that there was mental torture and aggravation before death, then you may find this aggravating circumstance exist [sic].

The jury's verdict read:

> We, the jury, unanimously find from the evidence beyond a reasonable doubt that the following facts existed at the time of the commission of the capital murder.

> 1) That the defendant actually killed Edwina Marter.

> Next, we, the jury, unanimously find that the aggravating circumstances of:

> 1) Richard Jordan committed the capital murder while engaged in the crime of kidnaping Edwina Marter.

> 2) Richard Jordan committed the capital murder for pecuniary gain.

> 3) Richard Jordan committed a capital offense which was especially heinous, atrocious & cruel & whether the murder was conscienceless & pitiless. In support of this circumstance the State claims that Edwina Marter was murdered in execution style & that she was subjected to extreme mental torture caused by her abduction from the home wherein she was forced to abandon her unattended three year old child & removed to a wooded area at which time she was shot in the back of the head by Jordan.

> exist beyond a reasonable doubt & are sufficient to us to impose the death penalty and that there are insufficient mitigating circumstances to out weigh the aggravating circumstances and we further find unanimously that the defendant should suffer death.

Jordan argues that the instructions were flawed for several reasons.[8] First, he argues that the inclusion of the State's theory of why the crime was heinous was unfair, as it singled out the prosecution's theory that Marter was killed in execution style while failing to provide the defense's theory that she was killed accidentally. He further argues that this language relieved the State of its burden of proof on this issue. Jordan claims that both instructions were vague and overbroad, but that the combination of the two instructions would have been particularly confusing for the jury.

---

[8]Jordan has withdrawn one of his arguments based on the State's response.

Additionally, according to Jordan, there was insufficient evidence to support a finding beyond a reasonable doubt that the offense was especially heinous, atrocious, or cruel. Finally, Jordan contends that the cumulative effect of these issues also violated his constitutional rights.

Respondents first argue that this entire issue is procedurally barred from review for failure of counsel to object to the instructions at trial. The Mississippi Supreme Court addressed this issue on direct appeal and found that "all of the issues raised concerning the heinous, atrocious, and cruel aggravator instructions are procedurally barred" because Jordan did not object to the instructions at trial. The court went on to say:

> Jordan argues that we will overlook a procedural bar where there are matters of fundamental constitutional significance at stake. "When the circuit court grants instructions clearly erroneous and which deny the accused a fair and objective evaluation of the evidence by the jury, we will reverse, even though there was no objection by defense counsel." *Duvall v. State*, 634 So. 2d 524, 526 (Miss. 1994). *See also Booker v. State*, 699 So. 2d 132, 135 (Miss. 1997) (citing line of cases excepting from procedural bars issues concerning limiting instructions concerning the heinous, atrocious, and cruel aggravator). Out of an abundance of caution, we will address Jordan's claim on the merits.

786 So. 2d at 1002. Jordan argues, as he did on his claim of prosecutorial misconduct during closing argument, that the phrase "out of an abundance of caution" suggests that the court excused the default because his was a death penalty case and determined the merits of his claim. Respondents disagree.

For the reasons discussed in the earlier section on prosecutorial misconduct, this Court is of the opinion that the phrase "out of an abundance of caution" does not signal that a substantive ruling was being made in place of the decision that an issue is procedurally barred. Likewise, the mention in the opinion that the state court has excused the bar and reached the merits of certain claims involving fundamental constitutional rights does not change this Court's opinion. Jordan correctly notes that *Booker v. State*, 699 So.2 d 132, 135 (Miss. 1997), lists several cases in which the court

reached past a procedural bar to consider the merits of claim involving an instruction on the "especially heinous, atrocious, or cruel" aggravating circumstance. However, those cases involved a specific issue – whether such an instruction was over broad and vague in the absence of a limiting instruction offering a definition of that aggravator. *Maynard v. Cartwright*, 486 U.S. 356 (1988) held that such an instruction was improper. *Clemons v. Mississippi*, 494 U.S. 738 (1990), held that, in a case where an invalid instruction was given, a state reviewing court could either reweigh the aggravating and mitigating circumstances or perform harmless error analysis. Under the authority of *Maynard* and *Clemons*, the Mississippi Supreme Court has consistently excepted cases involving the failure to provide a limiting instruction for that aggravator from procedural bars.

*Duvall v. State*, 634 So. 2d 524, 525-26 (Miss. 1994), involved an instruction that the Mississippi Supreme Court had specifically rejected in an earlier case. Given that unambiguous precedent, the court later held, "the trial court and prosecutor . . . had ample notice that [the] instruction . . . was clearly erroneous." *Fears v. State*, 779 So. 2d 1125, 1128 (Miss. 2000). In such a circumstance, the trial judge has an obligation to insure that the jury is properly instructed. 634 So. 2d at 526. However, where there is not a prior decision clearly condemning an instruction, trial counsel's failure to object will constitute a default that bars review. 779 So. 2d at 1128.

These cases excused default in specific situations that are not applicable to Jordan's case. This Court does not interpret the Mississippi Supreme Court's mention of them as an indication that it would excuse the failure to object to the instructions about which Jordan now complains. For that reason, this Court is of the opinion that the state clearly and unmistakably relied on its routine practice of refusing to review claimed trial errors where no contemporaneous objection was made to them.

This issue is barred from habeas review.

Alternatively, the claims regarding these instructions have no merit. Jordan's first argues that it was improper for the trial court to include the State's theory as to why the jury should find that the crime was especially heinous atrocious and cruel. Respondents offer another reason that this particular claim should be barred – Jordan failed to argue a federal claim in his state court appeal. He only asserted that his "rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Mississippi Constitution" were violated. Jordan responds that the citation to the federal constitution was enough. For the reasons more fully explained in the court's discussion of Jordan's ineffectiveness claim in Section XXII of this Opinion, the Court finds that this reference is marginally sufficient to entitle Jordan to habeas review of this claim.

The Mississippi Supreme Court found that this inclusion was not error because Jordan had not offered his own theory as to why the crime did not fit that category. Reviewing the evidence that Jordan offered at trial, the court stated:

> Trial strategy is a better reason Jordan chose not to attempt to put "his" theory in writing in Instruction No. 1. To say that Jordan exercised compassion by leaving a three-year-old unattended in the Marter home or that by shooting Edwina only once in the back of the head defies logic.

786 So. 2d at 1002. The court continued, "Regardless, the State certainly had every right to offer an instruction which outlined its theory of the case. The instruction complained of by Jordan was fairly supported by the evidence and was properly given. *See Wall v. State*, 718 So. 2d 1107, 1111 (Miss. 1998)."

Jordan's first argument is that the inclusion of the State's contention into the instruction unfairly highlighted the State's theory without presenting Jordan's. The Mississippi Supreme Court

interpreted this argument as suggesting that the defense should have insisted on including the theory that those actions were not heinous, atrocious, or cruel. This Court construes the argument somewhat differently. Much of the State's theory was not in dispute – Marter's kidnaping, the forced abandonment of her young child and the gunshot to the back of her head. At issue was whether Marter was shot "execution style" by Jordan or whether her murder was an accident that occurred as she tried to escape. Thus, this Court concludes that Jordan's actual argument is that the instruction should have included his contention that he accidentally shot Marter while attempting to fire over her head to prevent an escape.

Federal habeas review can result in the granting of relief on a jury instruction that is ambiguous, inconsistent or deficient only where there is "'a reasonable likelihood' that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Waddington v. Sarausad*, ____ U.S. ____, 129 S. Ct. 823, 831 (2009) (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)). The instruction must be judged "in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72. Relief is warranted when the instruction "'so infected the entire trial that the resulting conviction violates due process.'" *Waddington*, 129 S. Ct. at 832 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

This Court finds that the inclusion of the State's theory did not amount to a due process violation, because the record in this case indicates clearly that the jury was informed as the Jordan's theory. Both of Jordan's initial statements to law enforcement included his claim that he shot Marter accidentally while she was trying to escape. He presented an expert witness to refute the State's experts as to the nature of Marter's wound and what it indicated about her position when she was shot. Finally, in closing argument, defense counsel made the following comments:

[T]here is one thing that I do want to spend a little bit of time on, is one of the aggravating circumstances that the State says that exist. And that is the States's theory that this was an execution style killing.

And in addressing this issue I want to be perfectly clear that I think the crime itself is horrible enough as it is. And there's a lot of undisputed evidence that makes it a horrible crime. But I just don't believe that there is sufficient evidence for you to conclude that it was an execution style killing.

And the Court, in its instructions, has told you not to be swayed by conjecture, and that's what this theory is, it's conjecture.

Defense counsel then summarized Dr. Riddick's testimony regarding the autopsy report and continued:

Now this theory about Mrs. Marter being on her knees when she was shot poses some problems in my mind because this mannequin depicts the trajectory of the bullet as entering the lower part of her skull in the rear and exiting in the front upper to the left. That means that the projectile was following an upward trajectory. Now if she were on her knees and her head was in an upright position and he fired downward it seems like the trajectory would have been going downward. If she had her head bent forward then it seems that the trajectory would have – could have followed the upward path and the bullet would have landed in the grass near her body. But there wasn't any bullet. They never found any bullet.

I asked Dr. Atchison about that and he said the bullet could have ricocheted. Well how does a bullet ricochet off of dirt? And I just wanted to respond to that. I don't want to make – as I said, whether he shot Mrs. Marter standing up, running away, kneeling down, I think it's horrible enough in and of itself without trying to make it just a little bit worse on conjecture. And that's what the State – I mean the Court has told you not to do is base your opinion on conjecture.

In this context, the Court finds that the failure to include Jordan's theory of the murder in the instruction did not so affect his trial as to amount to a due process violation. The jury was well aware of his argument on this issue, and it is not grounds for habeas relief.

Jordan also argues that the inclusion of the State's theory of Marter's killing relieved the State of its burden of proof on this aggravating circumstance. In essence, he believes that the instruction permitted the jury to find that the killing was heinous, atrocious, or cruel, as well as conscienceless

and pitiless, if the jurors simply believed the State's theory, without requiring them to make the further finding that the theory satisfied the definition of that aggravator.  In other words, Jordan argues that the instruction allows the jury, if they believed the State's theory that the murder was execution style, to automatically conclude that the murder was especially heinous, atrocious, or cruel, and conscienceless and pitiless, without making an express determination to that effect.

In ruling on this issue, the Mississippi Supreme Court initially held that he failed to contemporaneously object to the instructions about which he complained, so he was barred from raising them for review.  786 So. 2d at 1024.  The court continued, "Nevertheless, we will address the merits of his claim."  *Id*.  For the reasons earlier expressed on this subject, this Court holds that the discussion of the merits was an alternative holding, and the state court clearly and expressly relied on an independent state ground in reaching this decision, thus barring habeas relief.  In any event, Jordan could not succeed on the merits.

The state court's opinion on this issue on direct appeal was brief:  "As Jordan himself points out, we have considered and denied such arguments in approving a similarly-worded jury instruction to the one at issue in *Evans v. State*, 725 So. 2d at 694-96.  Therefore, this issue is without merit." 786 So. 2d at 1026.  In its post-conviction opinion, the court once more found the issue barred, but alternatively addressed the merits thusly:

> There was sufficient evidence for the jury to find that Edwina's murder was heinous, atrocious, cruel, conscienceless and pitiless.  There was no unconstitutional burden-shifting in the jury instructions or evidentiary shortcuts for the jury.  Nor were the instructions unconstitutionally vague or overly broad.  The instructions properly limits [sic] the jury's discretion, advising them that they may find the aggravating factor only if they find that Jordan 'utilized a method of killing that inflicted physical or mental pain upon Edwina Marter before her death, and there was mental torture and aggravation before death."  This claim is without merit.

912 So. 2d at 819.

The portion of the instruction about which Jordan complains instructs the jury to determine whether the instruction was heinous, atrocious, or cruel. It goes on to say, "*In support of this circumstance the State claims* that Edwina Marter was murdered in execution style . . . ." This Court believes that the language indicated to the jury that the State's "claim" was its argument in support of a finding that the aggravator existed, not a presumption that the aggravator existed if the State's theory was adopted. Moreover, that language was followed by the admonition: "You must unanimously find beyond a reasonable doubt that one or more of the preceding aggravating circumstances exists in this case to return the death penalty." The prosecution's closing argument underscored the necessary finding. In his initial argument, he said:

> The aggravating circumstances have been proved beyond a reasonable doubt. The three aggravating circumstances are the commission of a murder or the crime of murder during the commission of a kidnaping; the crime was for pecuniary gain; and that it was especially heinous, atrocious, or cruel. All you have to do is find one beyond a reasonable doubt . . . .

Later, in his final argument to the jury, the prosecutor reminded the jury that, in order to sentence Jordan to death:

> You also have to list under B the aggravating circumstances. There's three of them. The murder in the commission of kidnaping, pecuniary gain, which means obtaining money, and that the murder was especially heinous, atrocious or cruel. you don't have to find all three of them. As long as you find one beyond a reasonable doubt.

When combined with the instruction, this language effectively communicated to the jury that the actual finding it had to make was not that the murder occurred execution style, but that it was especially heinous, atrocious, or cruel.

Jordan argues that Respondents err in contending "so long as the jury was instructed at some point that it had to find the aggravating circumstance beyond a reasonable doubt, the instructions pass

constitutional muster. However, that is not the law." He then compares his case to two Supreme Court cases in which improper burden-shifting was found. However, those cases are distinguishable. In *Sandstrom v. Montana*, 442 U.S. 510, 513 (1979), the jury was given an affirmative instruction that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts." This was a statement of the law directing the jury's consideration of the evidence, and it conflicted with the state's burden to prove all of the elements of a crime beyond a reasonable doubt. *Id*. Because a reasonable jury could have construed that instruction as mandating an affirmative finding on the element of intent, or as shifting the burden to the defendant to disprove intent, it was an improper burden-shifting instruction that denied the defendant due process. *Id*. at 517-18, 524.

In *Francis v. Franklin*, 471 U.S. 307, 310-11 (1985), the defendant argued, as does Jordan, that he killed the victim accidentally. The jury was instructed as follows:

> The acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted. A person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts but the presumption may be rebutted.

*Id*. at 311. The Supreme Court condemned the instruction, noting that the Due Process Clause "prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime." *Id*. at 313. *Francis* explained the distinction between mandatory and permissive instructions: "A mandatory presumption instructs the jury that it must infer the presumed fact if the State proves certain predicate facts. A permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion." *Id*. at 314. Because the language of the instruction at issue was "cast in the language of command," it was a mandatory presumption that shifted the burden of proof to the defendant and thereby violated

the Due Process Clause. *Id*. at 317-18. General instructions on the burden of proof did not legitimize the offending instruction. *Id*. at 319.

The language of the instruction in Jordan's case did not tell the jury that, if they found that Marter was killed "in execution style," they were to presume that the aggravating circumstance was established. At most, the instruction created a permissive inference, telling the jury that they *could* find the aggravating circumstance satisfied by a finding that Marter was executed. In the absence of any language specifically linking the finding on execution to the finding on the aggravator, this Court does not believe that the instruction created any presumption at all. However, if a permissive presumption had been created, it only denied Jordan due process "if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." *Id*. at 314-15 (citing *Ulster County Court v. Allen*, 442 U.S. 140, 147-63 (1979). Reason and common sense would justify the conclusion that the murder was heinous, atrocious, and cruel if Marter was executed as she knelt before her killer. Thus, the guarantee of due process was not violated by this instruction, and the Mississippi Supreme Court's decision was neither contrary to, nor an unreasonable application of, clearly established federal law.

Jordan argues that Instructions 1 and 2 were vague and overbroad, both individually and in concert. He claims that the finding that Marter was killed execution style was at odds with the definition of "heinous, atrocious, and cruel," as "[a]n execution method of killing is the least likely method of killing to cause 'physical pain' and 'mental pain.'" He argues that the first paragraph of Instruction 2 is vague and overbroad within the interpretation given in *Shell v. Mississippi*, 498 U.S. 1 (1990), and that the second paragraph is infirm because it omitted reference to mutilation, dismemberment or a lingering or torturous death. Respondents argue that the instructions mirrored

language approved in earlier state court cases, as well as the recent case of *Bell v. Cone*, 543 U.S. 447 (2005).

The Mississippi Supreme Court also addressed the merits of this claim as an alternative holding, after finding that it had been defaulted. With respect to the claim of vagueness and overbreadth, the court stated:

> Instruction No. 1 does state that the jury could find that the crime was especially heinous because Edwina was murdered in execution style, but it goes on to say, "*and* that she was subjected to extreme mental torture caused by her abduction from the home wherein she was forced to abandon her unattended three year old child and removed to a wooded area at which time she was shot in the back of the head by Jordan." Today we will not decide whether a straightforward execution style killing, without more, constitutes "heinous atrocious or cruel," but we do find that the execution style killing, in addition to the circumstances listed above, did constitute "heinous, atrocious or cruel."
>
> We have approved of Instruction No. 2 as a proper limiting instruction concerning the "especially heinous" aggravator. *See, e.g., Edwards v. State*, 737 So. 2d 275, 315 (Miss. 1999); *Puckett v. State*, 737 So. 2d 322, 359-61 (Miss. 1999). Therefore, Jordan's claim is without merit.

786 So. 2d at 1004.

In *Shell v. Mississippi*, 498 U.S. 1, 2-3 (1990), the Supreme Court addressed an instruction containing only the language of the first paragraph of Instruction 2. The Court held that it was constitutionally deficient, noting that "the phrases "extremely wicked or shockingly evil" and "outrageously wicked and vile" could be used by "'[a] person of ordinary sensibility [to] fairly characterize almost *every* murder.'" *Id.* (quoting *Maynard v. Cartwright*, 486 U.S. 356, 363 (1988); *Godfrey v. Georgia*, 446 U.S. 420, 428-29 (1988). States using some form of this language in their statutory definition of aggravating circumstances continued to refine it. In *Walton v. Arizona*, 497 U.S. 639 (1990), the Court affirmed a death sentence in a state that permitted the imposition of the

death sentence by the trial judge, rather than by a jury.[9]  One of the statutory circumstances that could

be used as an aggravator was whether the offense was committed in a manner that was "heinous,

cruel, or depraved."   In affirming the sentence, the Court held that Arizona state courts had

sufficiently narrowed that language in their construction of the statute, and it was presumed that the

trial judge applied that construction.  *Id*. at 653.  It then set out the analysis to be performed by a

federal court reviewing the application of a statutory aggravating or mitigating circumstance:

> [I]t must first determine whether the statutory language defining the circumstance is
> itself too vague to provide any guidance to the sentencer.  If so, then the federal court
> must attempt to determine whether the state courts have further defined the vague
> terms, and if they have done so, whether those definitions are constitutionally
> sufficient, *i.e.*, whether they provide *some* guidance to the sentencer.  In this case
> there is no serious argument that Arizona's "especially heinous, cruel or depraved"
> aggravating factor is not facially vague.  But the Arizona Supreme Court has sought
> to give substance to the operative terms, and we find that its construction meets
> constitutional requirements.

*Id*. at 654.

In *Maynard*, the Court had suggested that it would approve a definition of the aggravator that

would limit it to murders involving torture or physical abuse.  486 U.S. at 364-65.  In *Walton*, the

Court approved the limiting definition used by the Arizona Supreme Court, which held that a murder

was especially cruel when accompanied by mental anguish, including the victim's uncertainty as to

his fate or physical abuse.  497 U.S. at 654.  It also approved the state court's construction of the term

"depraved," which was established when the murderer "relishes the murder, evidencing debasement

or perversion" or "shows an indifference to the suffering of the victim and evidences a sense of

pleasure in the killing."  *Id*. at 655.

---

[9]*Walton* was subsequently overruled by *Ring v. Arizona*, 536 U.S. 584 (2002), but only to
the extent that a jury must now find that aggravating factors exist.

In *Cone*, the Court considered a statutory aggravating circumstance permitting the death penalty if the murder "was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind."   543 U.S. at 448 n.1.  A limiting instruction given by the Tennessee court defined "heinous, atrocious or cruel" in the following manner: "'Heinous' means extremely wicked or shockingly evil.  'Atrocious' means outrageously wicked and vile.  'Cruel' means designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the suffering of others, pitiless." *Id*. at 452 n.4.

In *Cone*, the victims were an elderly couple who had been beaten to death in their home by the petitioner.  Blood was spattered throughout the house, and the victims' injuries indicated that they had tried to resist.  On direct appeal, the Tennessee Supreme Court had affirmed the finding that the crime was especially heinous, atrocious and cruel after reciting the facts of the case and concluding, "The deaths of the victims were not instantaneous, and obviously one had to be killed before the other.  The terror, fright and horror that these elderly helpless citizens must have endured was certainly something that the jury could have taken into account in finding this aggravating circumstance." *State v. Cone*, 665 S.W.2d 87, 95 (Tenn. 1984).

Cone petitioned for habeas relief, which was ultimately granted by the Sixth Circuit. *Cone v. Bell*, 359 F.3d 785 (6th Cir. 2004).  After reviewing the Supreme Court precedent discussed above, that court concluded that, while no case considered exactly the same language used in the Tennessee statute, similar instructions had been held to be unconstitutionally vague.  It then considered whether the Tennessee Supreme Court had "saved" the instruction by applying a narrowing construction to it. *Id*. at 796-97.  In an earlier case, the Tennessee court had applied language approved by the Supreme Court in *Proffitt v. Florida*, 428 U.S. 242, 255-56 (1976), to hold that the aggravator was

"directed at 'the conscienceless or pitiless crime which is unnecessarily torturous to the victim.'" *State v. Dicks*, 615 S.W.2d 126, 132 (1981) (quoting *State v. Dixon*, 283 So. 2d 1, 9 (Fla. 1973)). The Sixth Circuit recognized that the state court had explicitly reviewed the facts supporting the finding of that aggravator, but it had not specifically applied, or even mentioned, the *Dicks* decision. Thus, it held, no narrowing interpretation was applied to the unconstitutional instruction, and the state court's decision was therefore an unreasonable application of federal law. *Cone*, 359 F.3d at 797.

The Supreme Court reversed, holding, "Federal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation." *Cone*, 543 U.S. at 455 (citing *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003); *Early v. Packer*, 537 U.S. 3, 8 (2002)). Finding no express refusal to apply its limiting construction, particularly where the Tennessee court had earlier recognized that it was constitutionally compelled and regularly applied it, the Supreme Court presumed that the Tennessee court had applied it to Cone's case. The Court also reviewed the facts in the state court opinion and found them to be similar to facts recited in cases where the limiting construction had been expressly applied. *Id.* at 456. Reviewing the limiting construction applied by *Dicks* and other cases from the Tennessee Supreme Court, the Supreme Court held that, even if the statutory aggravating circumstance was facially vague, "[W]e are satisfied that the State's aggravating circumstance, as construed by the Tennessee Supreme Court, ensured that there was a 'principled basis' for distinguishing between those cases in which the death penalty was assessed and those cases in which it was not." *Cone*, 543 U.S. at 459 (citing *Arave v. Creech*, 507 U.S. 463, 474 (1993)).

Although the Supreme Court has not considered the exact language of Jordan's instruction, its clearly established precedent has generally held that states may present additional language to the

jury that defines the heinous, atrocious or cruel aggravating circumstance. Moreover, even if this instruction were facially overbroad, it could be saved by appropriate appellate review by the state court. *Cone*, 543 U.S. at 456; *Proffitt v. Florida*, 428 U.S. 242, 255 (1976). The Mississippi Supreme Court routinely reviews this aggravating circumstance to determine whether the facts of each case fit within its guidelines for determining whether the crime was heinous, atrocious or cruel. For example, a murder committed after a kidnaping, sexual assault and a rape also exhibited those qualities and justified the same finding. *Woodward v. State*, 726 So. 2d 524, 538-39 (Miss. 1997). The seriousness with which the court conducts that review was evidenced by its declaration that the aggravator was improperly found in a case where the victim was strangled, where there was "no evidence of any 'additional acts' to set the crime apart from the norm of capital felonies as conscienceless, pitiless or unnecessarily torturous." *Taylor v. State*, 672 So. 2d 1246, 1276 (Miss. 1996). On the other hand, the evidence was sufficient to support the aggravator where it showed that the victim was kidnaped from her home, forced to "walk to her impending doom on nerve damaged feet, all the while leaving her to ponder how, when, why and in what manner she would be executed," and, once arriving at the "chosen execution site," the defendant "ordered Mrs. Harris to kneel before him. He then stood a couple of feet away, and savagely fired four shots into her fragile body." *Underwood v. State*, 708 So. 2d 18, 39 (Miss. 1998).

The Mississippi Supreme Court has reviewed the revised instruction on numerous occasions, and it has never suggested that a bare finding of physical or mental pain would mandate a finding of that aggravating circumstance. Instead, the cases indicate that the state court considers the last sentence of that instruction as further refining and limiting the imposition of the death penalty to cases where there was "mental torture" or "barbarity." The state court's intention was made clear

in *Jenkins v. State*, 607 So. 2d 1171, 1181-82 (Miss. 1992), where the court re-affirmed its intention that the aggravating circumstance be applied to only a limited class of murders. There, the court analyzed an instruction similar to Jordan's Instruction 2 and found it to be proper. In specifically addressing the last sentence, the court noted that it was taken from *Pinkney v. State*, 538 So. 2d 329, 357 (Miss. 1988), *vacated on other grounds*, 494 U.S. 1075 (1990), where the court "expressed the desire to see that 'our capital sentencing juries . . . be more specifically instructed on the meaning of 'especially heinous, atrocious or cruel.'" *Jenkins*, 607 So. 2d at 1181 (quoting *Pinkney*, 538 So. 2d at 357). In *Conner v. State*, 632 So. 2d 1239, 1270-71(Miss. 1993), *overruled on other grounds by Weatherspoon v. State*, 732 So. 2d 158 (Miss. 1999), the court analyzed the instruction and held that, while the first sentence standing alone was unconstitutionally vague, "The second and third sentences, however, provide additional specificity and detail sufficient to meet the demands of the Eighth and Fourteenth Amendments to the United States Constitution." *Id*. at 1271; *see also Watts v. State*, 733 So. 2d 214, 238-39 (Miss. 1999).

Finally, Jordan claims that the instruction was faulty because it was not the complete instruction, patterned after the statute, that had been approved by the Mississippi Supreme Court. *King v. State*, 784 So. 2d 884, 891 (Miss. 2001). Thus, he argues that the omission of references to mutilation, dismemberment, or a lingering or torturous death "substantially watered down the State's burden and left the jury free to find this aggravating circumstance even in the absence of anything that would set this crime apart from other capital murders." This argument was raised by Jordan in his post-conviction brief, but it was not addressed by the state court.

Jordan is correct in asserting that *King* recommended use of an instruction it had approved in an earlier case, and that instruction would have included the language omitted at Jordan's trial.

*Id*. at 890-92. However, the court went on to state, "The definition which we have previously established as an acceptable instruction is certainly not the only acceptable instruction." *Id*. at 891. After remand, the Mississippi Supreme Court revisited King's conviction and sentence, noting that the sentencing instruction that had been used in the second trial still did not quote the approved instruction. *King v. State*, 960 So. 2d 413, 440-41 (Miss. 2007). Again cautioning courts "from giving different instructions other than the specific one that this Court has directed the court to use," the court found this instruction "conforms to the minimum standard" and further relief was unnecessary. *Id*.

*King* was the only authority cited in this part of Jordan's argument, If his contention is that the instruction was incomplete under state law, that is not a cognizable habeas claim. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). The question for this Court on habeas review is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). The language omitted from Jordan's instruction were merely two additional situations that would support a finding that the aggravator existed. All of those situations are listed in the disjunctive:

> If you find from the evidence beyond a reasonable doubt that the defendant utilized a method of killing *which caused serious mutilation, that there was dismemberment of the body prior to death*, that the defendant inflicted physical or mental pain before death, **or** *that a lingering of torturous death was suffered by the victim,* then you may find this aggravating circumstance.

It has long been the law that, where a statute is written in the disjunctive to include alternate acts that would amount to guilt, "it is enough to prove either." *Crain v. United States*, 162 U.S. 625, 624 (1896). Thus, an indictment may re-write such a statute to include all of the acts in the conjunctive, but the conviction will be valid on a showing of any one of them. *Griffin v. United*

*States*, 502 U.S. 46, 51 (1991) (citing *Crain*). Here, the problem is with the omission of two acts that would establish an aggravating circumstance. In the context of habeas review, this omission must be shown to have "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

Neither of the omitted acts would have been supported by the evidence, and it was not necessary to prove their existence to support a finding that the murder was especially heinous atrocious or cruel, where there was another act, supported by the evidence, that could sustain the jury's finding. *Cf. Schad v. Arizona*, 501 U.S. 624, 636 (1991) (holding that, where state provides alternative acts for committing an offense, federal courts "are not at liberty to ignore that determination and conclude that the alternatives are, in fact, independent elements under state law."); *see also Richardson v. United States*, 526 U.S. 813, 817 (1999) (explaining the difference between an "element" of a crime and an "underlying fact."). Jordan has not shown how he was prejudiced by their omission, so it cannot be said that the omission had a substantial effect on the jury's verdict. In fact, a more persuasive argument could have been made by that the *inclusion* of these acts would have been prejudicial. Mississippi trial judges are encouraged to tailor jury instructions to the facts of the case. *Mackbee v. State*, 575 So. 2d 16, 34 (Miss. 1990). Inclusion of terms like "torture" and "dismemberment" that were extraneous to the facts could have had a much worse effect on the jury than their omission had. For these reasons, the Court is of the opinion that Jordan has not shown a constitutional injury here that would justify habeas relief.

Jordan's arguments rely on his belief that an execution style murder could not be heinous, atrocious, or cruel because of its quickness. Clearly, the events that occurred prior to the murder support a finding that Jordan inflicted mental pain before death. The events that occurred after the

murder demonstrate that the crime was conscienceless and pitiless and inflicted with indifference to the suffering of others. Even if this Court agreed with Jordan's interpretation, it could not find that the state court's construction unreasonably applied clearly established federal law. Moreover, the instruction in question has been reviewed numerous times in state court, and a review of those cases shows that the Mississippi Supreme Court has applied a limiting construction of it that appropriately narrows the class of persons eligible for the death penalty under this aggravator. For these reasons, the language of the instructions, either singly or in combination, offers no basis for habeas relief. For the same reasons, Jordan's argument that the evidence was insufficient to support the jury's finding on this aggravator is likewise unpersuasive.

Finding no error in the instructions on the heinous, atrocious, or cruel aggravating circumstances, the Court cannot conclude that there was cumulative error that entitles Jordan to relief. *Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir. 2007). (Where individual allegations of error do not constitute error, there is nothing to "cumulate.'").

**Ground S:** **Petitioner was denied his right to the effective assistance of counsel guaranteed by the Sixth, Eighth, and Fourteenth Amendments due to trial counsel's failure to raise objections to instructions pertaining to the especially heinous, atrocious or cruel aggravator.**

This Court has found that the instructions given on the especially heinous, atrocious, or cruel aggravator were proper. That finding precludes a conclusion that trial counsel was ineffective for failing to object to them. *Paredes v. Quarterman*, 574 F.3d 281, 291 n.13 (5th Cir. 2009) (citing *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1993) ("An attorney's failure to raise a meritless argument . . . cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue.")

**Ground T:** **At the penalty phase, Petitioner was denied his rights guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution due to the trial court's instructions to the jurors that they were not to rely on sympathy; in the alternative, trial counsel were ineffective for not objecting to the trial court's mistaken and prejudicial statements concerning sympathy.**

Jordan claims that the trial court erred by giving Instruction No. C-1, in that it informed the jury, "You should not be influenced by bias, sympathy, or prejudice. Your verdict should be based on the evidence and not upon speculation, guesswork or conjecture." Jordan claims that, in preluding the jury from considering sympathy, the trial court violated his Eighth and Fourteenth Amendment rights to a have the use a "reasoned moral response" to determine the appropriate punishment.

Respondents first argue that the issue is barred from review because Jordan did not make a contemporaneous objection to the instruction at trial. The Mississippi Supreme Court agreed in Jordan's opinion on direct appeal; "[n]evertheless, we will address the merits of his claim." 786 So. 2d at 1024. As has been held earlier, this language does not suggest that the state court intends to rule on the merits of the claim, and the opinion provides clear evidence that the court was relying on the separate and independent state law that provides that the failure to make a contemporaneous objection to jury instructions waives the right to argue them on review. The state court's alternative ruling on the merits rejected Jordan's claim, which it noted was an issue earlier resolved in *Holland v. State*, 705 So. 2d 307, 351 (Miss. 1997). *Jordan*, 786 So. 2d at 1025. The court continued, "In *Holland*, we found that such an instruction does not mean that the jury should totally disregard sympathy and is, therefore, permissible." *Id.*

Jordan's argument heavily relies on the case of *Parks v. Brown*, 860 F.2d 1545, 1553-55 (10th Cir. 1988), which held that an "anti-sympathy" instruction violated the petitioner's right to individualized consideration of the mitigating circumstances. Citing several Supreme Court cases,

the Tenth Circuit determined that sympathy was a mitigating factor entitled to consideration. *Id.* at 1559. A year later, the same court set aside another death penalty for the same reason, relying on the earlier decision in *Parks*. *Davis v. Maynard*, 869 F.2d 1401, 1411-12 (10th Cir. 1989). Shortly thereafter, the Supreme Court reversed *Parks*, holding that its precedent did not dictate the result reached by the Tenth Circuit. *Saffle v. Parks*, 494 U.S. 484, 489-90 (1990). Thus, it held, the Tenth Circuit had created a new rule, which would not be applied retroactively to his case. *Id.* at 487-89, citing *Teague v. Lane*, 489 U.S. 288, 299-301 (1989). As the Court explained:

> The objectives of fairness and accuracy are more likely to be threatened than promoted by a rule allowing the sentence to turn not on whether the defendant, in the eyes of the community, is morally deserving of the death sentence, but on whether the defendant can strike an emotional chord in a juror.

*Saffle*, 494 U.S. at 495. Shortly after it decided *Saffle*, the Court also vacated the judgment in *Davis* and remanded it for further review in light of the *Saffle* decision. *Saffle v. Davis*, 494 U.S. 1050 (1990). The Mississippi Supreme Court's decision on this issue is fully in accord with *Saffle*.

Jordan has asked this Court, if it finds that this issue is barred for lack of a contemporaneous objection, to find that his attorney was ineffective in failing to properly raise it. As it has been established that the claim is meritless, and for the reasons earlier expressed, his attorney was not ineffective for failing to raise it. Jordan cannot receive habeas relief on this issue.

**Ground U: Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated when the trial court gave sentencing instruction No. 1; in the alternative, trial counsel was ineffective for not preserving issues relative to this instruction.**

Jordan has withdrawn this issue as grounds for relief.

**Ground V: The trial court erred by overruling in part Defendant's motion requesting that trial court question the potential jurors about whether (I) they would automatically vote for the death penalty; (ii) their feelings in support of the death penalty would prevent them from considering or substantially impair their ability to consider a life**

149

**sentence for defendant; and (iii) they deem any of the mitigating factors Defendant intends to prove irrelevant to their sentencing decision.**

Jordan complains that the trial court improperly restricted his counsel from adequately questioning potential jurors about whether:

> (1) they would automatically vote for the death penalty; (2) their feelings in support of the death penalty would prevent them from considering or substantially impair their ability to consider a life sentence for the defendant; and (3) they deem any of the mitigating factors defendant intended to prove irrelevant to their sentencing decision.

In so doing, Jordan contends, the trial court violated *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). Respondents maintain that the transcript of the voir dire shows that the trial court permitted all of the questioning that *Morgan* deemed necessary.

Prior to trial, Jordan filed a motion requesting that the court voir dire the jurors on the three issues listed above. The transcript shows that the judge and trial counsel discussed this motion during a pretrial hearing, in which the judge told the attorneys that he would follow the law as it existed at the time of trial, which would likely permit the first question. The court and counsel conferred on this matter again on the first day of voir dire, after the jury had been dismissed for the night. The judge informed the lawyers as follows, "Mr. Sumrall, the rule is, and, Mr. Owen, that you cannot ask a hypothetical question involving one of the aggravating, mitigating factors." He went on to note that the prohibition did not include "their philosophical views on the death penalty or life imprisonment. I'm saying on specific mitigating, mitigating factors that y'all anticipate that are going to be coming up." Defense counsel responded, "I don't plan to. No, sir."

Jordan argues that the trial court violated his constitutional rights by failing to permit defense counsel to voir dire the jury on the second and third issues in his motion. Specifically, he contends that *Morgan v. Illinois*, 504 U.S. 719, 728-29 (1992), mandates that he be allowed to ask those

questions. Respondents counter that *Morgan* is not as far-reaching as Jordan claims and that its dictates were followed in this matter. The Mississippi Supreme Court considered this issue on direct appeal and held:

> Jordan can show no prejudice from the trial judge's refusal to follow Jordan's proposed voir dire questions. He merely reworded the *Witt* [*Witt v. Wainwright*, 470 U.S. 1039 (1985)] question to follow the ruling in that case. As to the question whether the jury members would believe that his mitigating evidence was irrelevant, defense counsel may not use hypothetical questions to secure a commitment from the jurors concerning the verdict they will render. *Evans v. State*, 725 So. 2d at 650. Here, the trial judge cautioned defense counsel concerning *Evans*, but told defense counsel that he would not prohibit the asking of philosophical questions concerning their beliefs on the death penalty or life imprisonment. The trial judge's instructions and questions were within the confines of our precedent, and it cannot be said that he abused his discretion or prevented Jordan's counsel from fully inquiring into the potential jurors beliefs concerning the death penalty.

786 So. 2d at 1023.

In *Morgan*, all of the jurors were asked, "Would you automatically vote against the death penalty no matter what the facts of the case were." 504 U.S. at 723. However, the trial court refused to permit defense counsel to ask jurors, "If you found Derrick Morgan guilty, would you automatically vote to impose the death penalty no matter what the facts are?" The trial court's refusal was based on the belief that the substance of the question had already been asked. *Id*. Later, the jurors were asked whether they could be fair and impartial and whether they could follow the court's instructions.

The Supreme Court held that it was error not to permit the questioning sought by the defendant, holding that its prior cases established "that a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause." *Id*. at 728. Conversely, "[a] juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as

151

the instructions require him to do." *Id.* Such a juror is likewise not fair and impartial and should be removed. The fact that the jurors had responded affirmatively to questions about their fairness made no difference. *Id.* at 730-35. The Court went on to note, "Any juror to whom mitigating factors are likewise irrelevant should be disqualified for cause, for that juror has formed an opinion concerning the merits of the case without basis in the evidence developed at trial." *Id.* at 739.

The Fifth Circuit has held, "*Morgan* only 'involves the narrow question of whether, in a capital case, jurors must be asked whether they would automatically impose the death penalty upon conviction of the defendant." *Trevino v. Johnson*, 168 F.3d 173, 183 (5th Cir. 1999) (quoting *United States v. Greer*, 968 F.2d 433, 437 n.7 (5th Cir. 1992)). Thus, *Morgan* should not be extended to require habeas review of a claim that a defendant was prohibited to ask whether jurors would consider specific mitigating factors, such as, in Trevino's case, youth. *Id.* The Fifth Circuit has demonstrated no intent to change that position. *See Crawford v. Epps*, 353 F. App'x. 977, 985 (5th Cir. 2009).

The United States Supreme Court has not directly ruled that a defendant should be permitted to ask jurors whether their feelings about the death penalty would prevent or substantially impair the consideration of a life sentence or whether they deemed Jordan's mitigation factors to be irrelevant. *Morgan* does not extend to those issues. Fifth Circuit precedent does not construe any other Supreme Court cases as necessarily applicable to that issue. There being no clearly established federal law on this subject, the Mississippi Supreme Court's decision cannot have offended § 2254, and Jordan cannot obtain habeas relief on this issue.

<u>**Ground W**</u>: **Petitioner is entitled to habeas corpus relief due to the cumulative effect of the errors at his resentencing trial.**

This claim was raised on direct appeal, where it was denied by the Mississippi Supreme Court, which held, "Since we did not find reversible error in any of Jordan's issues, this claim is without merit." 786 So. 2d at 987. The claim was raised again in Jordan's post-conviction petition, where the court discussed the claim at greater length:

> Where there are no individual errors, there can be no cumulative error. *Foster v. State*, 639 So. 2d 1263, 1303 (Miss. 1994). This Court has previously recognized that "[w]here there is no reversible error in any part, . . . . there is no reversible error to the whole." *Doss v. State*, 709 So. 2d 369, 401 (Miss. 1996) (quoting *McFee v. State*, 511 So. 2d 130, 136 (Miss. 1987)). This Court has further noted, "A criminal defendant is not entitled to a perfect trial, only a fair trial." *McGilberry v. State*, 741 So. 2d 894, 924 (Miss. 1999), citing *Sand v. State*, 467 So. 2d 907, 911 (Miss. 1985). The record indicates that Jordan received a fair trial. This issue is without merit.

912 So. 2d at 823.

Jordan cannot show that these decisions were contrary to, or an unreasonable application of, clearly establish federal law set forth by the United States Supreme Court. There is no Supreme Court case on this issue, although the Court has been called upon in other cases to set a standard for cumulative error review. The Fifth Circuit in *Derden v. McNeel*, 978 F.2d 1453 (5th Cir. 1992) (en banc), *cert. denied,* 508 U.S. 960 (1993), adopted a rigorous standard for cumulative error analysis: "[W]e now hold that federal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors "so infected the entire trial that the resulting conviction violates due process."978 F.2d at 1456 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). *Derden* continues to be followed in the Fifth Circuit. *See, e.g., Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir. 2007). (Repeating the language from *Derden* quoted above and stating, "As is apparent from this standard and as this court has stated explicitly, where individual allegations of error are not of constitutional

stature or are not errors, there is 'nothing to cumulate.'").  Because this Court has found no error of constitutional dimension in this matter, there is nothing for Jordan to "cumulate."  Therefore, he is not entitled to habeas relief on grounds of cumulative error.


## CONCLUSION

Having reviewed each of Jordan's claims for habeas corpus relief under the deferential standard of review required by 28 U.S.C. §2254(d), it appears that none possesses sufficient merit to warrant issuance of the writ.  The Court finds no part of the Mississippi Supreme Court's opinions to be contrary to, or an unreasonable application of, clearly established federal law or an unreasonable determination of the facts in light of the evidence presented.  It is the Court's opinion that Richard Jordan is not entitled to habeas corpus relief under 28 U.S.C. § 2254.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that Richard Jordan's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 is hereby **DENIED**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that this action is hereby **dismissed with prejudice**.  A separate final judgment dismissing this action with prejudice shall be entered in


accordance with Fed. R. Civ. P. 58.

**SO ORDERED** on this, the 30th day of August, 2010.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE